1                   UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3    ----------------------------------)
                                       )
4                                      )
     UNITED STATES OF AMERICA,         )
5                    Plaintiff,        ) No. 10-10124 9th Circuit
                                       )
6            vs.                       ) No. CR 09-0918 TUC-CKJ
                                       )
7    ROBERT LEROY STODDARD, JR.,       )      Tucson, Arizona
                     Defendant.        )      December 4, 2009
8                                      )
                                       )
9    ----------------------------------)

10

11                  TRANSCRIPT OF BENCH TRIAL

12

13           BEFORE THE HONORABLE CINDY K. JORGENSON
                 UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16

17   For the Plaintiff:   By:   Ann DeMarais
                                U.S. Attorney's Office
18                              405 W. Congress St., Suite 4800
                                Tucson, AZ   85701
19
     For the Defendant:   By:   Robert L. Stoddard, Jr., pro so
20                              Nathan Leonardo (Advisory Counsel)
                                2 E. Congress, Suite 900
21                              Tucson, AZ   85701

22
     Mary A. Riley, RMR, FCRR
23   United States Court Reporter
     U.S. District Court
24   405 W. Congress St.
     Tucson, AZ   85750

25
             Proceedings produced by computer-aided transcription

```
 1                      INDEX OF WITNESSES

 2

 3    CHRISTOPHER GEORGE HOZEY

 4    Direct Examination by Ms. DeMarais          Page  11

 5    Cross-Examination by Mr. Stoddard           Page  28

 6    Redirect Examination by Ms. DeMarais        Page  49

 7     (Recalled by government in rebuttal)

 8    Direct Examination by Ms. DeMarais          Page 118

 9    Cross-Examination by Mr. Stoddard           Page 126

10

11

12    CHRISTOPHER MICHAEL SMITH

13    Direct Examination by Ms. DeMarais          Page  56

14    Cross-Examination by Mr. Stoddard           Page  62

15    Redirect Examination by Ms. DeMarais        Page  69

16

17

18    ROBERT LEROY STODDARD, JR.

19    Direct Examination by Mr. Stoddard          Page  75

20    Cross-Examination by Ms DeMarais            Page  83

21    Redirect Examination by Mr. Stoddard        Page  95, 112

22    Recross Examination by Ms. DeMarais         Page 114

23

24

25
```

```
1   NICHOLAS REGAN

2   Direct Examination by Mr. Stoddard          Page   98

3   Cross-Examination by Ms. DeMarais           Page  104

4   Redirect Examination by Mr. Stoddard        Page  109

5

6   FREDERICK TRAINER

7   Direct Examination by Ms. DeMarais          Page  132

8   Cross-Examination by Mr. Stoddard           Page  140

9   Redirect Examination by Ms. DeMarais        Page  164

10

11                    INDEX OF EXHIBITS

12  Exhibit Number  1                           Page   21

13  Exhibit Number  2                           Page   21

14  Exhibit Number  3                           Page   21

15  Exhibit Number  4                           Page   21

16  Exhibit Number  5                           Page   51

17  Exhibit Number  7                           Page  134

18  Exhibit Number 12                           Page  154

19

20

21

22

23

24

25
```

1                                  **TRANSCRIPT OF PROCEEDINGS**

2    (10:13 a.m.)

3              MS. DEMARAIS:  Good morning.  Ann DeMarais for the

4    government.

5              THE COURT:  Good morning.

6              MR. STODDARD:  Robert Leroy Stoddard.

7              THE COURT:  All right, and Mr. Stoddard's representing

8    himself.

9              And go ahead, Mr. Leonardo.

10              MR. LEONARDO:  Nathan Leonardo appearing as advisory

11    counsel.

12              THE COURT:  Good morning.

13              And this is the time set for trial.  I do have the

14    indictment, which has obviously been filed by the government, the

15    government's witness list, and -- let's see, so we have --

16    opening remarks will be the first thing that we'll do.

17              So Ms. DeMarais, would you like to make your opening

18    statement to the Court?

19              MS. DEMARAIS:  Actually, your Honor, there are some

20    pretrial matters.

21              THE COURT:  Oh, all right.  Go ahead.

22              And Mr. Stoddard, Ms. DeMarais will be approaching the

23    podium at times.  I'm just going to have you seated at counsel

24    table so that you can consult with Mr. Leonardo.  Just make sure

25    you speak into that microphone for me.

1            All right.  Go ahead, Ms. DeMarais.

2            MS. DEMARAIS:  Your Honor, when we were here the last

3   time, there was discussion of this 24 hour video of -- of the

4   range on October 21st, '09.  I have provided that video.

5   Officer -- the defendant was claiming that Officer Hozey was on

6   the range when he wasn't supposed to be, and in fact he was

7   assigned there that day and he'll testify that he was there that

8   day.  And so I think we will stipulate with regard to that, and I

9   will elicit testimony regarding October 21st, 2009, that he was

10  on the range that day as the defendant said he was.

11            THE COURT:  How is that relevant to the -- well, this

12  is an incident that occurred on January 9th?

13            MS. DEMARAIS:  Judge, I don't feel it is relevant.  I

14  made that objection before, it's not relevant that he was there.

15  I don't think -- but if the defendant feels it is relevant, like

16  I said, he was there, so --

17            THE COURT:  All right.

18            MS. DEMARAIS:  And then the second -- the second thing

19  we can, I guess, take care of at the end of the day -- at the end

20  of the morning, but your Honor, when we were here last time I was

21  given two additional witnesses, and per disclosure agreement

22  we're supposed to have the 14 days, and we're supposed to have a

23  detailed summary.

24            All I'm requesting, your Honor, is that the

25  defendant do provide a proffer as to what these two witnesses are

```
 1    going to say.  I have no idea what they're going to say.  And
 2    then I would like to make a motion in limine, or an objection to
 3    their testimony, if appropriate.
 4              And that's all I have.
 5              THE COURT:  All right.  Thank you, Ms. DeMarais.
 6              Mr. Stoddard, the government did file a notice of its
 7    witnesses on November 23rd.  You have not filed anything in
 8    writing yet as to who your witnesses are, which you should have
 9    done.
10              So can you tell me the names of each of your witnesses,
11    and what the proposed testimony would be?
12              MR. STODDARD:  The first witness is going to be --
13              THE COURT:  Pull that microphone right over to you.
14              Okay, the first witness is who?
15              MR. STODDARD:  The first witness is going to be
16    Nicholas Regan.  And what he's going to testify to is on October
17    the 21st, Officer Hozey came on the range, and he made
18    threatening remarks towards me.  I brought these concerns to the
19    lieutenant who was making his round in his SHU, and I'm asking
20    him could he go get the captain so that I can address this issue
21    with him that took place.
22              Officer -- another inmate by the name of Brian Cash is
23    going to be able to attest to the same thing.
24              THE COURT:  All right.  So this relates to the
25    October 21st, '09 -- is this all on the videotape, or --
```

1          MR. STODDARD:  Yes, ma'am.  It's on the video, but it's

2    more so the type of video that monitors the hallway.  It has no

3    audio to the video.  All it will show is Officer Hozey coming on

4    the range when he was told numerous times, from my understanding

5    from speaking with certain supervisors, that he was allowed to

6    work in his SHU, however he was not supposed to come on the

7    range.  And I couldn't get none of that in writing, but he --

8    from my understanding, he's been told he's allowed to work in the

9    SHU, but he's not supposed to come on the range because of our

10   situation.

11          THE COURT:  So this is Nicholas Regan and Brian Cash?

12          MR. STODDARD:  Yes ma'am.

13          THE COURT:  All right.  So why do you think this is

14   relevant to this trial, which involves an incident that occurred

15   on January 9th of 2009?

16          MR. STODDARD:  Well, this -- from my understanding,

17   this is the second time -- when he came on -- when he came on the

18   range, I said, "Man, you know you're not supposed to be working

19   here."  He used a -- he told me, F me.  I told him F you.  And

20   as -- this was all taking place as he's walking down the range.

21   And he stated to me, you know, out loud, "I have five cans of

22   chew to anyone who would F inmate Stoddard up during rec."  Now,

23   a can of chew in jail can make you as much as $600.  So from a

24   standpoint of being in jail when you not allowed to have tobacco

25   products in jail, he's basically offering up $3,000 to an inmate

1    who would physically do bodily harm to me at recreation.

2              THE COURT:  All right.

3              So Ms. DeMarais, do you have any additional pretrial

4    issues that you'd like to raise at this time?

5              MS. DEMARAIS:  Yes, your Honor.

6              From my understanding that -- what he is saying is that

7    on October 21st, 2009, that Officer Hozey was on the range, and

8    he was.  And I have provided the duty roster, or his assignments

9    that he was assigned that in overtime.  So he was there.

10             THE COURT:  What is the range?

11             MS. DEMARAIS:  The range is the section --

12             THE COURT:  I guess I'll find out more about that

13   during the trial.

14             MS. DEMARAIS:  It's just an area.

15             THE COURT:  An area.  Okay.

16             MS. DEMARAIS:  It's like an area.  So the area where

17   the defendant's housed, I guess.

18             And anyway, so we'll stipulate that, yes, he was there.

19   And the video would not show any kind of -- I mean, would not

20   have any audio regarding threats made, and of course, the

21   government disputes that.  But your Honor, this is months later.

22   Even if it were true, this is not relevant to the spitting at

23   all.  It does not go to his truthfulness, or untruthfulness, and

24   it's irrelevant.

25             And I think it's -- in addition, it's extrinsic type of

1    evidence calling additional witnesses for a subsequent act, and

2    the government would move for a motion -- a motion in limine to

3    exclude that evidence, both -- of both witnesses.

4            THE COURT:  All right.  Well, let me go ahead and hear

5    the government's case first.  I'll take your motion under

6    advisement.  Let me just hear the government's case, and then

7    I'll decide whether or not this additional -- these witnesses on

8    behalf of the defense would be relevant in this bench trial.  So

9    I'll take your motion in limine under advisement.

10           And so Ms. DeMarais, would you like to make any opening

11   remarks to the Court?

12           MS. DEMARAIS:  No, your Honor.

13           And I would invoke the rule as well.  I'm going to have

14   two witnesses, and I'll invoke the rule.

15           THE COURT:  All right.

16           Mr. Stoddard, is there any opening statement that you

17   would like to make on your own behalf?

18           MR. STODDARD:  No, ma'am.

19           THE COURT:  All right.

20           So the government -- why don't we go ahead and have all

21   of your witnesses come up to the clerk, be sworn in as witnesses,

22   then we'll have your first witness remain and the second witness

23   can step out.

24           Gentlemen, if you could come forward to the clerk, the

25   lady right in front of me, just -- you can walk right up here,

1   and give her your full names, and she will swear you both in as

2   witnesses.  Then I'll have the first witness stay here, and the

3   second one, we'll have you step out.

4           (Christopher George Hozey, and Christopher Michael

5   Smith were duly sworn by the clerk.)

6           THE COURT:  All right.  And gentlemen, let me just tell

7   you a couple of things about witnesses that apply whenever the

8   rule's invoked by either side, is you're not to talk to each

9   other about the case until the case is concluded.  However, you

10  are free to talk to Ms. DeMarais about the case.

11          Further -- well, I think, Ms. DeMarais, the victim

12  under the victim's rights statutes can remain throughout the

13  proceedings, does not need to be excluded, am I right?

14          MS. DEMARAIS:  Yes, your Honor.

15          THE COURT:  If he would like to remain.

16          So Mr. Hozey, if you'd like to remain throughout the

17  trial after you testify, you certainly can.

18          Mr. Smith, you'll need to step outside until we have

19  you actually testify.

20          So are you calling Mr. Hozey first?

21          MS. DEMARAIS:  Yes.

22          THE COURT:  All right.

23          So Mr. Hozey, if you could come on up to the witness

24  stand.

25          And Mr. Smith, if you could have a seat outside, we'll

 1    let you know when we need you to testify.

 2              And Mr. Hozey, if you could just be sure to speak into

 3    that microphone for us.  It is a flexible microphone.

 4              And Ms. DeMarais, you may proceed.

 5              MS. DEMARAIS:  Thank you.

 6                         CHRISTOPHER GEORGE HOZEY

 7                          DIRECT EXAMINATION

 8    BY MS. DEMARAIS:

 9    Q    Please introduce yourself to the judge, and spell your last

10         name.

11    A    Ma'am, my name is Christopher George Hozey.  Last name

12         spelling is H-O-Z-E-Y.

13    Q    And who do you work for?

14    A    The Federal Bureau of Prisons.

15    Q    And where do you work?

16    A    The assignment changes based on the quarter, but I'm

17         assigned as a correctional officer in the institution.

18    Q    And which institution is that?

19    A    Federal Correctional Complex, Tucson, Arizona.

20    Q    How long have you been with corrections?

21    A    It will be three years in February.

22    Q    On January 9th, 2009, were you working?

23    A    Yes, I was.

24    Q    And is that at the same FCC in Tucson, Arizona?

25    A    Yes.

| | | |
|---|---|---|
| 1 | Q | On that date did you come in contact with anybody that's in |
| 2 | | this courtroom? |
| 3 | A | Yes, it's Robert Stoddard, sitting right there. |
| 4 | Q | And could you please describe what he's wearing? |
| 5 | A | At the moment? |
| 6 | Q | Yeah. |
| 7 | A | Khaki issued uniform from the institution. |
| 8 | | MS. DEMARAIS:  Let the record reflect that the witness |
| 9 | | has identified the defendant. |
| 10 | | THE COURT:  Yes, the record may so reflect. |
| 11 | | BY MS. DEMARAIS: |
| 12 | Q | What happened that day that you came in contact with the |
| 13 | | defendant? |
| 14 | A | He had spit on me. |
| 15 | Q | Okay.  Do you remember about what time you showed up for |
| 16 | | your shift that day? |
| 17 | A | I was assigned the evening watch.  I was there approximately |
| 18 | | 4:00 -- 4:00 p.m. |
| 19 | Q | All right.  And do you punch a clock or anything when you |
| 20 | | come in? |
| 21 | A | No, you just check in with you shift lieutenant, and then |
| 22 | | you go to your assignment. |
| 23 | Q | So you checked in around 4:00 p.m.? |
| 24 | A | Actually, it was probably a little earlier than that.  I'm |
| 25 | | usually 20 minutes earlier or so. |

1   Q    And what type of uniform do you wear?

2   A    The uniform you see me wearing now, or different variation

3        with -- it's just a blue shirt instead of a white.

4   Q    On January 9th, 2009, when did you first come in contact

5        with the defendant?

6   A    As I walked into the special housing unit he was being held

7        in the holding cell.

8   Q    And tell the judge what kind of contact you had when he was

9        in the holding cell?

10  A    Minimal contact at that point.  I asked why he was in there.

11       He smiled.  I can't exactly recall any remark he made at

12       that point, but I went into the officer station and asked

13       why he was in there, and I guess the day watch shift

14       said that he was having issues on the day watch.

15  Q    Okay.  And tell the judge what this holding cell -- I mean,

16       what is a holding cell?

17  A    The holding cell in the special housing unit is used -- they

18       place an inmate in there when he's causing trouble on his

19       range, or the cell he's residing in.  So like I said --

20           THE COURT:  What is -- could you clarify what the range

21  is?

22  BY MS. DEMARAIS:

23  Q    Yeah, what is -- tell her what the range is.

24           What does that mean?

25  A    The range -- in special housing, we refer to it as a range,

|    |   |                                                                              |
|----|---|------------------------------------------------------------------------------|
| 1  |   | or a run.  There's six different -- how can I describe it?                    |
| 2  |   | Six different rows, I guess you could call them.  There's a                   |
| 3  |   | secure grill door on the front of the range, and you walk                    |
| 4  |   | down -- it's like a column, and there's cells on the left                     |
| 5  |   | and right of the column and a row.  So there's six of those.                  |
| 6  |   | And then the special housing, that's where they reside.                       |
| 7  | Q | And when you say special, what makes -- is special housing,                   |
| 8  |   | that area in those ranges, different from the rest of the                     |
| 9  |   | prison?                                                                       |
| 10 | A | Yes, it's different from the rest of the general population.                  |
| 11 |   | Special housing is used to place inmates that are already                     |
| 12 |   | incarcerated in jail.  It's like a jail within a jail.  If                    |
| 13 |   | they can't behave on the general population compound, they                    |
| 14 |   | go to special housing unit.                                                   |
| 15 | Q | Okay, and how is that area different than where the other                     |
| 16 |   | people are housed?                                                            |
| 17 | A | The inmates are placed in their cells 23 hours a day.                         |
| 18 |   | They're afforded one hour of recreation per day, five days a                  |
| 19 |   | week.  They're fed in their cells.  They don't go to the                      |
| 20 |   | chow hall.  It's, I guess, the Bureau's way of controlling                    |
| 21 |   | the inmate because he can't reside on the general compound.                   |
| 22 | Q | Okay.  So the general compound people are basically just                      |
| 23 |   | milling about?                                                                |
| 24 | A | They have controlled movement.                                               |
| 25 | Q | They're not, like, in their cell, and --                                      |

| | | |
|---|---|---|
| 1 | A | No, they're afforded to go on controlled movements, to |
| 2 | | recreation, education.  They can go to the yard where they |
| 3 | | play soccer. |
| 4 | Q | Okay.  And so this special housing unit, the ranges are -- |
| 5 | | is it fair to say like a hallway? |
| 6 | A | Yes. |
| 7 | Q | This is one hallway -- okay. |
| 8 | A | Yes. |
| 9 | Q | And how many ranges are there? |
| 10 | A | There are six. |
| 11 | Q | Six ranges.  Okay.  Six hallways. |
| 12 | | Okay, and you were saying that he was in a holding |
| 13 | | cell.  After you had this initial conversation with him, did |
| 14 | | you come in contact with him later in your shift? |
| 15 | A | Yes, I did. |
| 16 | Q | And when was that? |
| 17 | A | It was after I was done feeding my ranges that I was |
| 18 | | assigned -- or my hallways, I was -- he asked if I had any |
| 19 | | mail for him, and I told him that, yes, I did.  The |
| 20 | | conversation proceeded.  He asked me to give him his mail. |
| 21 | | I told him I would give him his mail once he went back to |
| 22 | | his assigned cell, because I didn't know if he was in there |
| 23 | | for -- if he was causing problems, or issues.  So I tried to |
| 24 | | use the mail as a tool to coerce him back into his cell, and |
| 25 | | not cause any further problems. |

1    Q    Let me interrupt you.  So the holding cell is -- like,

2         people don't stay there?

3    A    No.  They're not housed in the holding cell.  It's just a

4         place that you will put an inmate, like I said that's

5         causing issues, or he's being held to see a lieutenant.

6         It's a temporary assigned cell with nothing in it.  There's

7         three walls, and a grill -- grill door.

8    Q    Is there even a bathroom?

9    A    No.

10   Q    So it's just a -- okay.  So you said you can get your letter

11        when you go back to your cell --

12   A    Yes.

13   Q    -- when we take you back?

14            What happened then?

15   A    He proceeded to tell me how I better not mess with his mail,

16        that mail's important to inmates.  I told him I understood

17        all of that.  And then that was about the last of that

18        conversation, I mean, and then --

19   Q    Let me -- when you're talking, now, you're acting like,

20        yeah, this happened.  Was this, like, contentious?  Was he

21        yelling at you, you --

22   A    No, there was no --

23   Q    At that point?

24   A    No, there was nothing at that point.

25   Q    What happens after that incident?

1    A    I continued on with the rest of my shift, passed out

2         supplies pretty much up until 9:00 p.m., and then we went to

3         go put inmate Stoddard back in his assigned cell.  When I

4         say we, referring to the special housing unit officers that

5         were assigned there that night.  So we went down to the

6         holding cell from the officer station, which is located

7         directly in front of the holding cell, and as we went down

8         there he had submitted to restraints to go back to his

9         assigned cell, because in special housing the inmate when

10        they're escorted have to be restrained.  He asked if I had

11        his letter.  I didn't have the letter at the moment.  I told

12        him I'd go get it, because I had placed it in the officer's

13        station earlier when we had the conversation.  I went and

14        retrieved his letter, walked down the stairs, went to hand

15        it to him.  He got pretty belligerent, started yelling at me

16        because he noticed that the tape was broken on the letter,

17        so he just assumed that I had read his letter.  When we

18        receive the letter in the prison, inmates' letters, it comes

19        from the mail room.  So the mail is inspected.  If it's not

20        legal mail, we can read it.  But I put the letter in the

21        officer station, retrieved the letter, as I said, went to

22        give it to inmate Stoddard.  He accused me of reading his

23        letter.  I tried to explain to him that I didn't read his

24        letter.  He got --

25   Q    Let me stop you real quick, because you said a lot.  So at

| 1  |   | that -- around 9:00 p.m. that's when -- who decides that, |
|----|---|---|
| 2  |   | okay, now take him back to his cell?  How -- |
| 3  | A | It was the SHU OIC. |
| 4  | Q | Okay. |
| 5  | A | OIC is officer in charge, the SHU number 1. |
| 6  | Q | Okay.  And so that person decides, okay, you can take him |
| 7  |   | back to then cell now? |
| 8  | A | They have to be placed in their cells before the 10:00 p.m. |
| 9  |   | count.  You can't count the inmates when they're not in |
| 10 |   | their cells. |
| 11 | Q | So he has to go back? |
| 12 | A | Yes. |
| 13 | Q | Okay.  In order to -- and then you told the judge that he |
| 14 |   | submitted to restraints, or something like that.  What do |
| 15 |   | you mean? |
| 16 | A | Originally, when we went to place him back in his cell he |
| 17 |   | complied and he submitted to hand restraints.  What that |
| 18 |   | means is he turned around, put his hands up to the food tray |
| 19 |   | slot, and we put hand restraints on him to take him back. |
| 20 | Q | Handcuffs? |
| 21 | A | Yes, handcuffs. |
| 22 | Q | Okay.  So he submitted to that.  And then -- then you were |
| 23 |   | talking about his mail.  You were saying that if it's not |
| 24 |   | legal mail, that it's opened and read?  It's inspected? |
| 25 | A | Yes. |

1   Q   Okay.  So that has nothing to do with you?

2   A   No.

3   Q   Okay.  And when you're having this discussion about the

4       mail, are you the only person there, or is everybody there

5       because he's supposed to be going back to his cell, or

6       what's going on?

7   A   No, there was other officers there.  As far as -- the

8       conversation didn't last long.  He got upset, said, "You

9       might as well put me back in the holding tank, because I'm

10      going to do what I'm going to do."  So we did place him back

11      in the holding tank, because we didn't want any further

12      issues, and at that point we went back into the officer

13      station and called the operations lieutenant to see what he

14      wanted us to do.

15  Q   And the decision was made to do what?

16  A   Well, the operations -- after we called him, said to go

17      ahead and take inmate Stoddard back to his cell, that he was

18      on his way to special housing unit.

19  Q   Okay, then did he comply again?  Do you handcuff again, or

20      how does that work?

21  A   No, that was -- after we got our orders from the lieutenant,

22      we went down the stairs of the officer station, and that's

23      when he spit on me.

24  Q   Okay.  And before he spit on you, did he say anything?

25  A   No.  It happened very quickly.  I was going down the stairs.

```
1          I think there was two officers in front of me.  By the time
2          they said watch out, or look out, the spit was already in
3          the air.
4               THE COURT:  What -- I'm -- I'm not following this.  So
5   at this point could you clarify, was Mr. Stoddard removed from
6   his holding cell?
7               THE WITNESS:  No, ma'am.  He was still inside the cell.
8               THE COURT:  So you were on the stairs and he spit from
9   --
10              THE WITNESS:  There's a -- there's a food tray slot.
11              MS. DEMARAIS:  I'll get the pictures, Judge.
12              THE COURT:  Okay.  Never mind.
13              Go ahead.
14  BY MS. DEMARAIS:
15  Q    We'll stop -- we'll get back to the spitting stuff, but I'm
16       going to show you what's been marked -- actually, you've
17       seen what's been marked for identification as Exhibits 1
18       through 4, haven't you?
19  A    Yes.
20  Q    And do those -- and what were those that I showed you?
21  A    They were pictures of the holding cell that inmate Stoddard
22       was in that night.
23  Q    And do they fairly and accurately depict what that area and
24       the cell looked like on January 9th, 2009?
25  A    Yes.
```

1               MS. DEMARAIS:  I move to admit Exhibit 1 through 4.

2               THE COURT:  Mr. Stoddard, any objection to the

3  admission of Exhibits 1 through 4?

4               MR. STODDARD:  No, ma'am.

5               THE COURT:  All right, Exhibits 1 through 4 are

6  admitted into evidence.

7  BY MS. DEMARAIS:

8  Q   So this is Exhibit 1.  Tell the judge what she's looking at.

9  A   Ma'am, that's the holding cell that inmate Stoddard was in,

10     and the stairways leading down to it.  At the top of the

11     stairways that's where the officer station is located.

12  Q   And so you told the judge you were all -- you were all

13     walking down the stairs from your -- from the office up

14     there?

15  A   Yes.

16  Q   Okay.  And you said there are a couple of people ahead of

17     you?

18  A   Two.

19  Q   Okay.  And Stoddard was in this -- in the cell?

20  A   Yes, ma'am.

21  Q   Okay.  I'm going to show you Exhibit 2.  Tell the judge what

22     she's looking at now.

23  A   That's the grill door to the holding cell with the -- the

24     food tray slot.

25  Q   Okay, and -- I mean, I think you can kind of tell.  Is there

| | | |
|---|---|---|
| 1 | | plexiglass behind the bars there? |
| 2 | A | Yes, there is. |
| 3 | Q | And so is the only opening that food slot? |
| 4 | A | No, there's no plexiglass behind where the foot slot is |
| 5 | | located. |
| 6 | Q | I'm sorry.  That question was poor. |
| 7 | | So the only, like, open place is the food slot? |
| 8 | A | Yes. |
| 9 | Q | And that's how -- and at that time on January 9th, 2009, |
| 10 | | there was no cover for that or anything, it was open like |
| 11 | | that? |
| 12 | A | Yes. |
| 13 | Q | Exhibit 3, what the judge is looking at now? |
| 14 | A | That's the food tray slot. |
| 15 | Q | Okay.  And lastly, if you could explain to her what Exhibit |
| 16 | | 4 is? |
| 17 | A | Exhibit 4 is a picture of the hallway where the holding |
| 18 | | cell's located.  To the left behind the fire extinguisher |
| 19 | | you can see the handrails for the stairwell that goes up to |
| 20 | | the officer's station, and directly across from that is the |
| 21 | | holding cell that inmate Stoddard was in that night. |
| 22 | Q | So in Exhibit 4 when you see that little handrail, that is |
| 23 | | the same staircase that you see in Exhibit 1? |
| 24 | A | Yes, it is. |
| 25 | Q | Correct? |

1    A    Yes.

2    Q    Okay.  So you're all -- you were telling us that you're all

3         walking down to remove him from his cell, and somebody says

4         watch out?

5    A    Yes.

6    Q    And you said it happened quickly, but what happened, if you

7         could -- exactly during that time?

8    A    Inmate Stoddard was crouched down so his face was in the

9         food slot, and he spit through the food slot, and it hit me

10        in the face and the upper chest area.

11   Q    I hate to ask you to describe the spit, but can you give us

12        any kind of an idea what the consistency was, how much it

13        was?

14   A    It was more -- more of a spray than, I guess, mucous.  More

15        saliva.  But it was more of a spray through the air than,

16        like, a direct shot.

17   Q    Can you show the judge on your face where it hit you, and

18        the chest?

19   A    It was mostly the right side of my face here, and upper

20        chest area.

21   Q    And -- and I guess these might sound like dumb questions,

22        but what was the sensation when it hit you?

23   A    Wet.

24   Q    Wet?

25   A    Yes.

| | |
|---|---|
| 1 | Q   And I think you already told us that he didn't say anything |
| 2 | before.  Did he say anything after? |
| 3 | A   After he spit on me? |
| 4 | Q   Yeah. |
| 5 | A   Yeah, he said that he spit on me because I read his mail.  I |
| 6 | mean, that was the only reason, I guess, he gave for |
| 7 | spitting.  He said he held me responsible for his mail, |
| 8 | because I was the range officer that night. |
| 9 | Q   Did he say anything else to you?  Make any other remarks to |
| 10 | you? |
| 11 | A   Immediately after he spit on me the SHU officers that were |
| 12 | in there, they went in and placed him in ambulatory |
| 13 | restraints.  And as they were doing so, he started becoming |
| 14 | combative and belligerent. |
| 15 | MR. STODDARD:  Object to relevance, your Honor. |
| 16 | THE COURT:  No, overruled, completes the -- the story. |
| 17 | So you my continue. |
| 18 | Go ahead. |
| 19 | A   Yes.  After he spit on me, the SHU officers went into the |
| 20 | cell.  I was also in the cell.  He started making remarks as |
| 21 | they were putting the ambulatory restraints on him to |
| 22 | control him better than just the hand restraints that he |
| 23 | had.  He threatened to kill my family and myself. |
| 24 | Q   Do you remember what words he used?  Anything specific? |
| 25 | A   As far as the story he gave, the story was about coming back |

1       to Tucson after he got out, because he was short-timing, and

2       that he knew we were close to an airport so he could fly

3       back and go to South Tucson, because he knew that was the

4       ghetto, get a $500 gun, and said it wouldn't be that easy --

5       or you need to think about it.  It wouldn't be that

6       difficult for me to come back.

7   Q   And you -- you used the term short-time.  Can you explain to

8       us what that is?

9   A   Just -- it means he was going to get out soon.  Get out of

10      prison soon.

11  Q   And can you explain to me -- okay, he's in this holding

12      cell, then he's -- he's spit on you?

13  A   Yes.

14  Q   Then you all unlock the cell, and go in to get him -- or

15      how -- explain to us how that works.

16  A   Yes -- because in prison -- or the federal prison system, I

17      guess, the spitting is considered assault.  So the SHU OIC

18      went in there along with other SHU staff members, and they

19      placed him in ambulatory restraints to control the inmate.

20      Since it was considered assault, they could do an immediate

21      use of force.  Inmate Stoddard didn't become combative at

22      that time so that there was no physical force that had to be

23      used.  They just applied the ambulatory restraint set to

24      him.

25  Q   Okay.  So you get spit on.  Do you go tell somebody --

1          that's the part I'm missing.  Like, you get spit on, and do

2          you go right in there?  Explain to us how that works.

3     A    After the spitting we put him in ambulatory restraints.  The

4          operations lieutenant was already in route, so he came.

5          They did a debriefing after the incident.  What that is, is

6          a -- they bring the video camera down, because there was an

7          immediate use of force that took place.  They videotape each

8          staff member that was involved.  They do an injury

9          assessment to see if any staff were injured.

10    Q    Okay.  Let me stop you, because I probably just -- when you

11         say -- what do you mean when you say placed in ambulatory

12         restraints?  That's probably what I'm not understanding.

13         What does that mean?

14    A    Ambulatory restraints are more restraints that are applied

15         to control the inmate, I guess, more effectively than just

16         regular hand restraints.

17    Q    Does it have anything to do with moving somebody?

18              Why is it called ambulatory?

19    A    I'm not sure why it's called that.

20    Q    Okay.  So you all go in the cell, and you place these

21         ambulatory restraints on him.  Then what happens next, other

22         than -- you told us that he threatened you and stuff, but

23         where did they take him, or what happens?

24              Does he stay in that holding cell?

25    A    Yes, he did at that point.

1    Q     Okay.  So he stays there?

2    A     Yes.

3    Q     I'm sorry.  You were saying they do an aftermath video of

4          everybody that was involved?

5    A     Yes, an after action review.

6    Q     And you were on that video?

7    A     Yes.

8    Q     Did you ever seek medical treatment?

9    A     Yes, from a physician's assistant that was assigned that

10         night.

11   Q     Somebody that works there?

12   A     He works for the whole institution.

13   Q     Okay, and so you saw that physician's assistant that night?

14   A     Yes.

15   Q     And did you have any injuries?

16   A     No.

17   Q     And without telling us what the instructions were, were you

18         given instructions?

19   A     Yes.  He instructed me to wash my face with warm soap and

20         water, and flush my eyes out with water.

21   Q     And is that what you did?

22   A     Yes.

23   Q     And during this -- and during this time when he did spit on

24         you, January 9th, you were acting in your official capacity

25         as a corrections officer?

```
 1   A     Yes.

 2            MS. DEMARAIS:  If I could have a moment, Judge?

 3            THE COURT:  Yes.

 4            MS. DEMARAIS:  Pass the witness, Judge.

 5            THE COURT:  All right.

 6            Mr. Stoddard, if you could just speak right into the

 7   microphone as you question the witness.

 8            So you may cross-examine the witness.

 9                        CROSS-EXAMINATION

10   BY MR. STODDARD:

11   Q     All right.  Mr. Hozey, you say you came in contact with me.

12         I was already in the holding tank?

13   A     Yes.

14            THE COURT:  You can pull that over closer to you.

15   BY MR. STODDARD:

16   Q     But isn't it a fact that when we first came in contact, I

17         was in my cell and I had my window covered?

18   A     No, I don't recall it that way.

19   Q     How I did get from -- you say -- so you basically saying I

20         was already in the holding tank when you came -- came into

21         work?

22   A     Yes.

23   Q     What time did you come to work?

24   A     I was assigned for 4:00 p.m.

25   Q     So from 4:00 p.m., as you know it, up until you say the
```

1   alleged incident took place around 9:30, I was in the

2   holding tank the whole time that you was -- you was working,

3   right?

4 A That's -- yes.

5 Q And you was assigned to work C range?

6 A Yes.

7 Q Did you feed me?

8 A I don't recall feeding you because you were in the holding

9   cell.

10 Q My point exactly.  Why wasn't I fed, then, in the holding

11   tank, as you say I was in the holding tank from the time you

12   came in?

13 A I assumed another range officer fed you.

14 Q Isn't it a fact, Mr. Hozey, that I was in my cell, I had my

15   window covered, you tapped on my window, you fed up trays,

16   and when you -- which was dinner trays.  As you were coming

17   back to collect the dinner trays I had my window covered.

18   You tapped on the door.  I didn't answer you.  So you say to

19   me, "I guess you don't want your meal."  So that never took

20   place, Mr. Hozey?

21 A No, I don't recall it that way.

22 Q So why did I -- I know that you was even working C range to

23   even ask you if I had mail?

24    Out of everyone in the SHU I asked you?

25    It ain't like you assigned to work the same range every

1       day.

2   A   I don't understand.  What's your question?

3   Q   My question is you say that you never came -- you never came

4       to my door.  So you basically saying I was in the holding

5       tank.  Why would I ask you out of all people about my mail?

6           How -- how did I know you had mail for me if we never

7       even had this discussion about mail?

8   A   Because you were in your holding tank.

9   Q   Isn't it a fact, Mr. Hozey, that when I was in -- when I was

10      in my cell -- when I was in my cell when you came to pick up

11      the trays, you knocked on the door.  I wouldn't answer.  You

12      say, "I guess you don't want your mail."  You leave.  A

13      little while later, I guess, I'm assuming, Birmingham, which

14      was the number one, you was the one that came and got me,

15      told him bring Stoddard, put Stoddard in the holding tank.

16      I was uncuffed in the holding tank.  At that moment

17      Birmingham came and asked me what the problem was.  I told

18      Birmingham I just needed some time out of the cell.  As time

19      passed, I seen you, asked you -- inquired about my mail.  I

20      asked you did I have any mail?  You said, "Yes."  I say,

21      "Can I get my mail?"  You say, "Not at this present time."

22      Okay, cool.  Then when it was time to leave --

23          MR. STODDARD:  Excuse me, your Honor.

24          (Mr. Stoddard and Mr. Leonardo conferred off the

25  record.)

1          THE COURT:  And Mr. Stoddard, you'll have a chance to

2    testify, if you'd like.  So if you could just limit this to more

3    of a question and answer, and try to shorten it up a little bit.

4          MR. STODDARD:  Okay.

5          THE COURT:  Instead of asking a really lengthy

6    question, try to ask your questions short, and break them up into

7    pieces if you can.

8          Go ahead.

9          MR. STODDARD:  Okay.

10   BY MR. STODDARD:

11   Q    Now, in regards to my mail, you stated that the mail comes

12        from the mail room already sealed up, correct?

13   A    Yes.  The mail room officer inspects it.

14   Q    So when you gave me my mail, my mail was opened?

15   A    Yes.

16   Q    Why was it opened when it was already inspected before I

17        come -- before the inmate even receive it?

18        Can you tell me why my mail was open, the seal -- the

19        tape sealing broke on the mail?

20   A    No, I can't, because I didn't do that.

21   Q    If you didn't do it, is it fair to say knowing how the mail

22        comes sealed but if the seal was popped, that someone had to

23        read my mail?

24   A    When it comes from the mail room, the letter is cut open,

25        I'm assuming with a letter opener.  After they inspect your

| | | |
|---|---|---|
| 1 | | mail, they place a piece of Scotch tape over the slot on the |
| 2 | | envelope that was cut open so that the letter doesn't fall |
| 3 | | out.  When I received the mail, the tape was on there, like |
| 4 | | you say it was.  When I put your mail in the officer station |
| 5 | | because I told you you would get your letter later, I |
| 6 | | assumed nobody was going to touch your mail.  When I gave |
| 7 | | you the letter, you had noticed that the Scotch tape was |
| 8 | | broken so you assumed that I read your letter.  And I tried |
| 9 | | to explain to you that I did not, and that's when you |
| 10 | | became verbally belligerent. |
| 11 | Q | My question, again, was when you gave me the mail, was the |
| 12 | | seal open? |
| 13 | A | Yes.  The Scotch tape was broken. |
| 14 | Q | When it was sealed when you put it in the office, is it fair |
| 15 | | to assume that another officer popped the seal? |
| 16 | A | Yes. |
| 17 | Q | And what would be the reason to pop my seal if the mail is |
| 18 | | already inspected once coming into the institution? |
| 19 | A | They wanted to inspect your mail again. |
| 20 | Q | Would it -- is it fair to say that it was more so because I |
| 21 | | had been acting up the entire time that I'd be in the SHU, |
| 22 | | that this would just be another way of just messing with |
| 23 | | inmate Stoddard? |
| 24 | A | I can't say that.  All I can say is I didn't read your |
| 25 | | letter.  I don't know who read your letter. |

```
 1   Q    Have you ever seen another inmate's mail get opened in the
 2        manner which you seen it opened?
 3             MS. DEMARAIS:  Objection, relevance.
 4             THE COURT:  Yes.
 5             Mr. Stoddard, if you could just limit your questions to
 6   this particular incident.
 7             So I'll sustain that objection.
 8             MR. STODDARD:  Okay.
 9   BY MR. STODDARD:
10   Q    You say I spitted on you, and you went to medical.  There
11        wasn't no DNA evidence taken?
12   A    No.
13   Q    So this whole case is pretty much based off of -- with no
14        physical evidence, more so that he say, you know?  Officer
15        saying he seen me do something, correct?
16   A    Yes.
17   Q    Now, they showed a picture of the hallway, the long hallway.
18        Is there a camera in that hallway?
19   A    Not that I'm aware of.
20   Q    So anything can take place in that hallway, and there's no
21        video proof to substantiate your claim other than what you
22        are testifying to today?
23   A    No, there's no video proof.
24   Q    So do you think that -- you know, this is your personal
25        opinion, that for us to be in a federal prison where you
```

1       have six ranges, all six ranges have videos on the range but

2       that long hallway, as the photo will show, a long hallway

3       has no video in that hallway, do you feel -- is that a

4       breach of security?

5               MS. DEMARAIS:  Objection.  Beyond the scope of this

6   officer's knowledge.

7               THE COURT:  Yes, sustained.

8               Go ahead, Mr. Stoddard.  Ask another question.

9               MR. STODDARD:  All right.

10  BY MR. STODDARD:

11  Q    The next day, Mr -- Mr. Hozey, what code did you write me up

12       for?

13  A    I wrote you for threatening and assault.

14  Q    Could you -- if you know off the top of your mind -- or if

15       you have something you can read from, can you read which

16       code you wrote me up for the 224's -- could you read that

17       code, if you have anything?  If not, I have a copy that you

18       can read from.

19  A    I don't have anything to read.

20              MR. STODDARD:  Can he head this, your Honor?

21              THE COURT:  Yes.  Mr. Leonardo, can you see what

22  Mr. Stoddard has there?  Is that the actual prison regulation, or

23  --

24              (Mr. Stoddard and Mr. Leonardo conferred off the

25  record.)

1        MR. LEONARDO:  He's got his report, your Honor.  The

2   witness report.

3        THE COURT:  Okay.  Why don't we have that marked as an

4   exhibit.

5        And Mr. Leonardo, you can just hand those exhibits --

6   or that document to the marshal who can bring it up to Jill.

7   We'll have it marked, and given to the witness, and then

8   Mr. Stoddard, you can ask the witness questions about his report.

9        MS. DEMARAIS:  I have extra stickers, if --

10        THE COURT:  Oh, okay.

11        And Mr. Stoddard, this exhibit will be returned to you

12   after the trial.

13        If you could show it to Ms -- yes.

14        So that's Exhibit Number what, Jill?

15        THE CLERK:  11.

16        THE COURT:  11.  So the witness has been handed Exhibit

17   Number 11.

18        Did you want to ask him, Mr. Stoddard, some questions

19   about that?

20        MR. STODDARD:  Yes.

21   BY MR. STODDARD:

22   Q    Mr, Hozey, can you read out loud Exhibit Number 11, please?

23   A    Which block, block 11?

24   Q    Yes.  The part that -- yes, block number 11.

25        THE COURT:  And if you're going to read, sir, you need

1  to read slowly so the court reporter can get your voice down.

2  THE WITNESS:  Yes, ma'am.

3  THE COURT:  Go ahead.

4  A  On January 9th, 2008, at approximately 9:30 p.m., inmate

5  Stoddard was in the holding cell, and as I walked down the

6  stairs from the officer station, inmate Stoddard became

7  verbally abusive toward me, and then spit on my face and

8  upper chest area.  SHU staff then proceeded to place inmate

9  Stoddard in ambulatory restraints, and inmate Stoddard then

10  began to make threatening statements toward myself and my

11  family.  He stated that he would be getting out of prison

12  soon, and that he was going to kill me and my family.

13  Q  Can you read the codes that you wrote me up for?

14  A  Code 203, threatening another with bodily harm, and 224,

15  assault on any person, less serious.

16  Q  Okay, why wasn't I wrote up for 101?

17  Would you like me to read -- I'm going to read what 101

18  states.  101 states:  Assaulting any person, including

19  sexual assault, or an armed assault on an institution

20  secured perimeter.  A charge for assaulting any person at

21  this level is to be used only when serious physical injuries

22  has been attempted or carried out by an inmate.

23  Can you tell me why you never wrote me up for that?

24  A  For 101?

25  Q  Yes.

1  A    Most of my lieutenants wouldn't recommend a 101 for

2       spitting.

3  Q    Okay.  I'm going to read to you what -- the code which you

4       actually wrote me up for, which was 224.  Assault on any

5       person charged with this act only when a less serious

6       physical injury or contact has been attempted or carried out

7       by inmate.

8            So when you -- when you wrote this -- me up for a 224,

9       you looked at this as a minor incident as far as an assault

10      go?

11           MS. DEMARAIS:  Objection as to characterization of

12  minor.

13           THE COURT:  Well, overruled.

14           You can answer.

15  A    Can you repeat the question?

16           THE COURT:  If you understand the question.

17  BY MR. STODDARD:

18  Q    When you wrote me up for a 224 and not a 101, was the reason

19      why you wrote me up to a 224 was you didn't feel as though

20      it was a serious assault?

21  A    Yes.  Yes.

22  Q    So why is -- this trial is here.  Do you consider this

23      assault to be major or minor in your eyes?

24           MS. DEMARAIS:  Object, and on relevance.  Calls for a

25  legal conclusion, sort of.

```
 1              THE COURT:  Yes, sustained.
 2    BY MR. STODDARD:
 3    Q    Okay.  For the infraction that you wrote me up for, I was
 4         sanctioned in-house by the DHO --
 5              MR. STODDARD:  -- when I say in-house, your Honor, I
 6    just mean with -- inside the institution --
 7    BY MR. STODDARD:
 8    Q    -- for the threatening, which is a 203, I received 14 days
 9         DS.  For the assault without serious injury, I received 30
10         days DS.  So for this -- and 27 days loss of good time.
11         Now, when -- when -- when assault -- alleged assault has
12         taken place on a staff or inmate, isn't the shot supposed to
13         be suspended pending SIS/F.B.I. referral for possible
14         prosecution?
15    A    I don't know the answer to that question.  I'm not the DHO.
16    Q    This -- this not nothing the DHO would do.  It's -- it's
17         policy that all assaults, especially --
18              MS. DEMARAIS:  Objection.  He has answered the question
19    that he doesn't know, your Honor.
20              THE COURT:  All right.
21              So ask another question, Mr. Stoddard.
22    BY MR. STODDARD:
23    Q    You say -- you say that there was two officers, I believe,
24         you said present during the time I spit on you?
25    A    There were two in front of me, as I recall, walking down the
```

1       stairs.

2   Q   Do you recall who them two officers was?

3   A   Officers Smith and Fitzgerald.

4   Q   Officers Smith and Fitzgerald.  Were there any other

5       officers present?

6   A   Yes.

7   Q   Could you tell me who them other officers were?

8   A   The entire special housing crew that night was Officer

9       Fitzgerald, Smith, Birmingham, Garcia, Gonzalez, myself.

10  Q   And you say that it was two officers present that seen the

11      spitting, correct?

12  A   No, I say there was two officers in front of me, and I think

13      there was more officers that actually saw the spitting than

14      just those two.

15  Q   So you assuming.  You're not even sure.  You're just

16      assuming, because you never -- in your testimony you never

17      mentioned anything about any other officers other than two

18      that you mentioned, but you only said one said look out.

19  A   That's how I recall it.

20          THE COURT:  What's your question, Mr. Stoddard?

21          MR. STODDARD:  Your Honor, I have --

22          THE COURT:  I mean, to the witness.  And you'll be able

23  to testify, but --

24  BY MR. STODDARD:

25  Q   Okay, my question is it was only two officers present in --

1       let me rephrase it.

2               To your recollection when this alleged assault took

3       place, all the officers you named was present?

4   A   There were more officers there on the stairwell behind me.

5       I can't elaborate as to what they saw.  I'm sure that they

6       could testify and say what they did see, but I know for a

7       fact that two were in front of me.

8   Q   Okay.  You say whoever you want was present, but you said

9       there was some standing behind you.  Did you look over your

10      shoulder, or are you just guessing they was behind you,

11      because I don't --

12  A   As we were coming out of the officer station that night to

13      try to put you back in your cell, we stood up selectively as

14      a group because all seven of us were in there, and we were

15      going to go down the stairs to see if we could get you to

16      comply to come out of the holding cell to go back to your

17      assigned cell in C range.

18  Q   But all you actually seen, can really attest to is actually

19      seeing two?

20  A   Two going down the stairs in front of me, yes, that's what I

21      saw.

22  Q   Is there a remote possibility that these other officers that

23      you say seen it could not have seen it, because you didn't

24      see them?

25              That they probably wasn't even present?

```
 1  A    I can't speak for those officers.
 2  Q    Okay.  Have -- Mr. Hozey, have you ever been written up for
 3       --
 4            MS. DEMARAIS:  Objection, on relevance.
 5            THE COURT:  Let him finish the question.
 6            Go ahead and finish the question.
 7  BY MR. STODDARD:
 8  Q    Have you ever been written up, Mr. Hozey, for assaulting
 9       inmates by another inmate?
10            MS. DEMARAIS:  Objection, on relevance.
11            THE COURT:  Well, no, overruled.
12            You may answer.  Go ahead.
13  A    To my knowledge, one inmate.
14  Q    And who would that inmate be?
15  A    Inmate Brian Cash.
16  Q    And could you -- and what was you wrote -- written up for?
17  A    Attempted physical abuse of an inmate.
18  Q    And that's the first and only time you been wrotten (sic)
19       up?
20  A    That I'm aware of.
21  Q    That you're aware of.  When -- when you are wrotten up, is
22       it brought to your attention each time you wrote up -- are
23       them write-ups brought to your attention?
24  A    Eventually.  Cash's wasn't brought to my attention until it
25       was found no credibility on inmate's allegations.  I wasn't
```

1    aware of it until they closed the investigation.

2  Q    Okay.  Do you recall maybe -- I don't have an exact date but

3    I'm going to say after this alleged incident took place,

4    maybe within four to seven days you and Officer Santiago

5    coming into my cell, and us three sitting down having a

6    discussion about this alleged incident?

7  A    About what incident?

8  Q    This incident that I'm being prosecuted for, the spitting

9    incident?

10 A    Yes.

11 Q    And when you came into the cell, did Santi -- Lieutenant

12    Santiago -- did he open the door up, cuff me up, or did he

13    just open the door up and the two of you all just walked in?

14 A    We just walked in.

15 Q    Okay.  Now, by policy that shouldn't have been done,

16    correct?

17 A    No, by policy we should have handcuffed you.

18 Q    Exactly.  Now, when Lieutenant Santiago came in, do you

19    recall the nature of the discussion -- did -- the three of

20    us sat down, you were sitting on a stool, Lieutenant

21    Santiago was sitting on the toilet, and I was sitting on my

22    bunk.  Do you recall the nature of the conversation?

23 A    It was mostly about you.

24 Q    Well, do you recall?

25 A    No, not -- no.

1   Q   Is it fair to say that the nature of the conversation was

2       about the alleged incident that I'm being prosecuted for

3       today?

4   A   Yeah.  We were -- I recall Lieutenant Santiago wanting to

5       speak with you because he didn't want you to act up anymore,

6       because I wrote the incident report on you.

7   Q   Well, isn't it a fact that we was having -- because you

8       been -- as though you work in the range, that we was having

9       so many confrontations that he wanted to diffuse the whole

10      situation, and that's why you came in and we sit down and we

11      talked?

12  A   Yes, it is.

13  Q   And everything from that point on was supposed to been

14      resolved.  And is it fair to say that after that

15      conversation have you ever had any problems with me?

16  A   No, I haven't.

17  Q   Okay.  When I asked you about my mail, did anyone read it,

18      you didn't say specifically who read it, but you said that

19      you do remember officers speaking about the contents of the

20      letter, correct?

21  A   Yes.

22  Q   Now, when you -- when you check in -- when you check in

23      mail, shouldn't mail only be checked for contraband, meaning

24      just open it up, shake it, see if anything is in it that

25      shouldn't be in it?

| | | |
|---|---|---|
| 1 | A | No, we can read the letters. |
| 2 | Q | What is the purpose for reading the letter when it's already |
| 3 | | inspected when it first come into the institution with |
| 4 | | people who are assigned to do them particular things, which |
| 5 | | are inspect the mail once it come into the institution? |
| 6 | A | As far as I'm aware, we can read an inmate's letter.  If you |
| 7 | | have letters in your cell, your assigned cell, we can shake |
| 8 | | your house down, and we can read the letters. |
| 9 | Q | Okay, but isn't the reason why you -- the letter was read |
| 10 | | was because of my behavior that day? |
| 11 | | It was just another form of getting at me? |
| 12 | A | No, I don't think so.  You'd have to ask the officers that |
| 13 | | read your letter. |
| 14 | Q | Did you tell me that officers read my letter? |
| 15 | A | I'm assuming they did, because the tape was broken. |
| 16 | Q | So you -- you say you heard officers talking about it, |
| 17 | | correct? |
| 18 | A | Yes, a couple of them. |
| 19 | Q | What officers did you hear speaking about the contents of my |
| 20 | | letter? |
| 21 | A | It would be Gonzalez and Birmingham. |
| 22 | Q | Why would the nature of my letter be a discussion if it was |
| 23 | | only being inspected for contraband? |
| 24 | | MS. DEMARAIS:  Objection.  Calls for speculation since |
| 25 | he was not the one that was talking about it. |

1       THE COURT:  Were you present when the letter was talked

2    about?

3       THE WITNESS:  Yes.  After, I guess, the officers had

4    read it, they had made comments on the letter.

5       THE COURT:  Okay.

6       So Mr. Stoddard, ask another question.

7  BY MR. STODDARD:

8  Q    Okay.  When you all was placing me in ambulatory restraints,

9       do you recall the comments you made about the letter in

10      reference to my sister?

11 A    Yes, I said your -- I knew your sister worked for OPM.

12 Q    So why would you make that comment to me?

13 A    Because I lost my temper.

14 Q    So it was more so being done in a threatening manner?

15 A    Not threatening, no.

16 Q    I mean, so you say you lost your temper, so sometime is it

17      fair to say when we lose our temper, we may say things or do

18      things that we normally wouldn't do under normal

19      circumstances?

20 A    You can say that for anyone.

21 Q    Okay.  Why -- you say you lost your temper, so how would you

22      even know to -- well, I got to ask a different question.

23      As I was placed in -- let me ask you this.  What is --

24      what is policy pertaining to placing the inmates in

25      restraints?

1           Who must authorize the inmate to be placed in

2      ambulatory restraints?

3  A    It would be the lieutenant.

4  Q    Now, was the lieutenant -- did the lieutenant authorize you

5      all to put me in restraints?

6  A    I don't know.  The SHU OIC did.

7  Q    So to your knowledge -- to your knowledge the SHU lieutenant

8      was not notified.  It was more so something that Officer

9      Birmingham did on his own?

10  A    Yes.  There was no SHU lieutenant that night, so Officer

11      Birmingham was the SHU officer in charge.

12  Q    When you say there was no lieutenant, do you mean there was

13      no lieutenant present in the institution?

14  A    No, I mean special housing unit.  There was an operations

15      lieutenant that was there that night.

16  Q    And where was he?

17  A    He was in route to special housing unit.

18  Q    Okay.  Now, once I was placed in ambulatory restraints in

19      the holding cell where the alleged incident took place at --

20      isn't this the location in which I was placed in ambulatory

21      restraints?

22  A    In the holding cell, yes.

23  Q    Now, once I was placed in ambulatory restraints where was I

24      taken to?

25  A    I don't recall.

1    Q    I mean, you recall everything else, sir.  Isn't it a fact

2         the video will show us that I was taken from the holding

3         tank and placed outside in January.  If my memory serve me

4         correct, I believe I just had on a pair of shower shoes or

5         tennis shoes, a pair of socks, a pair of boxers, and a

6         t-shirt at around let's say 9:45 at night.  I was placed

7         outside.  January the 9th, 9:45 at night.  I'm in ambulatory

8         restraints --

9              MR. STODDARD:  And your Honor, ambulatory restraints is

10   pretty much how I have shackles on --

11             THE COURT:  All right, and you can testify to that, but

12   your question is whether --

13   BY MR. STODDARD:

14   Q    Why was I placed outside?

15             THE COURT:  Are you aware that he was -- well, I think

16   he already said he wasn't even aware --

17   A    No, I don't recall you being placed outside.  I didn't

18        escort you to the rec cages outside.  I didn't know you went

19        out there, probably until later.  There's bits and pieces

20        that you're bringing up that I don't recall because I wasn't

21        a part of.

22   Q    Now, is it -- is it -- is it a norm to -- you can only

23        speculate on this question.

24             Why was I -- once I was put in ambulatory restraint,

25        why was I not left inside of the holding tank?

```
1    A    I would assume because there was no door on the food flap so
2         you couldn't spit on staff again.
3    Q    Was there any other place out -- other than outside that I
4         could have been placed in indoors at -- on January the 9th
5         at around 9:30 at night other than outside?
6    A    Are there other places in special housing unit that you
7         could have been placed?
8    Q    Yes.
9    A    We were instructed not to use the multipurpose rooms
10        anymore, so the only other place I can imagine is the rec
11        cages, or another holding tank, and I guess the sallyport.
12   Q    So to your knowledge why would you think that wouldn't have
13        been done?
14            MS. DEMARAIS:  Objection.  Calls for speculation.
15            THE COURT:  Well, if you know, you can answer.
16   A    Well, the -- all the holding tanks that the special housing
17        unit have that we place inmates in temporarily, none of them
18        have a door on the food flap access, the little rectangular
19        slot in the door.  There's no food flap.  So you assaulted
20        staff for spitting.  I can only assume that you weren't
21        placed in one of those other holding tanks because there was
22        no protection inside the food flap cover to stop you from
23        spitting again.
24   Q    Now, being as though I was placed outside, is there anything
25        being placed in the holding cage outside that could prevent
```

1       me from spitting again, as you state?

2 A    You're outside.  You're not directly around staff.  You're

3     in a confined area.

4 Q    But once I'm in a confined area, there's no glass or

5     anything that's preventing me from spitting again?

6 A    No, if you wanted to spit, you could spit again.

7 Q    Okay.  Now, you don't think that was considered cruel and

8     unusual punishment that -- on January the 9th to put me

9     outside in the clothes that I had on?

10         MS. DEMARAIS:  Objection on relevance, and beyond the

11 scope of this witness' knowledge.

12         THE COURT:  Yes, sustained.

13         So Mr. Stoddard, you can ask another question.

14 BY MR. STODDARD:

15 Q    I'm going to say my last question is when this alleged

16     incident took place, did you assume that it would go this

17     far, as far as me being prosecuted for that alleged assault?

18 A    No.

19         MR. STODDARD:  I have no further questions, your Honor.

20         THE COURT:  All right.

21         Any redirect?

22         MS. DEMARAIS:  Yes, your Honor.

23                 REDIRECT EXAMINATION

24 BY MS. DEMARAIS:

25 Q    Officer Hozey, do you play any part in which cases the U.S.

1          Attorney decides to prosecute?

2     A    No.

3     Q    When did you find out that the U.S. Attorney was going to

4          prosecute this case?

5     A    I don't remember the exact date.  I think it was four or

6          five months after January 9th.

7               THE COURT:  All right.  Ms. DeMarais, let me just have

8     you hold on a minute.  I do have a jury deliberating on another

9     case.  I just need to --

10              MS. DEMARAIS:  Okay.

11              THE COURT:  All right.

12              Go ahead, Ms. DeMarais.  You may proceed.

13    BY MS. DEMARAIS:

14    Q    So fair to say that you're not involved in the decision

15         making, whether he's going to be prosecuted further by a

16         U.S. Attorney or not, is that true?

17    A    Yes.

18    Q    We were talking about -- and let me show you again Exhibit

19         3, and that's the food slot that was open?

20    A    Yes.

21    Q    Has that been -- since this incident, has that been

22         retrofitted?

23    A    Yes, they placed a door on it, I suppose to stop another

24         inmate from doing the same thing.

25              MS. DEMARAIS:  One second, Judge.

1           THE COURT:  Yes.  Take your time.

2   BY MS. DEMARAIS:

3   Q    I'm going to show you what I'm going to go ahead and mark as

4        Exhibit 5, if can I find it.

5           And you haven't looked at this one yet, so I'm going to

6        ask you to look at what's been marked for identification

7        purposes as Exhibit 5.

8           You were telling the judge about a little tray thing.

9        Is that depicted in Exhibit 5?

10  A    Yes.

11  Q    And does Exhibit 5 fairly and accurately depict what it

12       looks like now after they placed that little -- I don't know

13       what you call it, the cover?

14  A    Yes, that's what it looks like now.  Yes.

15          MS. DEMARAIS:  I move to admit Exhibit 5 into evidence.

16          THE COURT:  Is there any objection to Exhibit 5?

17          MR. STODDARD:  No, ma'am.

18          THE COURT:  Okay, 5 is admitted into evidence.

19  BY MS. DEMARAIS:

20  Q    The defendant was asking you a lot of questions about, I

21       guess, things that were happening after he spit on you.

22       Were you upset when he spit on you?

23  A    Yes.  I've never been spit on before.  I didn't -- I was

24       angry.

25  Q    Was it a pleasant experience for you to be spit on?

1    A    No.

2    Q    And you're saying that you worked -- this is the first time

3         you'd been spit on by an inmate?

4    A    Yes.

5    Q    And he also was asking you about this meeting with

6         Lieutenant Santiago?

7    A    Yes.

8    Q    When did that meeting occur -- about, if you don't remember

9         an exact date?

10   A    Maybe a week or two after the spitting.

11   Q    Was it long before the U.S. Attorney determined to prosecute

12        this case?

13   A    Yes.

14   Q    The defendant was asking you about a write-up you had

15        regarding inmate Cash.  What was the final outcome of that

16        investigation?

17   A    No credibility was found.

18   Q    So were the allegations not sustained?

19   A    No, they weren't sustained.

20   Q    Now, he asked you a lot of questions about what codes, and

21        he showed you this document, the codes you charged.  Can you

22        just briefly tell me what a code is, or what he was talking

23        about when he was saying you can pick this code, or that

24        code?

25             What is a code, I mean?  Is it a --

1    A    They're codes that were used to write an inmate up for

2         something on their incident report, something that they've

3         done that's not authorized.

4    Q    Is that like an internal --

5    A    Yeah, there's a --

6    Q    It's not like a statute or anything.  It's like an

7         internal -- like a rule book?  I'm trying to figure out --

8    A    Yes, it's in the institution supplement as far as I'm aware.

9         There's codes -- there's 100 series, 200, 300, and 400; 100

10        being the most severe, 400 being the least severe.

11   Q    Did you sustain a serious injury in this incident?

12   A    What I consider to be serious, no.

13   Q    Did you consider any injury at all?

14   A    At the time it happened, there's the potential for it

15        because I didn't know the inmate's history on -- his medical

16        status, or if he was -- you know, had any infectious

17        diseases.  But we generally only use 101 series codes for

18        serious assault, what we consider is stabbings or inmate

19        beatings.  You know, they use padlocks in their socks and

20        they beat each other.  That type of code is what we'll use

21        for that.  The 200 is usually less serious, like spitting.

22   Q    And you said you didn't have a serious injury, but at the

23        time when he spit on you did you know his medical history?

24   A    No, I did not.

25   Q    But you're aware that -- well, what were your fears when you

```
 1          got spit on?
 2   A    I think every -- well, myself personally, I was worried that
 3        he had something as far as HIV, or hepatitis.
 4   Q    And lastly, when he spit on you, did that spit make contact
 5        with your body?
 6   A    Yes, it did.
 7   Q    Where?
 8   A    On my face and upper chest area.
 9             MS. DEMARAIS:  I have no more questions, Judge.
10             THE COURT:  All right.
11             Mr. Hozey, I just have a question.  How far would you
12   say you were from the food slot area when you were spit on?
13             THE WITNESS:  On the bottom step.
14             THE COURT:  Okay, so what are we talking about?  How
15   many feet, how many inches?
16             THE WITNESS:  Approximately three feet, four feet maybe
17   from the food -- food slot.
18             THE COURT:  All right.  And you say there were two
19   officers in front of you, so I'm kind of --
20             THE WITNESS:  As we were walking down the stairs,
21   ma'am, one of them went to the left, I think it was Smith, and
22   then the other officer went to the right on each side of the
23   hallway, and I heard Fitzgerald say, "Look out, Hozey."
24             THE COURT:  Okay, so -- but at the time you were spit
25   on, the other two officers were actually -- one was to your left
```

1   and one was to your right?

2              THE WITNESS:  Yes.

3              THE COURT:  And you were approximately three to

4   four feet away from this food slot area?

5              THE WITNESS:  Yes.

6              THE COURT:  Any follow-up questions from the government

7   to the Court's questions?

8              MS. DEMARAIS:  No, your Honor.

9              THE COURT:  All right.

10             May this witness step down, then?

11             MS. DEMARAIS:  Yes.

12             THE COURT:  All right.  Sir, you may step down.  And as

13  I said earlier, you're free to either remain in the courtroom, or

14  go about your business.

15             THE WITNESS:  Yes, ma'am.

16             THE COURT:  May he be excused, or do you want him to

17  remain?

18             MS. DEMARAIS:  I want him to remain.

19             THE COURT:  All right.  So you can speak with

20  Ms. DeMarais about that issue.

21             All right, let's -- I do need to take up another matter

22  with this jury that's deliberating.  Let's take about a ten

23  minute break from this case.  We'll take a recess from this case,

24  and then I'll deal with my jury issue, and then we'll reconvene.

25             (The Court recessed at 11:20 a.m., and reconvened at

1    1:03 p.m.)

2              THE COURT:  The record can reflect the presence of

3    counsel, the defendant, advisory counsel.

4              And let's see, the government may call its next

5    witness.

6              MS. DEMARAIS:  The government calls Agent Smith --

7    Officer Smith, I guess.

8              THE COURT:  Sir, if you could just have a seat right up

9    here on the witness stand.  You've already been sworn in as a

10   witness.

11             And you may proceed.

12                      CHRISTOPHER MICHAEL SMITH

13                        DIRECT EXAMINATION

14   BY MS. DEMARAIS:

15   Q    Please introduce yourself to the judge, and spell your last

16        name.

17   A    Christopher Smith, S-M-I-T-H.

18   Q    And who do you work for?

19   A    Federal Bureau of Prisons.

20   Q    How long have you done that?

21   A    Little over two years now.

22   Q    Were you working on January 9th, 2009?

23   A    Yes, ma'am.

24   Q    What were you -- I mean, what were your duties that day?

25   A    I was a -- a SHU range officer.

|   |   |   |
|---|---|---|
| 1 | Q | Okay, and SHU, again, is the -- |
| 2 | A | Special housing unit. |
| 3 | Q | And a range officer means what? |
| 4 | A | The officer that takes care of the inmates on a particular |
| 5 |   | run. |
| 6 | Q | Like a hallway? |
| 7 | A | Hallway with -- lined with cells. |
| 8 | Q | What were you wearing that day? |
| 9 | A | My uniform. |
| 10 | Q | Do you remember what time you came on, about? |
| 11 | A | 4:00 p.m. |
| 12 | Q | We're here on an incident with the defendant who's sitting |
| 13 |   | there, Mr. Stoddard.  Did you have an occasion to run into |
| 14 |   | him that day? |
| 15 | A | Yes, ma'am. |
| 16 | Q | And do you recall the first time you saw him that day? |
| 17 | A | The first time that day, no, ma'am, I don't recall. |
| 18 | Q | Okay.  Do you remember him at some point being in the |
| 19 |   | holding cell? |
| 20 | A | Yes, ma'am. |
| 21 | Q | What do you remember about him being in a holding cell? |
| 22 | A | Just remember him being in there for most of the day.  I |
| 23 |   | don't recall for how long.  Specifically, I remember seeing |
| 24 |   | inmate Stoddard later in the evening crouched down by the |
| 25 |   | cell door when he spit on Officer Hozey. |

1   Q    Okay.  So you actually witnessed that?

2   A    Yes, ma'am.

3   Q    And this may sound like a dumb question, but you say you saw

4        Stoddard crouched down.  Explain to the judge what exactly

5        you saw.

6   A    I seen the inmate crouched down, not kneeling but crouching

7        with his hands on the -- a little food slot, and he was

8        yelling.  And I had already walked by him, and he yelled

9        something which made me turn around.  So I turned, and

10       that's when I seen inmate Stoddard spit.

11  Q    Okay.  When you approached the defendant in his cell, what

12       were you supposed to be doing then?

13            I mean, what was your plan when you guys walked down

14       the stairs?

15  A    I honestly do not recall our plan, what we were going to do.

16       I don't remember at that time what we were going to do.  I

17       just remember we were walking by him.

18  Q    Okay.  Do you remember all who was there?

19  A    Let's see, there was myself, Officer Hozey, Officer

20       Gonzalez, Officer Mayorga, and Officer Garcia.

21  Q    I'm going to show you what's been -- what's Exhibit 1.

22            And do you recognize that picture?

23  A    Yes, ma'am.

24  Q    And what is that a picture of?

25  A    That is the stairwell leading from the control room.

1    Q    Okay.  And when you said you were approaching the cell, were

2         you walking down those stairs?

3    A    I had walked down those stairs, made a left.

4    Q    So you turned that way?

5    A    Yes, ma'am.

6    Q    Left.

7         Do you remember which position you were in -- I mean,

8         are people going down in a single line, or --

9    A    Yes.  We all -- we all were in the control room together.

10        We all decided we were going to do whatever it is we were

11        going to do, so we all took off, and we were going to do our

12        mission, whatever that was.  I don't recall exactly.  So we

13        all left.  I don't remember if there was anybody in front of

14        me, but I know Officer Hozey was behind me.  I walked down

15        the stairs and made that left, and approximately two paces,

16        if less, past what you see is when -- that's when I turned

17        and seen inmate Stoddard spitting on Officer Hozey.

18   Q    Okay.  I'm going to show you another exhibit, 2, and that's

19        just a close-up photo of the one we just looked at.  You

20        told the judge that he was crouching down.  Is this -- was

21        he crouching -- well, explain to her where he was crouching

22        down.

23   A    Right in front of that opening with his hands on top of the

24        tray -- or, like, holding onto it.

25   Q    I'm sorry, where were his hands?

1  A    On --

2          THE COURT:  You can actually touch the screen.  It will

3  mark the exhibit.

4  A    Oh, okay.

5          THE COURT:  Or draw a circle.

6  A    Right there.

7  Q    His hands were there?

8  A    Um-um.

9  Q    Okay.  And about how -- can you give the judge an idea about

10       how far Hozey was from Stoddard when he got spit on?

11  A    Four, five feet maybe.

12  Q    And you said you heard Stoddard yell something.  Do you

13       remember what he yelled?

14  A    No, ma'am.

15  Q    And did you say anything?

16  A    No, I did not say anything.

17  Q    And why did you turn -- you said you turned around.  Why?

18  A    He must have said something that made me turn around.  I --

19       I typically don't pay any attention to, you know, the normal

20       rants and raves, but for some reason I had keyed in on

21       something.

22  Q    Okay.  And can you give the judge an idea of -- was there

23       anybody between you and Hozey?

24  A    No.

25  Q    How far behind you is Hozey when you turn around?

1   A   Maybe two paces.

2   Q   When you turned around, what were you -- what were you first

3       looking at?

4   A   I -- I first looked at inmate Stoddard.

5   Q   Okay, and that's when you said he was crouching?

6   A   Yes.

7   Q   Did you notice anything else about him?

8   A   No.

9   Q   And then you told the judge you saw him spit on Hozey.  And

10      this might sound like a stupid question, but can you be more

11      detailed on what exactly you saw?

12  A   He -- his face was plastered up against the door, that --

13      the opening, and as he was yelling, then he just gathered up

14      the saliva and spit a spit onto Hozey.

15  Q   And I know this seems like I'm asking you -- describe spit,

16      but can you -- okay, so we get the idea, but like, did you

17      see a spray, did you see a single object fly out, did you

18      see anything --

19  A   It was more like spray.

20  Q   Did you actually see it?

21  A   Yes.

22  Q   Did you see where it landed?

23  A   It landed on Officer Hozey.

24  Q   Where did it land on him?

25  A   Oh, face and shoulder area.

1   Q    Do you remember -- what did Hozey do, if you remember?

2   A    I do not.

3   Q    After that happened -- right after that happened, do you

4        remember the defendant saying anything?

5   A    I know he did.  I just don't know what.  He -- he just

6        continued on with his belligerent -- and his rants, and his

7        raving.

8   Q    And on this date, January 9th, 2009, what facility were you

9        working at?

10  A    FCC Tucson.

11  Q    In Tucson.

12          MS. DEMARAIS:  I pass the witness, Judge.

13          THE COURT:  Mr. Stoddard, any questions for the

14  witness?

15          MR. STODDARD:  Yes, ma'am.

16          THE COURT:  And if you can pull that microphone down

17  towards you.

18          Go ahead.

19                        CROSS-EXAMINATION

20  BY MR. STODDARD:

21  Q    Officer Smith, you say -- you say you came to work at 4:00?

22  A    Yes.

23  Q    When you came in at 4:00, did you notice if I was in the

24       holding tank when you came to work on that --

25  A    I do not recall.  If you were there, then yes, I did, but

| | |
|---|---|
| 1 | right now, 12 months later, I -- I don't recall exactly |
| 2 | where you were. |
| 3 | Q   So is there any way you can just give me a yes or no answer |
| 4 | if you saw me? |
| 5 | MS. DEMARAIS:  I think the witness has testified -- |
| 6 | THE COURT:  I think you said you don't remember? |
| 7 | THE WITNESS:  Yeah, I know I seen him.  I just don't |
| 8 | know where at that point. |
| 9 | THE COURT:  Okay. |
| 10 | BY MR. STODDARD: |
| 11 | Q   Okay.  Officer Smith, you say that you can't recall because |
| 12 | it was 12 months ago.  Well, the same is -- though you have |
| 13 | some other key facts that you can clearly remember, as my |
| 14 | walking down the steps and going to the left.  While you was |
| 15 | giving your testimony I was reading, so I could have heard |
| 16 | wrong but it sounds like you say that after you say you went |
| 17 | left when you came down the stairs again you went to the |
| 18 | right.  I'm not sure, I mean, if you say that or not.  Do |
| 19 | you recall saying that? |
| 20 | A   I did not. |
| 21 | Q   Okay.  You say I was belligerent, but you can't recall |
| 22 | exactly what I was saying.  Did they sound like anything |
| 23 | threatening to you, or just more so maybe me just cussing |
| 24 | him out? |
| 25 | A   At that particular moment I couldn't say if there was any |

1    threats going or not.  At that particular moment.  So I'm
2    not sure about threats at that moment.
3  Q    Okay.  I have some reports that I can get my hands on right
4    now that you wrote, Officer Fitzgerald wrote, Ms. Garcia
5    wrote, and Mayorga wrote.  You state -- I'm going to read --
6    would you like to read what you wrote?
7         THE COURT:  Wait -- hold on Mr. Stoddard.  Is this
8    something about this incident?
9         MR. STODDARD:  Yes, ma'am.
10        THE COURT:  Okay.  So let's see, Mr. Leonardo, if you
11   could bring that up to the clerk, we'll go ahead and have it
12   marked as an exhibit.
13        MS. DEMARAIS:  Judge, I would just object because
14   there's no question before him.
15        THE COURT:  All right.
16        (Mr. Stoddard and Mr. Leonardo conferred off the
17   record.)
18   BY MR. STODDARD:
19   Q    Okay.  Mr. Smith, after I was placed in ambulatory
20   restraints, do you recall where I was placed after I was
21   placed in ambulatory restraints -- immediately after being
22   placed in ambulatory restraints?
23   A    Immediately after?
24   Q    Before Lieutenant Hendricks came to the SHU?
25   A    You were left in the holding cell.

1    Q    Are you sure about that?

2    A    Immediately after?

3    Q    Yes.

4    A    So we had just got done --

5    Q    Putting ambulatory restraints --

6    A    Then, yes.

7    Q    There's nothing in your memory -- there's -- you certain

8         about that?

9    A    Yes.

10   Q    Okay -- okay, how would you describe my behavior in the SHU

11        since you been working in the SHU?

12   A    Poor.

13   Q    Would you say I was the -- probably the one -- the most --

14        the only individual that was really acting up in the SHU out

15        of everyone else in the SHU?

16   A    Yes.

17            MR. STODDARD:  So many things, your Honor, I would like

18   to ask him, but my mind --

19            THE COURT:  Well, just talk to Mr. Leonardo a minute,

20   and he can help you.

21            (Mr. Stoddard and Mr. Leonardo conferred off the

22   record.)

23   BY MR. STODDARD:

24   Q    Priors -- priors which your memory may serve, are you

25        familiar with, like, the sanctions that I received if -- by

| | | |
|---|---|---|
| 1 | | me continually acting up if I was to get another shot, which |
| 2 | | is an incident report, would that have affected the outcome |
| 3 | | of me going home? |
| 4 | A | You're asking me if I knew? |
| 5 | Q | Yes. |
| 6 | A | No. |
| 7 | Q | So it was never discussed that I had no good time left that |
| 8 | | could be taken away? |
| 9 | A | I don't concern myself with that, no. |
| 10 | Q | Okay.  When you was in the bubble, the control center, do |
| 11 | | you recall my mail being read? |
| 12 | A | Do I recall your mail being read? |
| 13 | Q | Yes. |
| 14 | A | Yes. |
| 15 | Q | Do you recall who opened my mail up and read the mail? |
| 16 | A | No. |
| 17 | Q | Do you recall who spoke about it? |
| 18 | A | At this point, no, I do not. |
| 19 | | (Mr. Stoddard and Mr. Leonardo conferred off the |
| 20 | | record.) |
| 21 | BY MR. STODDARD: | |
| 22 | Q | Earlier you said that when I spat through the slot, that |
| 23 | | Officer Hozey was hit on the left side of the face, correct? |
| 24 | A | I did not say that. |
| 25 | Q | You sure? |

1   A   Positive.

2   Q   When you -- when you showed the side that you showed him

3       getting spat on, you used your hand to show the side he got

4       spat on --

5   A   I did.

6   Q   -- which was your left hand.

7           When you was coming out of the control center, can you

8       tell me in which order you was as far as the officers coming

9       out of control between you and Hozey?

10          Was you in front of Hozey, and if so, how many officers

11      was up there with you?

12  A   I'm trying to remember.  I'm trying to count the names.  My

13      memory with names is -- I'm thinking five officers.

14  Q   So between Hozey -- between -- as far as coming down the

15      steps, it would have been five officers in front of Hozey

16      before Hozey actually came down the stairs?

17  A   No.

18  Q   That's the question I'm asking you.  How many officers was

19      in front of Hozey as Hozey was coming down the stairs?

20  A   I believe there was two in front of Hozey.

21  Q   And do you recall who those two was?

22  A   I believe it was Officer Mayorga in front of me, myself, and

23      then Officer Hozey.

24  Q   And you observed other officers coming down the stairs

25      behind Officer Hozey?

1   A   They were behind him, yes.

2   Q   Did you see them?

3   A   I'm going to say I -- I don't recall.  The only thing I

4       remember is seeing you.  That's what I remember.  I remember

5       seeing you and Hozey.  Everything else is just blank.

6   Q   But earlier you stated that it was five of you all that came

7       out of the control center?

8   A   Yes.

9   Q   But now you say you don't recall exactly who it was?

10  A   They -- they all could have been in the stairwell still at

11      that point.  Maybe that's why I don't recall seeing them.

12  Q   And especially Hozey, you know -- as you can see on the

13      monitor, there is no flap on the -- on the door.  I don't

14      know the last time that you been -- when was the last

15      quarter you worked in the special housing unit?

16  A   Five months ago.

17  Q   So five months ago.  We'll put it at, like, June, July?

18  A   Okay.

19  Q   When you left special housing unit in July, was there a trap

20      on the door?

21  A   No, there was not.

22  Q   And this incident took place -- my alleged assault incident

23      took place in January?

24  A   Yes.

25  Q   So when you left in July, there was no trap --

| | |
|---|---|
| 1 | A    There was not, no. |
| 2 | Q    -- on the door? |
| 3 | So is it fair to assume that the trap -- you may not |
| 4 | know it or not, that there there's a trap on the door now. |
| 5 | Is it fair to assume that the trap being placed on it in |
| 6 | July had nothing to do with the alleged assault incident |
| 7 | with me in January, because I'm pretty sure it wouldn't have |
| 8 | took six months to put a trap on the door? |
| 9 | A    What's your question? |
| 10 | Q    My question is do you believe that the trap was put on the |
| 11 | door for me allegedly spitting on Officer Hozey? |
| 12 | A    I don't have an opinion on that.  I obviously don't. |
| 13 | Q    But it's fair to say that you testified in July there was no |
| 14 | trap on the door? |
| 15 | A    Yes. |
| 16 | MR. STODDARD:  I'm going to have no further questions, |
| 17 | your Honor. |
| 18 | THE COURT:  Any redirect? |
| 19 | MS. DEMARAIS:  Briefly. |
| 20 | REDIRECT EXAMINATION |
| 21 | BY MS. DEMARAIS: |
| 22 | Q    When the defendant was asking you about if you had heard any |
| 23 | threats and you said not at that moment, at some point did |
| 24 | you hear threats? |
| 25 | A    Oh, yes, ma'am. |

| | | |
|---|---|---|
| 1 | Q | And when was that? |
| 2 | A | That was during -- that was while we were laying hard |
| 3 | | ambulatory restraints on him. |
| 4 | Q | And this is after the spitting? |
| 5 | A | After the spitting, yes. |
| 6 | Q | And what did the defendant say -- and give us an idea.  Is |
| 7 | | this minutes that you placed the restraints, seconds -- I |
| 8 | | haven't -- |
| 9 | A | Within minutes.  Maybe five minutes.  We had to get the gear |
| 10 | | together and things. |
| 11 | Q | I'm sorry, I didn't hear that last part. |
| 12 | A | We had to get the equipment together. |
| 13 | Q | Oh, to put on the restraints? |
| 14 | A | Yes. |
| 15 | Q | Okay.  So -- I'm sorry, so it took a little while, five |
| 16 | | minutes maybe.  And what did you hear the defendant say when |
| 17 | | you were placing the ambulatory restraints on him? |
| 18 | A | Verbatim, ma'am, I couldn't recall.  I just know that they |
| 19 | | were threats to Officer Hozey.  Inmate Stoddard was trying |
| 20 | | to antagonize Officer Hozey.  I do remember specifically |
| 21 | | inmate Stoddard stating, you know, "Go ahead and hit me, hit |
| 22 | | me, hit me," and Officer Hozey was having nothing of that. |
| 23 | | The threats -- I just know that there was threats made, and |
| 24 | | I don't recall what they were. |
| 25 | | MS. DEMARAIS:  Okay. |

 1              No further questions.

 2              THE COURT:  All right.  May this witness step down and

 3   be excused?

 4              MS. DEMARAIS:  I would like him here for recall.

 5              THE COURT:  At least step down.

 6              You may step down, and just keep in touch with

 7   Ms. DeMarais whether you need to be recalled.

 8              And sir, you'll have to remain out of the courtroom.

 9              THE WITNESS:  Yes, ma'am.

10              THE COURT:  All right, and the government may call its

11   next witness.

12              MS. DEMARAIS:  The government rests, your Honor.

13              THE COURT:  Mr. Stoddard, then, this is the time for

14   you to present your case, so at this time you need to decide

15   whether you want to testify or not.

16              Why don't you speak with Mr. Leonardo about that.

17              (Mr. Stoddard and Mr. Leonardo conferred off the

18   record.)

19              THE COURT:  You have to talk right into the microphone.

20              MR. STODDARD:  I'd like to move for a motion for direct

21   verdict, reurge the motion to dismiss that was filed.

22              THE COURT:  Before the magistrate judge, Velasco?

23              MR. STODDARD:  Yes, ma'am.

24              THE COURT:  All right.  And are you relying on the same

25   authority that was submitted by Mr. Leonardo?

1          MR. STODDARD:  Yes, ma'am.

2          THE COURT:  All right.

3          And Ms. DeMarais, your response to that motion?

4          MS. DEMARAIS:  Your Honor, I think that we have met our

5     burden at this point.  A reasonable juror could find the

6     defendant guilty of these charges, and I'll rest on my response

7     regarding that motion to dismiss initially, your Honor.

8          The statute was changed in 2007, basically having a

9     three tier, and the first tier is an assault, resisting,

10    impeding, and the second tier is for when there's contact.  And

11    the government has shown that there was contact, that the spit

12    hit him.

13         THE COURT:  All right.

14         I'm going to deny the motion for judgment of acquittal,

15    and find that the government at this stage of the proceeding has

16    submitted sufficient evidence for the case to go to the next

17    stage.

18         So Mr. Stoddard, so -- we're now in your defense case,

19    so you can either -- you can present witnesses.  You don't have

20    to.  You can testify if you'd like.  You absolutely don't have to

21    testify, and if you want to speak with Mr. Leonardo about that --

22             (Mr. Stoddard and Mr. Leonardo conferred off the

23    record.)

24         MR. STODDARD:  I'd like to call my first witness,

25    Mr. Nicholas Regan.

1          THE COURT:  All right.  Let's hold on.  Before you call

2     them, I'd like to know the relevancy of their testimony -- and

3     are you planning on testifying in this case, sir?

4          MR. STODDARD:  Yes, ma'am.

5          THE COURT:  All right.

6          So it just seems to me -- I don't know if the actual

7     act of spitting is in dispute here, or if these witnesses are

8     more to -- I'm not sure why the witnesses are relevant.  So why

9     don't you try to explain to me why you think -- because what I'm

10    inclined to do is maybe hear your testimony first, and then

11    decide if these witnesses are relevant.

12         MR. STODDARD:  They go to Officer Hozey's character as

13    since I been indicted, he then made -- on two occasions he

14    offered inmates tobacco to do bodily harm to me when we go to

15    rec.  And my first witness is more so going to attest to hearing

16    him offer individuals tobacco to assault me as a result of this

17    indictment that I'm fighting right now, your Honor.

18         THE COURT:  All right.  So you're saying that these

19    witnesses will show that the -- that the officer is somehow

20    prejudiced against you, or biased in this case, and that may

21    somehow taint the testimony he's given to the Court today?

22         MR. STODDARD:  Yes.

23         THE COURT:  Is that -- all right.  So -- all right.

24    Well, let me -- I -- I'd like to hear your version of the events

25    first before I decide whether or not it's relevant, these

| | |
|---|---|
| 1 | additional witnesses.  So why don't you go ahead -- and if you |
| 2 | need a minute to speak with Mr. Leonardo, why don't you go |
| 3 | ahead -- well, speak with Mr. Leonardo.  It sounds like -- I |
| 4 | think you just told me that you do want to testify, but I'm |
| 5 | inclined to hear your testimony first before I decide if the |
| 6 | other witnesses' testimony is relevant. |
| 7 | So take a minute and speak with Mr. Leonardo. |
| 8 | (Mr. Stoddard and Mr. Leonardo conferred off the |
| 9 | record.) |
| 10 | MR. STODDARD:  Done, your Honor. |
| 11 | THE COURT:  All right.  So are you ready to testify |
| 12 | then? |
| 13 | MR. STODDARD:  Yes, ma'am. |
| 14 | THE COURT:  All right.  Why don't you stand -- and you |
| 15 | can just stay right there, and raise your right hand, and I will |
| 16 | have the clerk swear you in as a witness. |
| 17 | (Robert Leroy Stoddard was duly sworn by the clerk.) |
| 18 | THE COURT:  All right, and you can have a seat right |
| 19 | there.  And then again, talk right into the microphone. |
| 20 | And because you're representing yourself, I'll just go |
| 21 | ahead and let you -- obviously, you can't ask questions of |
| 22 | yourself.  So if you just want to give a summary of the facts |
| 23 | that you'd like to present to the Court at this time, and then |
| 24 | Ms. DeMarais may have some questions for you. |
| 25 | So go ahead. |

1                          ROBERT LEROY STODDARD

2                          DIRECT EXAMINATION

3    A      On January the 9th I had a couple of incident reports in the

4           special housing unit.  I had just been acting up on that

5           particular day, so I was in my cell.  Officer Hozey came

6           around, he passed out lunch.  I mean -- correction, he

7           passed out dinner.  And as he was coming back to pick up the

8           trays, I had my window covered up.  He banged on the window.

9           I didn't respond.

10                 THE COURT:  About what time was this, do you think?

11                 MR. STODDARD:  I would say between 4:30, 5:30.  Right

12   up in there.

13                 THE COURT:  Were you in that cell that's in the

14   picture -- that's been shown to me in the pictures?

15                 MR. STODDARD:  No, ma'am.  I was in a regular cell on

16   the range, on Charlie range, which is C range.

17                 THE COURT:  Okay.  Go ahead.

18   A      And so he said, "I guess you didn't want your mail."  So I

19          never responded to what he said, so he left.

20                 I kept hitting the button, and I'm assuming that the

21          number 1, which is the person that's responsible for the

22          special housing unit, which was Birmingham who's a

23          lieutenant now, but at the time he was a regular officer, he

24          sent the officer down to get me and bring me to the holding

25          tank.  That's in the picture.  If I had to say, I would say

1          maybe this is around between six and quarter to seven when I

2          was placed in the holding cell.

3                    THE COURT:  And that was done at your request?

4                    MR. STODDARD:  I wouldn't say it was done at my

5          request.  I think it was more so because I kept pushing the

6          button.  The number 1 -- which is a button.  It would make a

7          buzzing sound inside the bubble.  I'm just speculating, because

8          out of the blue the officer just came and got me, and placed me

9          inside of --

10                   THE COURT:  All right, so that's a disciplinary cell?

11                   MR. STODDARD:  No, I wouldn't say a disciplinary cell.

12         It's more so a cell that when an inmate comes into a SHU and

13         they've got to dress him out and put him into special housing

14         clothes, that's just a cell that they -- you know, they just hold

15         people in if you've got to go to DHO, which is a

16         disciplinary hearing officer, you got to go to medical when

17         medical staff come into the SHU.  It's just like a -- I'm going

18         to say a cage that just holds you in until you just go on to the

19         next stage.

20                   So while I was in there Lieutenant Birmingham come --

21         which he was a regular officer, but Lieuteant Birmingham come,

22         and he asked me what was going on, and I just told him I just had

23         a lot going on in my mind.  I just needed to get out of my cell a

24         little bit.  So he placed me into the cell.

25                   So when finally I see Officer Hozey, I asked him, I

1    say, "Man, do I have any mail?  Because I don't know if you was

2    just using that as a ploy or not."  I said to him, "There's two

3    things I'm not going to allow you to play with.  One is my mail,

4    and one is my food."  He say, "You don't think I notice?"  And he

5    said, "Yes, you do have mail."

6              And so he comes and he holds a piece of mail up to the

7    bubble -- to the window, which you can see -- from out there you

8    can see into the bubble.  I didn't have my glasses on so I

9    couldn't tell if the mail was for me or not.

10             So I finally say to Lieutenant Birmingham sometime

11   later that I'm ready to go back.  So when he was coming to put

12   handcuffs on me to take me back, they hand me my mail.  Who

13   exactly hand me my mail, I couldn't say, but my mail -- when --

14   my mail was open.  But I -- how I know it was open is when your

15   mail come into the institution, it goes to the mail room.  The

16   mail room go through your mail, I guess, look for contraband.  I

17   assume they probably read -- you know, in spats read letters to

18   see if anything in there that ain't supposed to be in.  Once

19   everything is okay, they put a piece of tape on it to seal the

20   mail back up, but the mail is still open but the tape is keeping

21   the contents inside.

22             So when he hand me the mail, it's open.  So now I'm in

23   my cell, and I say, "I'm not going nowhere."  So everybody leaves

24   from the front of the thing and they go do whatever it is.  So I

25   see Officer Hozey.  We going back and forth in a verbal, you

1    know, conversation.  I'm telling him, "Man, I'm holding you

2    responsible, because you the one that was passing -- you know,

3    passing the mail out."

4          And the next thing you know he goes into the bubble.

5    And when he goes into the bubble, people come running out of the

6    bubble, and they go into the other room that has the chains and

7    ambulatory restraints type of equipment.  And they came back,

8    open the thing up, and proceeded to put me in ambulatory

9    restraints.

10          After they placed me in ambulatory restraints -- when

11   they put you in ambulatory restraints, a video camera is supposed

12   to be present.  As of this particular moment, there was no video

13   camera present, and in that hallway there's no camera in the

14   hallway.  But they proceeded to take me from -- out the holding

15   tank I'm going to say around 9:40 and place me outside, 9:40 at

16   night when the lieutenant finally come down.  That's when they

17   got the camcorder and they proceeded with the camcorder to take

18   me from outside, from a cage outside, and put me into a cell.

19   But when Mr. Smith testified earlier, he testified that -- when I

20   asked him right after the ambulatory restraints was placed on me

21   where was I put at, he said without a doubt that I was left

22   inside of the holding -- the holding thing, but that's not the

23   case.  Soon as I was placed in the holding thing, they took and

24   placed me outside.

25          Now, I have a bad history of -- I been -- I been in the

1   special housing unit since October the 16th of last year.  I have

2   no privileges.  I have -- you know, I have copies.  I have my --

3   my phone thing let me know when my phone come back.  My phone is

4   suspended until July the 31st, 2014.  My commissary is in here

5   somewhere, suspended until 2015.  I couldn't obtain a copy of

6   when my --

7               MS. DEMARAIS:  I'm going to object on relevance, your

8   Honor.

9               THE COURT:  Yes -- so tell me why you think that's

10  relevant to what I need to decide.

11              MR. STODDARD:  Okay, because I had nothing I could

12  lose.  There was no other sanction that they could give me that

13  would hinder me from going home.  I'm scheduled to go home, max

14  out May 10th of next year.  And when I used to get into these

15  altercations, I used to -- you know, we be going back and forth.

16  I was like, "You can write all the shots you want.  A shot not

17  going to hurt me because there's nothing that you can take from

18  me.  I have no good time left or anything of that nature that

19  could hinder me from going home on May 10th."  And that's -- to

20  me, that's the relevance of this whole proceeding.  I feel

21  this whole proceeding is -- this is being done because I'm the

22  one in the SHU -- as Officer Smith testified to, that out of

23  everybody in the SHU, I was the one that was acting up the most.

24  And it's just -- I just feel --

25              THE COURT:  So you're -- are you trying to say that

1   these charges were brought against you to get you additional time

2   in custody?  Is that what you're trying to say?

3          MR. STODDARD:  I don't --

4          THE COURT:  That you can't lose any good time credit?

5          MR. STODDARD:  What happened was when the F.B.I. agent

6   came to see me, I didn't even know I was going to see the F.B.I.

7   agent.  They told me you was wanted at medical.  So when they

8   take me up in that area, they take me over towards R&D.  When I

9   get to R&D there's an F.B.I. agent who's sitting in the stands

10  earlier -- I don't know if he's still behind me or not, and an

11  SIS officer.  When I get in there he brings up three incident

12  reports that I have that he was going to try to get an indictment

13  for me threatening staff.  He said to me, he say, "We be

14  listening to your phone calls, we be monitoring your mail, things

15  of that nature."  I say, "You been listening to my phone calls?"

16  He say, "Yes, we do."  I say, "What are you listening to, phone

17  recordings?  Because I haven't had a phone in over three years."

18  He just kind of -- kind of laughed.  So I say, "Next thing you

19  know I guess you be coming to get me on Hozey lying on me saying

20  I spit on him."  He wrote the name Hozey down.  So during the

21  course of the interview he say to me, "We got ten of these, which

22  was threatening, that we can possibly charge you on.  Each one

23  carry five years.  We definitely going to proceed with one of

24  them."  I told him I didn't wish to speak to him anymore, and I

25  would like to leave.

1        The SIS officer who worked for the Federal Bureau of

2  Prisons, I believe SIS stands for special investigative services,

3  they mainly investigate things that go on within an institution,

4  he told me I can't go nowhere until they done.  So at this point

5  I really wasn't trying to catch another shot by refusing his

6  order and demanded that I leave, so I just sat there and listened

7  to the things they said.  And after that, they -- that was --

8  that was the end of that.

9        And here is a printout from November the 24th, 2009, of

10 all the incidents that I'm in court since I been in the Federal

11 Bureau of Prisons.  Since the first shot in court was on April

12 the 22nd, 2005.  I came into federal custody on January the 27th,

13 I believe, of 2005.  And since then if I had to say I record over

14 90 incident reports for various different rule violations.

15       I'm not sitting here -- I know I wasn't a model citizen

16 since I been in jail.  We -- we are in -- you know, I'm in a cell

17 23 hours a day, five days a week, you know, and if I have a

18 cellee, you must eat in the cell with this other individual.  If

19 one of you all have to use the bathroom, that person -- you got

20 to be in the cell with them.  You shower in the cell, everything

21 that -- you know, for two men being in the cell under them type

22 of conditions is real -- real harsh.

23       I just know -- I just know that this is -- from what I

24 feel is retaliation for me acting up.  And I asked numerous

25 officers from lieutenants on up to AW's who has over 15 years of

1    experience working for the Federal Bureau of Prisons, and I have

2    asked them have they ever seen anyone who has hepatitis or has

3    any type of disease such as HIV/AIDS get indicted for allegedly

4    spitting on staff?

5              THE COURT:  So is it your idea that this is retaliation

6    by -- by Mr. Hozey, or are you saying other individuals -- other

7    prison officials?

8              MR. STODDARD:  I'm going say that -- I'm going to say

9    by other prison officials.

10             THE COURT:  Not by Mr. Hozey?

11             MR. STODDARD:  Not by Mr. Hozey directly, no, I don't

12   --

13             THE COURT:  Well, then, why would it be relevant, these

14   other witnesses that you have, to talk about their contact with

15   Mr. Hozey if you don't think this is coming from Mr. Hozey?

16             MR. STODDARD:  No, I don't think Mr. Hozey was the one

17   who forced the issues to try to get me prosecuted.  No, I -- no,

18   I do not.

19             THE COURT:  So why would those other witnesses then be

20   relevant to what I need to decide?

21             MR. STODDARD:  Because he done -- he done came on the

22   range on two occasions, and then made threats towards my person

23   as far as offering other inmates to do bodily harm to me when we

24   go to rec.

25             THE COURT:  All right.  So any other statement that

1    you'd like to make at this time?  And then Ms. DeMarais will have

2    a chance to ask you some questions.

3              MR. STODDARD:  And I also would like to deny the

4    allegation of me spitting on Officer Hozey.  That incident never

5    took place.

6              THE COURT:  All right.

7              Now, Ms. DeMarais, do you have any questions for

8    Mr. Stoddard?

9              MS. DEMARAIS:  Yeah.  Do you want me to go up there?

10             THE COURT:  I guess you could stay there.  Otherwise,

11   he's going to be at your back.  You can sit or stand at counsel

12   table.  Just make sure you talk right into the microphone there.

13                        CROSS-EXAMINATION

14   BY MS. DEMARAIS:

15   Q    So Mr. Stoddard, you believe that you were prosecuted -- the

16        decision was made to be prosecuted by somebody in the

17        corrections department, is that what you believe?

18   A    No.

19   Q    Okay.  So you have an understanding that the prosecutor's

20        the one who decides to indict, to bring the case to the

21        grand jury.  Do you understand that?

22   A    Yes.

23   Q    Okay.  Now -- so you're saying you never spat on Hozey?

24   A    No.

25   Q    So you're saying that he -- he -- so both he and Smith are

| | | |
|---|---|---|
| 1 | | not telling the truth when they testified today? |
| 2 | A | They are completely lying. |
| 3 | Q | Completely lying? |
| 4 | A | Yes. |
| 5 | Q | Okay.  Now, you -- but you admit that you were in that cell? |
| 6 | A | Yes. |
| 7 | Q | And you admit that there was a confrontation? |
| 8 | A | A verbal confrontation, yes. |
| 9 | Q | Verbal confrontation.  And it had to do with your mail, |
| 10 | | correct? |
| 11 | A | Yes. |
| 12 | Q | And you -- and you talked a lot about when you got your mail |
| 13 | | that Hozey was the one who was passing out mail initially, |
| 14 | | correct? |
| 15 | A | Yes. |
| 16 | Q | And so when he gave you the mail back and the tape was |
| 17 | | broken, that you thought he had read it, didn't you? |
| 18 | A | When I was testifying earlier, I said I can't recall who |
| 19 | | gave me the mail.  So I never said that Officer Hozey gave |
| 20 | | me anything. |
| 21 | Q | Well, why were you so mad at Hozey then? |
| 22 | A | Because he was the one that was initially passing mail out |
| 23 | | when he came to pick up my tray and he knocked on my door |
| 24 | | and said, "I guess you don't want your mail." |
| 25 | Q | So you think it's his fault that someone read it, or why |

1        were you mad at Hozey?

2   A    I was upset with Hozey because he was the one that was

3        handling my mail.

4   Q    Okay.  And by the time you get your mail, somebody had

5        opened it.  Is that what you were mad about?

6   A    Yes.

7   Q    Okay.  So you were mad at Officer Hozey?

8   A    Yes, I was.

9   Q    Okay.  You told the judge that on January 9th of this year

10       that you had a couple incidents reports.  Isn't that what

11       you told her?

12  A    Yes.

13  Q    Because you were acting up that day, correct?

14  A    Yes.

15  Q    So you were placed in the holding cell for acting up?

16  A    No.

17  Q    You so your testimony is you were acting up that day, but

18       you were placed in the holding cell because you wanted to be

19       placed there.  You requested it?

20  A    Yes.

21  Q    What kind of acting up were you doing that day?

22  A    I -- things is just so discombobulated that I'm pretty sure

23       if I'm given a chance, your Honor, I can look through my --

24       and pretty much tell you --

25            THE COURT:  Do you have notes -- do you want him to

1  look through his notes, or just -- to refresh his memory about

2  what he was doing that day?

3         MS. DEMARAIS:  Well -- okay, I'll just -- your Honor,

4  at this point he has admitted that he was acting up that day, and

5  he has admitted that he's not a model prisoner, and I would like

6  to get into some of these things that he has done while he's

7  housed there.

8         THE COURT:  All right, go ahead.

9  BY MS. DEMARAIS:

10  Q    Let's just start with January 9th, 2009.  I mean, in the

11       past you did a lot of sprinkler breaking, didn't you?

12            You have numerous -- over the months numerous charges,

13       or whatever you call them -- what do you call them in the --

14       numerous charges of breaking sprinklers?

15  A    Yes.

16  Q    You used to do that a lot?

17  A    Yes.

18  Q    Do you think you broke a sprinkler that day?  That's why

19       they had you in the holding cell?

20  A    I'm not sure, but if I'm given a second I can almost tell

21       you -- if I'm given a second to look through this.  Oh, boy

22       --

23  Q    Well, that's all right.  You don't know what you did, but

24       whatever you did, didn't get you in the holding cell.  It

25       was your request to go there is what got you there.  Is that

1           what your testimony is?

2    A      Yes.

3    Q      Okay.  And it's your testimony that initially when Hozey

4           arrives you are in your cell.  You're not in the holding

5           cell, is that correct?

6    A      Yes.

7    Q      That's your testimony?  But you told the judge that you were

8           covered -- covering your window?

9    A      Yes.

10   Q      You're not supposed to do that, are you?

11   A      No.

12   Q      Okay.  So then you said Hozey banged on the window?

13   A      He tapped on the window, yes.

14   Q      Because you're not supposed to have the window covered?

15   A      Yes.

16   Q      But then sometime after -- so sometime after that is when

17          you got moved to the cell?

18   A      Yes.

19   Q      At your request?

20   A      Yes.

21   Q      And so you'll admit during that time that you were in that

22          holding cell on January 9th, 2009, that there wasn't a

23          little cover there, correct?  That was open, just like the

24          exhibit showed?

25   A      Yes.  Yes.

1   Q   And you were -- you were telling the judge that -- that

2       you've been in the SHU unit for -- have you been there all

3       the time you were in Arizona?

4   A   I was on the compound for eight days, got into a verbal

5       confrontation with the warden.

6   Q   So you know in the general area, people -- safe to say

7       there's a lot more freedom, correct?

8   A   Yes.

9   Q   You're not sitting in a cell all the time, correct?

10  A   Correct.

11  Q   And -- but you yourself admitted to the judge that you act

12      up quite a bit.  That's fair to say, isn't it?

13  A   Only in the SHU, yes.

14  Q   Well, it's kind of hard to get out of there, isn't it, if

15      you keep acting up?

16  A   Yes.

17  Q   Correct?

18  A   Yes.

19  Q   And so basically you told the judge you didn't have any --

20      they couldn't take any good time away from you because it's

21      all gone, correct?

22  A   Yes.

23  Q   There's nothing they can do to you at this point.

24          I want to talk a little bit about things that you have

25      done while you're there.  I mean, numerous times force was

```
 1         used against you.  And when they say force, they're talking
 2         about the ambulatory restraints, is that what they're --
 3    A    When they say force was used, it could be them officers
 4         suiting up, putting the helmet pads, elbow pads, things like
 5         that on, running up in the cell.
 6    Q    And they've had to do that quite a bit, use that against
 7         you?
 8    A    They never had to, quote, running a cell on me.  Only time
 9         they physically running a cell is when they come to the door
10         and actually cuff up.  If you refuse to cuff up, then they
11         going to run in.  I have never refused to cuff up.
12    Q    Just like Hozey was saying today, you complied?
13    A    I always comply.
14    Q    You always comply.  But isn't it true that actions have been
15         taken several times because you've broken the sprinkler
16         heads in your cell?
17    A    Yes.
18    Q    And you've also broken a window in your cell?
19    A    Yes.
20    Q    And then they have to take you out of your cell and put you
21         in the holding cell, correct?
22    A    They can put me where they choose to put me, just like I was
23         put outside.  So it's not -- you don't necessarily always
24         get taken out of your cell.  I even been left in a cell
25         where I bust the sprinkler.  They just done left me in there
```

|    |   |                                                                       |
|----|---|-----------------------------------------------------------------------|
| 1  |   | with everything wet, and I had to just hang everything up             |
| 2  |   | and let it dry.                                                        |
| 3  | Q | And another time -- I'll read you the date, on November 2nd,          |
| 4  |   | 2008, you threw feces through a food slot at an officer.  Do          |
| 5  |   | you remember that time that you got punished for that?                |
| 6  | A | But I didn't throw feces on him.                                       |
| 7  | Q | Oh, what was it?                                                       |
| 8  | A | I didn't throw feces on him.                                           |
| 9  | Q | Oh, you just threw it out there?                                       |
| 10 | A | Yes.                                                                   |
| 11 | Q | Okay.  And also, you've thrown urine out the food slot on             |
| 12 |   | more than one occasion?                                                |
| 13 | A | No.                                                                    |
| 14 | Q | Did you tell somebody it was urine?                                    |
| 15 | A | No.  I was wrote up for it.  That's what the officer assumed          |
| 16 |   | that it was.                                                           |
| 17 | Q | It was what?                                                           |
| 18 | A | The officer assumed that it was urine, and he wrote me up             |
| 19 |   | for it.                                                                |
| 20 | Q | You got written up for that?                                           |
| 21 | A | I threw milk out of the slot, but it did not get on an                |
| 22 |   | officer.                                                               |
| 23 | Q | You threw milk out?                                                    |
| 24 | A | Yes.                                                                   |
| 25 | Q | And they said that it was urine.  Okay.                               |

```
 1              And then -- well, you've thrown other stuff out the
 2         slot.  They just say an unknown liquid substance on
 3         January 14th, 2009.
 4              But safe to say when -- you're telling the judge, and
 5         there's numerous -- you've also set fires outside your cell?
 6    A    Yes.
 7    Q    More than one occasion?
 8    A    Yes.
 9    Q    And one time you flushed the toilet so -- you continued to
10         flush the toilet until it overflowed, is that correct?
11    A    Yes.
12    Q    And so when you're telling the judge that you had -- there's
13         a reason why you're in that unit, correct?
14              You know why you're there, because you keep doing those
15         things, true?
16    A    I'm going to say no.
17    Q    Okay, why do you think you're there?
18    A    Out of all these shots, probably about 90 shots in general
19         population, the part where you say you can have a lot of
20         freedom, in the entire time I've been locked up I've only
21         caught about five shots in the general population.  Any
22         other shot that I have received is me being in special
23         housing unit.  And I guess my training -- the way my mind
24         think is I'm already in the SHU, and if I act up, what are
25         they going to do, lock me up and put me in the SHU again?
```

1           The SHU to me is a jail within a jail, so --

2    Q     Okay.  And you've received -- as far as disclosure, you've

3          received all the incident reports by all the officers --

4          Hozey and Smith, they were there.  You've received that in

5          your disclosure, haven't you?

6    A     Incident report?

7    Q     Well, the report the officers write?

8    A     You mean, like the memo?

9    Q     Yeah -- yeah, the memo.  You've seen all those, right?

10   A     Yes.

11   Q     Now, you deny spitting on Hozey, but do you admit to

12         threating him?  Did you threaten him?

13   A     I never threatened him, no.

14   Q     You never said anything about --

15   A     Cussed him out.

16   Q     So you never said, I'm getting out soon, something to that

17         effect, I'm going to fly to Tucson, rent a car, and get you

18         and your family.  It would be easy to do.  You never said

19         that?

20   A     No, and neither do any of these officers who wrote memos say

21         that I did.  That only person that say that I did

22         anything along them lines is Officer Fitzgerald, I believe.

23   Q     But the other officer -- you just heard Smith.  He said he

24         remembers you yelling threats, but he couldn't remember what

25         they were?

1    A    He don't remember what it was.  And even when he wrote his

2         memo, he don't even mention that in his memo, which is dated

3         the date of the incident, which I'm sure at that time would

4         have been fresh in his memory.  He would have wrote that in

5         his report, but for some reason he didn't.

6    Q    He didn't write what the threats were.

7             Okay.  And you're serving your time for -- now, for

8         attempted distribution of cocaine.  Is that what you were

9         found guilty of?

10   A    I pled guilty to it.

11   Q    Pled guilty to that?

12   A    Yes.

13   Q    And that was a Washington D.C. case?

14   A    Yes.

15   Q    Okay.  And that's the one you're serving your time on now?

16   A    Yes.

17   Q    And then you also have a -- a previous felony conviction out

18        of Baltimore, Maryland, in 1997?

19   A    No.  Not out of Baltimore, Maryland, no.

20   Q    Was it out of Maryland?

21   A    Yes.  Prince George's County, Maryland.

22   Q    Prince George's County, Maryland.  And that was -- you

23        were -- did you plea or were you convicted on that one?

24   A    I pled guilty.

25   Q    And you pled guilty, and that was in July of 1997?

1   A    I don't know the exact year I pled guilty, but I do

2        know that I pled guilty to the charges.

3              MS. DEMARAIS:  No further questions, Judge.

4              THE COURT:  What was that charge -- or we don't know?

5              MS. DEMARAIS:  Well, your Honor, I do know, but -- and

6   I did file -- it was a felony count, and I did file a notice of

7   impeachment regarding that charge.

8              THE COURT:  Oh, all right.

9              (The Court and clerk conferred off the record.)

10             THE COURT:  What document number is that?

11             MS. DEMARAIS:  Or I can give you -- I have an unfiled

12  copy here.

13             MR. STODDARD:  Hey, your Honor, may I explain that --

14  what she's speaking on, your Honor?

15             THE COURT:  Hold on, just a minute.  Let's let her

16  finish up what she's doing, and then I'll give you a chance to

17  make another statement.  It will be kind of like redirect

18  examination.  Normally, your lawyer would ask you some additional

19  questions, but it -- I'll let you make a statement regarding

20  anything Ms. DeMarais has asked you about.

21             MR. LEONARDO:  I don't have any of the file copies in

22  my file.

23             THE COURT:  We can print a --

24             MS. DEMARAIS:  That's all I have, Judge.

25             THE COURT:  That's fine.  Was -- is it disputed that it

1   was a felony conviction?

2           MS. DEMARAIS:  No.

3           THE COURT:  All right, so you're saying -- your point

4   is that Mr. Stoddard has two felony convictions for purposes of

5   impeachment?

6           MS. DEMARAIS:  Correct, Judge.

7           THE COURT:  Okay.  That's fine.

8           All right.  So Mr. Stoddard, the government counsel's

9   done questioning you.  Is there anything that you'd like to --

10  normally, this would be redirect examination where your lawyer

11  would ask you some follow-up questions.  Anything that

12  Ms. DeMarais covered in questioning you that you'd like to make

13  an additional statement on?

14          MR. STODDARD:  Yes.

15          THE COURT:  Go ahead.

16                       REDIRECT EXAMINATION

17  BY MR. STODDARD:

18  A     When she -- you know, when Officer Smith testified earlier,

19        he stated he heard me making threats to Hozey but he -- he

20        couldn't recall the threats that I was making.  Even when

21        I -- I asked him, he couldn't recall the threats that he was

22        making.  Out of all these memos --

23          THE COURT:  I'll give you a chance to make a closing

24  argument to the Court --

25          MR. STODDARD:  Okay.

```
 1            THE COURT:  -- but are there any facts that you want to

 2   talk about at this point?

 3            MR. STODDARD:  Since I been -- like I stated earlier,

 4   since I been incarcerated, I can function very well in the

 5   general population.  It's just that when I come to the special

 6   housing unit, I just feel like it can't get any worser than what

 7   it is, and I lashes out.  I have been catching a whole bunch of

 8   shots for, you know, a whole bunch of different -- different

 9   things.

10            When she say that I threw urine or something on the

11   officer, it wasn't urine.  That was the incident that I was

12   wroten (sic) up for, and it just amazes me how I can be wrote up

13   for something and, you know, just get found guilty on it with no

14   physical evidence to substantiate these claims, no --

15            THE COURT:  Did you have an administrative hearing?

16            MR. STODDARD:  Yes, ma'am.

17            THE COURT:  Okay.  And you're saying you threw milk

18   and, not urine?

19            MR. STODDARD:  I threw milk through the slot.

20            And that's it -- pretty much it, your Honor.

21            THE COURT:  All right.  I'm going to allow you to call

22   your other witnesses.  So who's the next witness that you want to

23   call?

24            MR. STODDARD:  Nicholas Regan.

25            MS. DEMARAIS:  And your Honor, since there isn't an
```

1    attorney, I would just like the stand-by counsel to counsel

2    these -- I believe both of them are going to get on the stand and

3    commit perjury, your Honor.  I just would like somebody to

4    counsel them, if stand-by counsel could do that.

5             THE COURT:  Okay.  And for purposes of security in the

6    courtroom, where would the marshal service like these witnesses

7    to sit?

8             Do you want them up here on the witness stand, or some

9    other location?

10            THE MARSHAL:  The witness stand is fine.

11            THE COURT:  Do you need a few minutes?

12            THE MARSHAL:  Yes, if we may, your Honor.

13            THE COURT:  All right.  So go ahead and get Mr. Regan.

14            Is it Regan?

15            THE MARSHAL:  They're calling him now, your Honor.

16            THE COURT:  Mr. Leonardo?

17            MR. LEONARDO:  I was just going to say I have a matter

18   in another courtroom in the building at two.  Can I just run down

19   and check in?

20            THE COURT:  All right.

21            MR. LEONARDO:  I'll be right back.

22            THE COURT:  Let's go ahead -- we'll stand at recess

23   until the witness arrives, and is settled into the witness chair.

24            (The Court recessed at 2:00 p.m., and reconvened at

25   2:13 p.m.)

1              THE COURT:  The record can reflect the presence of

2    counsel, the defendant.

3              And we have a witness on the witness stand.  Jill, if

4    you could please swear him in.

5              MR. STODDARD:  Excuse me, your Honor, before we do

6    that -- excuse me, I didn't know when -- I have the video that I

7    would like to show.  I didn't know when I would be allowed to

8    show the video.

9              THE COURT:  Well, let's go ahead and finish with the

10   witness first.

11             MR. STODDARD:  Okay.

12             THE COURT:  Go ahead.

13             (Nicholas Regan was duly sworn by the clerk.)

14             THE COURT:  And have a seat.

15             And if you could talk right into the microphone.

16             And Mr. Stoddard, you may ask questions of the witness.

17                         NICHOLAS REGAN

18                       DIRECT EXAMINATION

19   BY MR. STODDARD:

20   Q    Mr. Regan, on October the 21st, 2009, when Officer Hozey

21        came on the range, what did you hear me say to Officer

22        Hozey?

23   A    "What -- what are you doing working this range?"

24   Q    And do you recall what he said to me?

25   A    He said, "Fuck you."

```
 1   Q    And do you recall what I said to him?

 2   A    You said, "Fuck you back."

 3   Q    And do you recall what he said after that?

 4   A    He made a statement on the range that he had three cans of

 5        chewing tobacco for anybody that would fuck you up at rec.

 6   Q    Sometime after that do you recall a Lieutenant Curran coming

 7        on the range?

 8   A    I recall a lieutenant coming on the range.  I don't know if

 9        it was Curran.

10   Q    Do you recall me having a conversation with the particular

11        lieutenant that stopped on the range?

12   A    Yes, I do.

13   Q    From your cell was you able to hear the contents of the

14        conversation which me and the lieutenant was having?

15   A    Some of it, yes.

16   Q    Can you state for the Court what did you hear?

17             MS. DEMARAIS:  Objection.  Hearsay, your Honor.

18             THE COURT:  No, overruled.

19             MS. DEMARAIS:  What the lieutenant said.

20             THE COURT:  Oh, wait -- who made -- who made the

21   statement?

22             Do you know who was making a statement?

23             THE WITNESS:  He was talking to -- Mr. Stoddard was

24   talking to the lieutenant.

25             THE COURT:  All right.
```

1              Go ahead.

2   A    All I heard you say to the lieutenant -- you voiced to him

3        what had took place when Officer Hozey came on the range,

4        and I believe -- to my knowledge what I heard Officer --

5        whatever the lieutenant you were talking to, he said that he

6        was going to state this to the captain, and to my knowledge

7        they both came back, the lieutenant and Captain Barnhart, to

8        your door to speak with you about the incident.

9   Q    When Captain Barnhart came on the range, do you recall --

10       before he got to my cell, do you recall where he started at

11       on the range as far as talking to people on the range?

12  A    At the end of the range.

13  Q    And worked his way down?

14  A    Yes.

15  Q    Do you recall him -- any of the conversation that me and

16       Captain Barnhart was having pertaining to the matter?

17  A    Yes, I do.

18  Q    Can you state for the Court what you heard?

19  A    Barnhart --

20            THE COURT:  Wait a minute.  Hold on, sir.  So

21  Mr. Stoddard, if you want this conversation that you had with

22  somebody to come out, you're going to have to talk about that, as

23  opposed to have somebody else talk about that.  So I'll let you

24  reopen your testimony if you want to talk about that

25  conversation.

1              But go ahead -- any additional questions for this

2    witness?

3    BY MR. STODDARD:

4    Q    When -- that Wednesday passed, but -- Wednesday before

5         Wednesday passed.  Between, I'm going to say, 11:00 and

6         12:30 you was told that you was wanted at medical, correct?

7    A    Yes, I was.

8    Q    And when the officer cuffed you up, what did he take you to?

9    A    He took me to a little holding cell in front of the

10        lieutenant's office in the SHU.

11   Q    And once the officer came back to get you, did he take you

12        to medical?

13   A    No, he didn't.

14   Q    Where did he take you to?

15   A    He took me to the counselor's office beside the holding

16        cell.

17   Q    And once you was in the counselor's office, was medical

18        waiting in there to see you?

19   A    No, they weren't.

20   Q    Who was waiting there to see you?

21   A    Someone from SIS, and F.B.I. agent.

22   Q    And can you tell the Courts what that discussion was about

23        when you went into that cell?

24   A    The discussion was about the incident that took place on the

25        range with Officer Hozey.

1    Q    And what type of questions did the F.B.I. agent or the SIS
2         officer ask you?
3    A    They wanted to know exactly what it was that Officer Hozey
4         had said to you.
5    Q    And you basically told him the same thing you told the
6         Courts today?
7    A    Yes, I did.
8    Q    And did there ever come a time that you was ready to leave?
9    A    Yes.
10   Q    And when you was ready to leave, what happened?
11   A    They told me that I wasn't allowed to leave until they were
12        through with the questioning.
13   Q    And what did you do once the people that was talking to you
14        said this to you?
15   A    I told them I had nothing further to say.  I was ready to
16        go.
17   Q    And then what happened after that?
18   A    They escorted me out.
19   Q    How would you classify my behavior far as -- how long have
20        you been -- known me?
21   A    Maybe around six months.  The whole time I been in the SHU.
22   Q    Have we ever been in general population together?
23   A    No, we haven't.
24   Q    So any interactions you had with me just basically been in
25        the SHU?

1    A      Yes.

2    Q      How would you classify my behavior as an inmate in the SHU?

3    A      You're not an angel.

4    Q      Tell me -- tell me, why do you say that?

5    A      Some of the things I seen you do.

6    Q      Such as?

7    A      Busted sprinklers, busting windows.

8    Q      And when you see me do that, how do you perceive the staff

9           to when I be acting out like that?

10          How do staff act back towards me?

11   A      To me in my -- my perception is it's like they taunt you.

12          They want you to do things like this so -- so they can, say,

13          strap you down, and four-points you, things of that nature.

14   Q      Have you heard any officers recently state that he hoped

15          that I get some jail time come Friday?

16          MS. DEMARAIS:  Objection on relevance.  What officers?

17          THE COURT:  Yes, if we could limit your questions to

18   anything relating to Officer Hozey, or any other witness'

19   testimony.

20          MR. STODDARD:  This is more so, your Honor, into one of

21   the memos that the officer wrote to the incident who was still

22   working in the special housing unit, even though he was -- he was

23   one of the officers that wrote a memo on the incident.  And since

24   I been in the SHU, he's been provoking me --

25          THE COURT:  Okay, this wouldn't be any of the witnesses

```
 1    who have testified before me today?
 2              MR. STODDARD:  No, ma'am.
 3              THE COURT:  Then it's not relevant.  What other people
 4    think, or what other people might want to happen to you is really
 5    not relevant to what I need to decide.
 6              So if you want to ask another question.
 7              MR. STODDARD:  I have no more questions, your Honor.
 8              THE COURT:  All right.
 9              Any cross-examination of the witness?
10              MS. DEMARAIS:  Yes, your Honor.
11                        CROSS-EXAMINATION
12    BY MS. DEMARAIS:
13    Q    You took an oath today, correct?
14    A    Yes, I did.
15    Q    You swore to tell the truth?
16    A    Yes.
17    Q    And you understand that if you don't tell the truth, that's
18         a crime?
19    A    Yes.
20    Q    You could do up to five years for perjury, correct?
21    A    Yes.
22    Q    Now, you weren't present when -- we're here today on a
23         spitting case.  You weren't present.  You never saw the
24         defendant spit on any -- on anybody, is that true?
25    A    No, I did not.
```

1   Q    And so your testimony today is regarding this October 21st,

2        2009, incident, which we're not really here on that either,

3        but let's go to October 21st, 2009.  And your testimony is

4        that Officer Hozey was working the range that day?

5   A    He wasn't working the range.  He was just doing a round.

6   Q    He was there, right?

7   A    He was there.

8   Q    Right.  Yeah, he was there.

9            And -- and it's your testimony that he yelled down the

10       range?

11  A    He didn't yell, but it was loud enough for those on the

12       range to hear what he said.

13  Q    And he offered two -- three pounds of chewing tobacco?

14  A    Yes.

15  Q    For -- for someone to beat Stoddard up?

16  A    Yes.

17  Q    Did you find that unusual?

18  A    No.

19  Q    And then you said that you talked to -- well, a couple

20       people called you in and sat you in an office and talked to

21       you?

22  A    Yeah, they did.

23  Q    And because they wanted to know if this -- if this action --

24       they wanted to know what happened, right?

25  A    Right.

```
 1   Q   To see if somebody's trying to bribe you when you're in
 2       prison, correct?
 3   A   No.  That wasn't the purpose of the questioning.
 4   Q   Well, what is -- do you think that if you had some complaint
 5       that a correction officer was bribing you, that somebody
 6       ought to be investigating that complaint?
 7   A   I do, yeah.
 8   Q   Now, Mr. Stoddard requests that you testify for him, is that
 9       true?
10   A   He asked me, yes.
11   Q   And when did that conversation take place?
12   A   Maybe three days after the incident.
13   Q   So three days after October 21st, 2009?
14   A   Yes.
15   Q   And did he ask you if you would testify in this case for
16       him?
17   A   Yes, he did.
18   Q   Did he -- did you say yes?
19   A   I told him, "Let me give it some thought."
20   Q   And when did you decide to testify?
21   A   I believe maybe a couple days before the F.B.I. agents came
22       and talked to me.
23   Q   And so a couple of days -- so about when was that?
24   A   I couldn't give you an exact date.  I don't even remember
25       exactly when they came to see me.
```

```
 1   Q   And how do you -- because neither one of you is in general
 2       population, how do you communicate with each other?
 3   A   Usually, we're right next door, or maybe two or three doors
 4       down from each other, or we might talk at rec.
 5   Q   Okay.  And can you explain to the judge, like, how that
 6       conversation shortly after the incident -- shortly after
 7       October 21st, how that -- where that conversation took
 8       place, and how it took place?
 9   A   It initially took place on the range, because after the
10       incident, he -- he yelled out his door, and -- the few guys
11       that he knows on the range, he said, "Anybody hear that?"
12       And those that heard it spoke out.
13   Q   When he said hear that, what did --
14   A   He was talking about what the officer came on the range and
15       said.
16   Q   And that's what you're saying -- well, they talked about --
17       I think you said he said, "What are you doing working the
18       range?"  And Hozey said, "Fuck you."  And then he said,
19       "Fuck you."
20   A   Exactly.
21   Q   And then -- so did everybody hear that portion?
22   A   I don't know about everybody, but I know a few select
23       individuals heard it.
24   Q   But you heard it?
25   A   Yeah, I heard it, because he was a door and a half away from
```

1     me.

2  Q  Okay.  And then this -- and then right after that -- was

3     that all it is, I'll give three pounds of chewing tobacco to

4     anybody that will beat him up?

5  A  That was it.

6  Q  And when are you all together?

7  A  We're never together.

8  Q  Well, how is that going to happen?

9        How would you beat him up if you're never together?

10 A  I'm on a rec alone/cell alone situation, so that's what I

11    mean when we're never together.  I don't know what his

12    status is.

13 Q  Okay.  So for you that wasn't going to happen, because

14    you're never -- you wouldn't have that opportunity to beat

15    the defendant up, correct?

16 A  It wouldn't happen, period, because I don't do things like

17    that.

18 Q  Well, let's say you wanted to -- let's say you have an

19    inclination to.  Do you ever have an opportunity to do such

20    a thing?

21 A  No, I don't.  I don't.

22 Q  And what are you doing your time for?

23 A  Drug conspiracy, and prostitution conspiracy.

24 Q  And when's the date that you're supposed to be released?

25 A  2030.

1          MS. DEMARAIS:  Pass the witness, Judge.

2          THE COURT:  Mr. Stoddard, any additional questions for

3   the witness, things that you haven't already asked?

4                      REDIRECT EXAMINATION

5   BY MR. STODDARD:

6   Q    Since you been on the range, have you ever seen me in the

7        rec cage with anyone else?

8   A    No, I have not.

9   Q    Since you been on that range, have -- prior to 10/21/09 have

10       you ever seen Officer Hozey come work in the SHU?

11  A    I seen him around in the SHU, but never on that range.

12  Q    So is it fair to say that Officer Hozey wouldn't even known

13       that I was on cell alone and rec alone status?

14  A    I would say that, yes.

15         MR. STODDARD:  No more questions, your Honor.

16         THE COURT:  All right.  Then the witness may step down

17  and be excused.

18         And Mr. Stoddard, who is your next witness?

19         (Mr. Stoddard and Mr. Leonardo conferred off the

20  record.)

21         THE COURT:  Let's see, Mr. Stoddard, who is your next

22  witness?

23         MR. STODDARD:  Your Honor, I was going to call Brian

24  Cash, but I don't want to take up any more of the Court's time,

25  because I would like to if possible get to the videos.  All

```
1    Mr. Cash is going to be able to attest to is the same thing
2    Mr. Regan attest to.
3               THE COURT:  So you're deciding not to call Mr. Cash --
4    is it C-A-S-H?
5               MR. STODDARD:  Yes, ma'am.
6               THE COURT:  All right.
7               Any additional witnesses that the government --
8               MS. DEMARAIS:  Yes, I will be calling a rebuttal
9    witness.
10              THE COURT:  Now, how long is this videotape?
11              MS. DEMARAIS:  Eight minutes.
12              THE COURT:  Okay.
13              So Mr. Stoddard, you want to play the videotape?
14              MR. STODDARD:  Yes, ma'am.
15              THE COURT:  Has that been given to the clerk as an
16   exhibit?
17              MS. DEMARAIS:  Oh, no.
18              THE COURT:  Do we have it or?
19              MS. DEMARAIS:  Judge, I was going to play it through
20   the computer thing, because --
21              THE COURT:  Okay.
22              MS. DEMARAIS:  But do you want -- I guess I can give
23   you my copy.  I'll mark it as an exhibit.
24              THE COURT:  Oh, all right, just so we have --
25              MS. DEMARAIS:  I had lovely stickers that I lost
```

1    somewhere on the way.

2              THE COURT:  Just so we have a record of what's actually

3    been played to the Court.

4              You can play it, and then we can have the physical --

5    of course, we'd release that back to you after the conclusion of

6    the trial.

7              MS. DEMARAIS:  Yeah -- yeah, that's no problem.

8              THE COURT:  All right.  So that's going to be Exhibit

9    Number what?  What's our next number?

10             MS. DEMARAIS:  That should be 6.

11             THE COURT:  Exhibit 6 will be the -- is it a CD?  Is

12   that what it is?

13             MS. DEMARAIS:  A DVD.

14             THE COURT:  A DVD.  Okay.  And so that's going to be

15   played right now at the request of Mr. Stoddard.

16             And just for a little background, this is of -- this is

17   of the incident in October -- I'm sorry, before we start it,

18   Mr. Stoddard, what does this exhibit show?

19             MR. STODDARD:  He's playing a tape from January the

20   9th.  It would be me being outside, and them coming to get me,

21   which Officer Smith had testified earlier when I asked him where

22   was I placed at.  It was after I was placed in ambulatory

23   restraints, he said I was left inside of the holding cell, but it

24   clearly shown -- it won't show them walking me outside, but it

25   show them bringing me from outside and putting me into a cell.

1          THE COURT:  So this is a video tape of you coming from

2     the outside being brought into a cell?

3          MR. STODDARD:  Yes, ma'am.

4          THE COURT:  On January 9th.

5          Is that right, Ms. DeMarais?

6          MS. DEMARAIS:  Yes -- he did misstate Smith's

7     testimony.  He said immediately after he was placed -- yes, it's

8     the aftermath video.  Somebody explained after the -- when

9     restraints are used, there's an aftermath video that was done.

10          THE COURT:  And the Court reporter will not take it

11     down since we have it as an exhibit.

12          (Exhibit 6 was played for the Court.)

13          THE COURT:  All right.  The record can reflect that the

14     video has been played.

15          Now, Mr -- and that was Exhibit Number --

16          MS. DEMARAIS:  6.

17          THE COURT:  -- 6.

18          All right.  So Mr. Stoddard, any additional evidence

19     that you'd like to present on your behalf?

20          MR. STODDARD:  I'd like to be able to testify about

21     this video, your Honor.

22          THE COURT:  All right, go ahead.  And I'll let you ask

23     him questions, Ms. DeMarais.

24                         REDIRECT EXAMINATION

25     BY MR. STODDARD:

1    A      They say that I'm being placed in ambulatory restraints for

2           allegedly spitting on Officer Hozey, but as you can see, no

3           officer, not even medical, was concerned about their health

4           by me spitting on them.  If you look at the video, you note

5           there's not one individual had anything protecting their

6           face.  Not one individual appeared to be afraid that I may

7           spit on him.

8                 You notice the video don't even show me being in the

9           holding tank.  The video shows me being outside, because

10          when I was -- as soon as I was placed in ambulatory

11          restraints, Birmingham had me placed outside.  So I was

12          outside from about 20 minutes to 10 until they came and got

13          me -- I think he said 10:15, somewhere up in there.

14                As you notice, I just had on some sandal shoes, some

15          socks, a t-shirt, and a pair of boxers.  And it's pretty

16          cold in January out here in Tucson that time of night.

17                Officer Smith testified that after I was placed in

18          ambulatory restraints, I was left inside of the holding

19          tank.  You can clearly see that they came outside to get me.

20          How did I get outside?  I don't think I'm Houdini, I just

21          appeared out there.  I had to be walked out there, your

22          Honor.

23                That's it, your Honor.

24                THE COURT:  All right.

25                Do you have any additional questions for Mr. Stoddard,

1       Ms. DeMarais, regarding his testimony just now?

2                   MS. DEMARAIS:  Yes.

3                       RECROSS EXAMINATION

4       BY MS. DEMARAIS:

5       Q    So you agree at one point in the evening you were in the

6            holding tank -- holding cell?

7       A    Yes, I stated that I was in the holding cell.

8       Q    Okay.  And then -- and then the incident happens, correct?

9       A    The alleged incident happens, yes.

10      Q    The alleged incident happened.  And then they move you from

11           the holding cell, and you're saying they move you outside?

12      A    Soon as I was placed in ambulatory restraints, they

13           proceeded to walk me straight out.  They put ambulatory

14           restraints on me, they proceeded to walk me straight from

15           the holding tank to set me outside until the lieutenant

16           came, the -- Lieutenant Hendricks, which is the dude that

17           had the white shirt on that was reading the paper.

18      Q    So immediately after placing the ambulatory restraints --

19           immediately after you're placed in the holding cell?

20      A    No.   Immediately after being placed -- I'm already in the

21           holding cell --

22      Q    Right.

23      A    -- when they come to place me in ambulatory restraints.

24           Once they put the ambulatory restraints on me, they did not

25           lock the door.

1    Q    They took you as soon --

2    A    As soon as they put me on it, they took me right outside.

3              MS. DEMARAIS:  Okay.

4              I don't have anything else, Judge.

5              THE COURT:  All right.

6              So Mr. Stoddard, any additional evidence that you'd

7    like to present?

8              MR. STODDARD:  I want to -- I would like to show that

9    video, what is going -- if -- if it be showed, I will ask at a

10   certain point could it be speeded up, because it's from a point

11   that Officer Hozey came on the range up to the point the

12   lieutenant came, I'm going to say maybe two, to two and a half

13   hours elapsed.  I know we don't have time to sit here for two and

14   a half hours to watch a range.

15             THE COURT:  Well, maybe the government can stipulate to

16   what's on the video.

17             MS. DEMARAIS:  Judge, honestly, I didn't have time to

18   sit through 24 hours, but let me -- if you give me one moment,

19   let me ask.

20             THE COURT:  Sure.

21             But a stipulation, Mr. Stoddard, is an agreement

22   between both sides that certain facts exist.  So if the

23   government will stipulate to these facts that you're trying to

24   show through this video, then I will accept that stipulation

25   instead of having the video played, or trying to find parts of

1   the video that might be relevant.

2           MS. DEMARAIS:  The government will -- the government

3   will stipulate that on October 21st, '09, that Hozey was on that

4   range, and that sometime after a lieutenant arrived on the range.

5           THE COURT:  All right.

6           And do you agree that those facts are true, Mr.

7   Stoddard?

8           MR. STODDARD:  I'm going to say them facts are true,

9   but there's more to it than just the lieutenant.

10          THE COURT:  All right, what other facts did you want to

11  show through the video?

12          MR. STODDARD:  That after I spoke with the lieutenant,

13  I requested to see the captain.  And it will show probably about

14  10 or 15 minutes max after the captain -- after the lieutenant

15  leaving off the range, the captain coming on the range starting

16  at the top of the range coming down.  And once he got to my door,

17  I brought my concerns to him about Officer Hozey threatening me,

18  and he said that he would look into it.

19          And this probably is irrelevant, but the lieutenant who

20  was on the range, he was -- what a coincidence, he just happened

21  to be one of the three officers that brought Mr. Regan in who was

22  on the range.  I don't know if that means anything to you, your

23  Honor.

24          THE COURT:  So basically, the video would show that

25  sometime after the lieutenant arrived, the captain arrived, and

1    talked to various people including you?

2             MR. STODDARD:  Yes, ma'am.

3             THE COURT:  All right, is there --

4             MS. DEMARAIS:  Judge --

5             THE COURT:  Can you agree that that happened?

6             MS. DEMARAIS:  And I'm recalling Officer Hozey, but

7    I'll stipulate that the captain arrived.  I don't know -- we

8    don't know that it was after the lieutenant, but the captain did

9    --

10             THE COURT:  Did talk to various people?

11             MS. DEMARAIS:  Yeah, we can stipulate that he talked to

12   people.

13             THE COURT:  And obviously, the video doesn't show what

14   was said.  That would be hearsay in any event.

15             So with that stipulation, I'll accept those facts as

16   true.

17             Mr. Stoddard, do you still feel that you want to play

18   this videotape --

19             MR. STODDARD:  If --

20             THE COURT:  -- relating to this October 21st --

21             MR. STODDARD:  -- if Mr. Hozey can say that the captain

22   had said something to him about my concerns, and that he will

23   admit that after the captain spoke to him, he never returned on

24   the range that particular evening.

25             THE COURT:  Well, we'll see what -- we'll see if you

1   still want to play the video after Mr. Hozey is recalled.  If he

2   raises something that you feel is -- becomes relevant in the

3   video, then we can -- you can tell me that you'd like to play at

4   least a portion of the video.

5           Now, other than this second video, which we have some

6   stipulations that have been reached regarding what that video

7   would show, do you have any additional evidence, Mr. Stoddard,

8   that you'd like to present in this trial?

9           MR. STODDARD:  No, ma'am.

10          THE COURT:  All right.  So the defense rests.

11          So now we're back to the government to present any

12  rebuttal testimony.

13          And does the government have any rebuttal testimony?

14          MS. DEMARAIS:  Yes, the government has.  We're going to

15  recall Hozey, as well as calling an additional witness, your

16  Honor.

17          THE COURT:  All right, so who would you like to call

18  first?

19          MS. DEMARAIS:  Hozey.

20          THE COURT:  All right.

21          Officer Hozey, if you could come back up to the witness

22  stand.  You've already been sworn in as a witness.

23          And Ms. DeMarais you may proceed.

24                      CHRISTOPHER GEORGE HOZEY

25                         DIRECT EXAMINATION

```
 1   BY MS. DEMARAIS:
 2   Q    Officer Hozey, do you remember working on October 21st,
 3        2009?
 4   A    Yes, I do.
 5   Q    Where were you assigned that day?
 6   A    That day I was working overtime in SHU, special housing
 7        unit.
 8   Q    And is SHU where you always work, or no?
 9   A    It was where I worked up until, I guess, after the incident
10        with inmate Stoddard, but --
11   Q    Okay.  Okay, on the 20 -- so the 21st you were working the
12        SHU unit?
13   A    Yes.
14   Q    Did you go down the hallway or range where Stoddard was
15        housed?
16   A    Yes, I did.
17   Q    And why did you do that?
18   A    To conduct a round.
19   Q    And what's a round?
20   A    Thirty minute periodic checks that we have to conduct on
21        each range to make sure that the inmate -- their safety, and
22        welfare, and health is not in jeopardy.
23   Q    And you've heard the defendant, because you've been here,
24        talk about the fact that you're not supposed to be assigned
25        there after the spitting incident -- I mean, did you
```

1      continue to work that area?

2   A  I did for a while until -- as I recall, inmate Stoddard was

3      indicted at that point.  I was approached by the special

4      housing lieutenant, Lieutenant Jones, and he recommended

5      that I don't work in special housing because he had gotten

6      indicted.  It was to my knowledge just a recommendation.  It

7      wasn't anything that was put down on a memorandum, or in

8      black and white.  So for the most part I stayed out of

9      special housing based on his recommendation.

10  Q  Do you decide where you go, or does someone else assign you

11     places?

12  A  The lieutenants.

13  Q  Okay.  On October -- so had you -- why do you remember

14     October 21st, '09?

15     How do you remember you were there?

16  A  That was the first day I had worked in there in months --

17     two or three months.  I can't remember the exact amount of

18     time.  And I was actually called at home for the overtime.

19     The lieutenant that called me was Lieutenant Scronick, and I

20     had told him that, yes, I'll take the overtime, because I

21     received an email prior to that saying -- the e-mail was

22     from Captain Barnhart stating that Officer Hozey's been

23     cleared to work in special housing again.  Any questions or

24     concerns, you can contact me at his extension.  So I did

25     take the overtime to go work SHU that day.

1   Q   Okay.  So they called you to work the overtime, so you were

2       going to work in that area.  That's why you remember that,

3       October 21st?

4   A   Yeah, because this was the first time I'd been back in a few

5       months.

6   Q   Okay.  You've heard about different ranges, hallways is what

7       I'll call them, but why did you choose to go down Stoddard's

8       hallway?

9   A   I didn't choose to.  I was approached by SHU number 2.

10  Q   When you say approached by SHU number 2, is that a person --

11      or tell us what that is.

12  A   It's a person.  There's a crew that works in special

13      housing, consists usually of 5 to 7 people.  Each of you

14      have different responsibilities.  The SHU number 2, or the

15      SHU housing officer number 2, is responsible for running the

16      floor, which would entail opening the grill for the feeding

17      on the ranges, and conducting your unit rounds.

18  Q   I'm sorry.  I interrupted you.  You said SHU number 2?

19  A   Approached me.

20  Q   Okay.

21  A   And asked if I could conduct a round on C range.  And I

22      looked at Officer Lewis -- I looked at him, and I said, "I

23      don't really like to go down that range, dude."  He's, like,

24      "But we're going to go over on time."  And I was, like,

25      "What about the other two guys that are working down here?"

1         And they were pulling rec, so -- and the executive staff was

2         doing their rounds on this particular day.  It was a

3         Wednesday.  That's the day they'd been doing their rounds in

4         the special housing.  So I told him if he needed a round

5         that bad, I would go down there and do the round, and I

6         proceeded to go conduct a round down on C range.

7   Q     Okay, when you say a round, what is that, just --

8   A     You check for living, breathing skin, bodies.

9   Q     How long -- I mean, how often do they have to be checked on?

10  A     Once in a 30 minute period, so twice an hour.

11  Q     So that's why you went there?

12  A     Yes.

13  Q     And then you were telling the judge something about

14        executive staff.  What is -- on Wednesdays.  What is that?

15  A     That's all the department heads, the wardens, the captain,

16        the lieutenants.  They all conduct rounds in special housing

17        unit on Wednesdays.

18  Q     So you just heard us enter into a stipulation that the

19        captain and lieutenant -- if I'm saying something wrong,

20        correct me, but the captain and the lieutenant came after

21        you?

22  A     Yes.  I conducted the round, then I proceeded to help the

23        other range officer pull inmates out to recreation, and --

24        and maybe an hour or two later I was approached by Captain

25        Barnhart and told to stay off the range.

1  Q   The captain and the lieutenant, they were going to be there

2      because it's Wednesday anyway?

3  A   Yes.

4  Q   Did you know inmate Regan -- do you know who he is?

5  A   I know of him.  I know his name.  I've never had much

6      interaction with him.

7  Q   So you -- you don't remember if he was there on the range

8      that -- on October 21st, '09, or not?

9  A   No.

10 Q   Okay.  So you explained why the lieutenant and the captain

11     would be there.  Did you have any conversation with the

12     defendant?

13 A   I made a remark as I was coming off the range with the

14     defendant.

15 Q   Okay.  Tell the judge what remarks were made.

16 A   He had tried to stop me, apparently because he wanted to

17     speak with me --

18 Q   How did he do that?

19 A   He saw me, started yelling, Hozey -- or Hozey, or whatever

20     it is that he calls me.  But he started yelling my name to

21     catch my attention.  And as I walked by his cell window, I

22     told him he did it to himself, and I continued to walk.

23     That's the remark I made.

24 Q   And that's it.  That's the only thing you said?

25 A   That's the only thing I said.

| | | |
|---|---|---|
| 1 | Q | And what did he say in response to that? |
| 2 | A | I didn't stay on the range long enough to listen to him, |
| 3 | | because once I went down and looked in the windows, I came |
| 4 | | off as fast as I could. |
| 5 | Q | And could you give the judge an idea of how long you were on |
| 6 | | that area total? |
| 7 | A | If I had to guess, two minutes. |
| 8 | Q | And two minutes, basically you're checking to see -- |
| 9 | A | The welfare of the inmate -- each inmate in their cell. |
| 10 | Q | Okay.  And you don't remember anything being said? |
| 11 | A | There was noise as I was walking off the range, but I didn't |
| 12 | | stay to listen what the inmates were saying, no. |
| 13 | Q | And you saw us just watch that video, the aftermath video? |
| 14 | A | Yes. |
| 15 | Q | Can you explain why that is done, or when is that done, I |
| 16 | | guess I should say -- why is the video done? |
| 17 | A | It's done for immediate use of forces, calculated use of |
| 18 | | forces.  There's always an after action review video done |
| 19 | | for staff being assaulted in any case.  It's policy. |
| 20 | Q | Was the video done because he was placed in ambulatory |
| 21 | | restraints, or -- or no -- or is it just done because -- I |
| 22 | | didn't understand the purpose of it, but you say it's always |
| 23 | | done? |
| 24 | A | Because they consider it a of force, I guess, when they |
| 25 | | place ambulatory restraints on an inmate. |

1    Q    So they consider it a use of force, so they do an aftermath
2         video that this is why we did that?
3    A    Yeah.
4    Q    Okay.  Got it.
5              Do you remember -- I think we discussed when you were
6         placing -- do you remember where the defendant went after
7         you placed the ambulatory restraints in the holding cell?
8    A    No, I don't recall, because I wasn't a part of anything that
9         moved him anywhere after the fact.  They told me to stay
10        away from him, because I was the one that he spit on.
11   Q    Now, the defendant testified regarding -- we'll go back to
12        January 9th, that he had a cover on his window or something.
13        Do you remember that at all?
14   A    No, I can't recall that.  January 9th I remember him in the
15        holding tank, and whatever transpired about his mail up to
16        that point, and I remember being spit on.
17   Q    So you -- so basically I think you have testified earlier
18        that you remember him being in the holding cell when you get
19        there at around 4:00?
20   A    Yes, I thought he was in the holding cell when I arrived.
21        It was pretty normal for him to be there.  He's there quite
22        consistently when you show up for evening watch -- or back
23        then he was.  I'm not sure what he's doing now.  I haven't
24        worked in the SHU in a while.
25   Q    At that time if somebody was breaking sprinkler heads, would

| | | |
|---|---|---|
| 1 | | that be normal to place them in the holding cell? |
| 2 | A | No, it's not normal. |
| 3 | Q | I know, but would that be a reason why somebody would be |
| 4 | | placed in -- |
| 5 | A | It could.  They're going to be -- have to be moved for the |
| 6 | | facilities workers to come replace the sprinkler in their |
| 7 | | cell anyways. |
| 8 | Q | And based on your knowledge, training, and experience in |
| 9 | | that area, can someone just say I want to go to the holding |
| 10 | | cell, and they would go? |
| 11 | A | No, it's quite odd for an inmate to request something like |
| 12 | | that. |
| 13 | Q | At the time -- and if you don't remember, you don't |
| 14 | | remember, but at the time was Stoddard in the cell by |
| 15 | | himself, his normal cell? |
| 16 | A | He's always been assigned, as far as I can recollect, by |
| 17 | | himself. |
| 18 | Q | So as far as your recollection? |
| 19 | A | Yes. |
| 20 | | MS. DEMARAIS:  That's all I have, Judge. |
| 21 | | THE COURT:  Mr. Stoddard, any additional questions for |
| 22 | | the witness? |
| 23 | | MR. STODDARD:  Yes, ma'am. |
| 24 | | CROSS-EXAMINATION |
| 25 | | BY MR. STODDARD: |

| | | |
|---|---|---|
| 1 | Q | Mr. Hozey, you stated a few seconds ago that you used to |
| 2 | | come to work sometime, and I used to always be in the |
| 3 | | holding tank from time to time, correct? |
| 4 | A | Not always.  I think I said quite often. |
| 5 | Q | At the times I was in the holding tank, was I in the holding |
| 6 | | tank when you seen me for disciplinary reasons? |
| 7 | A | Were you there for disciplinary reasons? |
| 8 | Q | Yes. |
| 9 | A | I can't recall of any. |
| 10 | Q | Is it fair to say that some inmates in the SHU, that they've |
| 11 | | been there so long, maybe because they be acting up, within |
| 12 | | reason you have some staff, either some lieutenant that may |
| 13 | | cater to certain inmates within reason — man, I need a |
| 14 | | lawyer, put me out in the first rec cage, or put me in the |
| 15 | | holding tank — and depends on who you ask it could get done? |
| 16 | A | Yeah. |
| 17 | Q | So it's not unusual to see a person in the holding tank and |
| 18 | | they not being in there for disciplinary reasons? |
| 19 | A | No, the holding tank's used for a lot of different purposes. |
| 20 | Q | Such as? |
| 21 | A | Such as it's a staging area.  When we kick inmates out of |
| 22 | | SHU we use it.  If we have one inmate in the law library, |
| 23 | | sometimes we'll put one in there on the ready to have him go |
| 24 | | to the law library once the inmate is done.  Just different |
| 25 | | SHU programs we use the holding tank for. |

1   Q    You say that -- is it normal -- is it normal -- let me

2        rephrase.

3            Have you ever seen an inmate placed in ambulatory

4        restraint, and the after he's placed in ambulatory

5        restraints he's placed outside, especially around twenty

6        minutes to ten at night?

7   A    You are the only one I've seen.

8   Q    So is it fair to say that's unusual?

9   A    I don't know what unusual is.  I haven't been a part of that

10       many ambulatory restraints, or use of forces.

11  Q    Since you been in the SHU, how many time would you say that

12       you then seen me in ambulatory restraints, or even

13       four-pointed for that matter?

14  A    A few.

15  Q    Yes.

16  A    I've seen a few, at least a few times that you've been in

17       ambulatories, or --

18  Q    And how would you classify my behavior since I've been in

19       the SHU?

20  A    Poor.

21  Q    Do you think there was anyone else in the SHU acting as bad

22       as I've been at that point in time that I was in the SHU?

23  A    You're probably the biggest nuisance at that point in time.

24  Q    Before I got indicted -- after the incident and before I got

25       indicted you was allowed to work in the SHU, correct?

1    A    Until you were indicted.

2    Q    Right.  Now, up and to that point did you and me have

3         any type of run-ins, any type of me threatening you, you

4         threatening me, anything of that nature?

5    A    No.

6    Q    Now, when you was working -- when you was working in the SHU

7         at that time in January 9th of '09, was I on cell alone or

8         rec alone to your status, or was it just the point I was

9         just always in the cell by myself and they just never came

10        to put anyone in the cell with me?

11   A    I don't know what your status was at that time.  I can't

12        recall.  I just think most SHU staff thought it was easier

13        not to give you a cellee because of the way you would act.

14   Q    Meaning when they would bring me a cellee, ask me to take

15        one, I would refuse?

16   A    Most of the time, yes.

17             MR. STODDARD:  I have no more further questions, your

18   Honor.

19             THE COURT:  All right, any --

20             MS. DEMARAIS:  No, your Honor.

21             THE COURT:  -- redirect?

22             All right, sir, you may step down.

23             Any additional rebuttal witnesses, Ms. DeMarais?

24             MS. DEMARAIS:  Yes.

25             Your Honor, the government is calling a Frederick

| | |
|---|---|
| 1 | Trainer.  I -- at this point I -- I have not disclosed the NCIC |
| 2 | to the defendant.  This was originally his witness. |
| 3 | THE COURT:  Um-um. |
| 4 | MS. DEMARAIS:  But then when I got the new witnesses -- |
| 5 | so I don't know if you want me to redact -- I do plan on asking |
| 6 | about any -- I'll just state for the record, he's serving time |
| 7 | for bank robbery.  He also has a concurrent sentence for theft of |
| 8 | property out of Alabama that he's serving time.  Those are the |
| 9 | only felonies in the last ten years.  In addition, there's a 1988 |
| 10 | theft case. |
| 11 | I've gone through the NCIC's.  I did not have time to |
| 12 | obtain any of the documents, but I believe after going through |
| 13 | the NCIC's those are his felonies that would be used -- would be |
| 14 | impeachable felonies. |
| 15 | THE COURT:  All right.  And normally, you would |
| 16 | disclose, what, a hard copy of some NCIC rap sheet? |
| 17 | MS. DEMARAIS:  Yes, or something.  For witnesses, it's |
| 18 | normally heavily redacted.  I would ask -- since the defendant's |
| 19 | representing basically himself, I would have to go through and |
| 20 | redact. |
| 21 | THE COURT:  What were the dates of the bank robbery and |
| 22 | the theft convictions? |
| 23 | MS. DEMARAIS:  I have -- it looks like a conviction |
| 24 | date of 7/22/99, and that's a bank robbery, using, carrying -- |
| 25 | using and carrying a firearm in relation to a crime of violence. |

1    That's the one he's serving his federal time on.

2              THE COURT:  All right.

3              So Mr. Stoddard, do you accept the government's avowal

4    that Mr. Trainer has these convictions, or do you want to

5    actually see his NCIC sheet, or his rap sheet?  The government

6    can give that to you.  It will be redacted.  There will a lot of

7    material -- information on there that you won't need, and won't

8    be entitled to see.  But if you accept her avowal that

9    Mr. Trainer has these prior convictions, she'll ask him about

10   that, and I will accept that fact as true that he has these prior

11   convictions.

12             MR. STODDARD:  Yes, ma'am.

13             THE COURT:  All right.  So you don't need to see the

14   rap sheet?

15             MR. STODDARD:  No, ma'am.

16             THE COURT:  All right.

17             So you'd call Mr. Trainer?

18             MS. DEMARAIS:  Yes, your Honor.

19             THE COURT:  All right.  We'll take a short recess --

20   oh, is he right there?

21             THE MARSHAL:  Yes, ma'am.

22             THE COURT:  All right.

23             Mr. Trainer, if you could stand up and raise your right

24   hand, I'm going to have the clerk swear you in as a witness.

25             (Frederick Trainer was duly sworn by the clerk.)

```
 1              THE COURT:  All right.  Ms. DeMarais, you may proceed.
 2                          FREDERICK TRAINER
 3                          DIRECT EXAMINATION
 4    BY MS. DEMARAIS:
 5    Q    Mr. Trainer, I first want to just go over a few things about
 6         your criminal history.  Are you serving time now for a bank
 7         robbery?
 8    A    Yes.
 9    Q    And that was -- you also -- was there a weapons related
10         charge also with that?
11    A    Yes.
12    Q    Carrying -- using a gun?
13    A    Brandishing.
14              THE COURT:  Can you move a little closer to that
15    microphone?
16    BY MS. DEMARAIS:
17    Q    And are you also serving concurrent time for a theft of
18         property case out of Alabama?
19    A    Yes.
20    Q    And lastly -- this was a while ago, but do you recall in
21         1988 if you were convicted of a felony theft charge?
22    A    1988?  Not that I remember.
23    Q    Do you ever remember being convicted -- I mean, even if it
24         was years ago, of a theft charge?
25              THE COURT:  I can't imagine 30 years ago would be
```

1    that -- was -- is that a yes answer?

2             THE WITNESS:  Yes.

3             THE COURT:  All right.

4             MS. DEMARAIS:  It's a theft charge, your Honor.  I

5    would say even if it goes past the ten years -- I'm going to go

6    ahead and -- your Honor, may I approach, because this is going to

7    be very difficult to read?

8             THE COURT:  Yes.

9             MS. DEMARAIS:  All right.

10   BY MS. DEMARAIS:

11   Q    I'm going to hand you what's been marked for identification

12        purposes as Exhibit 7.  I'll give -- I've handed you a hard

13        copy.  I'm just going to put a copy of Exhibit 7 on the -- I

14        don't know if you'll be able to read that all.

15             I'd like you to take a look at Exhibit 7.

16             Do you know what that is?

17   A    Yes, that's a copy of a note that was sent to me to rewrite

18        for inmate Stoddard.

19   Q    Okay.  And is this your -- and you said this is a Xerox copy

20        of a letter?

21   A    It's a Xerox copy, yes.

22   Q    And if you look at the bottom of Exhibit 7, is that your

23        signature on the bottom?

24   A    Yes.

25   Q    Did you -- it's kind of printed.  Did you print this letter

1          out?

2               I mean, is this in your handwriting?

3    A    Print -- no, this -- this -- this is a letter that was given

4         to me by Stoddard.  It asks me to rewrite it for him, and

5         then sign it for his lawyer.

6    Q    And -- and so did you rewrite the letter?

7    A    I rewrote it for him, and signed it.

8               MS. DEMARAIS:  And your Honor, I move to admit Exhibit

9    7 into evidence.  And we're not offering it for the truth of the

10   matter asserted, in fact what -- we're saying what's in it is

11   false, so I would say it's not hearsay.

12              THE COURT:  All right.  Do I you have an extra hard

13   copy that I can --

14              MS. DEMARAIS:  You know what?  They have a copy, and

15   I'll give you -- I'll give you a copy.

16              THE COURT:  All right.  Let me take a look.

17              Is there any objection, Mr. Stoddard, to the admission

18   of this Exhibit 7?

19              MR. STODDARD:  It can be admitted, but it's false --

20   but it can be admitted as far as what he's testified to.

21              THE COURT:  All right.  So there being no objection --

22   let me just take a look at it.

23              All right, I'm going to admit Exhibit 7, and I have --

24   I've reviewed it.

25              So go ahead, Ms. DeMarais.

1         MS. DEMARAIS:   Okay.

2   BY MS. DEMARAIS:

3   Q   Now, I'd like you to look at Exhibit 7.  And you were

4       telling the judge that -- well, how did this letter come

5       about?

6   A   One day we was out in rec --

7   Q   I'm sorry, you were out where?

8   A   Recreation.  And he asked me -- or asked me to be a witness

9       for him against Officer Hozey.  And he asked me to come in

10      and say that Officer Hozey and another officer -- Medina,

11      yeah, offered me five cans of tobacco, 100 rolls of stamps,

12      and so on.  You know, he's saying -- he's saying this would

13      help him, because his lawyer told him it would help him.

14  Q   Okay, and so he first approaches you about the thing.  Did

15      you agree to do it?

16  A   I really didn't agree.  It was just the point of him

17      being -- you know, it was an inmate/inmate thing.  And at

18      the time I thought it was a good idea to do it, but by the

19      time this stuff went in, I was like, no, I'm not going to go

20      up there and perjure myself for him, or nobody else, so --

21  Q   So he at first -- do you remember -- the letter's dated

22      September 6th, 2009.  Was this conversation -- do you

23      remember how long before this the conversation took place

24      between you and him?

25  A   Basically, it was, like, probably the early part of August,

1    or something like that.  And he gave me -- basically, he

2    told me this right here, and this is what he said verbatim.

3    He said, "Listen, these are the dates and times."  He said,

4    "Do not go outside of these dates and times, because it's

5    going to coincide with what I told my attorney."  He said --

6    he gave me a -- like, the 5th, 7, 8 days -- anywhere around

7    in that area will be good too.  And to tell him that at the

8    time that all of this took place, you were in the law

9    library and you heard what they said, which I was never in

10   the law library at the time whatever took place took place.

11 Q   Okay.  So you had this conversation, and you said you sort

12    of -- okay, I'll do it.

13       When did Exhibit 7 -- when did the letter happen?

14 A   Well, he -- on the date that I signed it?  It was probably

15    the same date, you know, but he had already gave me the

16    specific times to tell his lawyer, you know, when it could

17    have happened.

18 Q   Okay.  So did -- did --

19 A   The incident -- I mean, the incident.

20 Q   Okay.  So my question is did he -- did he write something

21    and then you copied this letter?

22 A   (Nods head.)

23 Q   Okay.  Explain to the judge exactly how that went.

24 A   Basically, when we left rec he told me, he say, "Listen, I'm

25    going to send something down to you.  All I need you to do

| | |
|---|---|
| 1 | is copy it, and put it in whatever legal terms you can."  So |
| 2 | that's what I did.  I -- I copied what he had written down. |
| 3 | Q | How did he get that to you? |
| 4 | A | We pass things. |
| 5 | Q | Oh, you just pass them down the cells? |
| 6 | A | Yeah, we pass things. |
| 7 | Q | Okay.  So sometime after this conversation you think -- and |
| 8 | | you think it was close to the date -- you have |
| 9 | | September 6th? |
| 10 | A | Yes. |
| 11 | Q | So do you think this is what he wrote, and you put it in |
| 12 | | your handwriting? |
| 13 | A | Well, you know, he can't really spell that good, so I |
| 14 | | rewrote everything, and spell the words. |
| 15 | Q | Okay.  So let's just go through the letter.  Starting at the |
| 16 | | top it says:  I certify by and through the statement |
| 17 | | January 5th or 6, I Frederick Trainer was approached by CO |
| 18 | | Hozey to conduct physical harm on an inmate, Robert |
| 19 | | Stoddard. |
| 20 | | Did you get that off of Stoddard's letter? |
| 21 | A | Yes. |
| 22 | Q | Was that true? |
| 23 | A | No. |
| 24 | Q | CO Hozey offered me five cans of tobacco, and three packs of |
| 25 | | cigarettes to go into the rec -- recreation cage and beat |

1      inmate Stoddard enough whereas he would bleed, but not do

2      harm enough to maim him.

3           You wrote that?

4   A  I wrote that, and plus I submitted an affidavit stating that

5      none of this took place.

6   Q  Okay.  We'll get to that in a minute, but we'll just go

7      through the letter.

8           So you -- you wrote this at the direction of the

9      defendant?

10  A  Yes.

11  Q  And it was not true?

12  A  It's not true.

13  Q  Okay.  And then earlier you were telling the judge he,

14     Stoddard, told you be specific about the time, and then you

15     say two, or maybe three days later I was offered

16     institutional money?

17  A  Yes.

18  Q  You're trying to -- Stoddard wanted you to stay in that date

19     range?

20  A  Yes, because for one, I was never -- you know, at the time

21     whatever took place with him, I never even witnessed none of

22     this.  So whatever he told me, I just took and wrote down

23     for him.

24  Q  Okay.  So it was -- three days later I was offered money,

25     that was not true as well?

1    A    Nobody offered me anything.

2    Q    Okay.  So in essence, everything in the letter which has

3         been marked Exhibit 7 is -- yeah, 7 is untrue?

4    A    It's bogus.

5    Q    And you did it at the direction of?

6    A    Leroy Stoddard.

7    Q    Did he ever talk to you about the spitting case?

8    A    Yes.

9    Q    What did he say?

10   A    He said I spit in the bitch face.  Excuse my language, but

11        that's what he said.

12   Q    He spit in the bitch's face?

13   A    Yes.

14   Q    Why did you agree to -- I'll just ask you.  Why did you

15        agree to do this, write it?

16   A    At the time, you know, he and I, we -- you know, it's an

17        inmate help inmate thing, but when -- when I thought about

18        it, you just can't go in there and just, you know, make up

19        something, and then expect me to stand on it, because for

20        one, if I come in here and stand on it and tell them I was

21        in the law library at this time that this happened and that

22        time this happened, they got a book whereas they can go back

23        and see that I was nowhere around.  So I decided -- I said

24        no.

25   Q    So sometime after you wrote this for him, did you -- well,

| | | |
|---|---|---|
| 1 | | did you understand that you were going to have to come to |
| 2 | | court and testify -- he wanted you to testify? |
| 3 | A | And I also -- yes, and I also told him, you know, before -- |
| 4 | | I mean, after I sent it in and I thought about what I was |
| 5 | | doing, I told him I was going to retract my statement.  I |
| 6 | | said I was going to sign affidavits stating that none of |
| 7 | | this happened. |
| 8 | Q | And at some point did you sign an affidavit? |
| 9 | A | Yes. |
| 10 | Q | Basically retracting? |
| 11 | A | Yes. |
| 12 | | MS. DEMARAIS:  If I could have a moment, Judge? |
| 13 | | THE COURT:  Yes. |
| 14 | | MS. DEMARAIS:  I'll pass the witness, Judge. |
| 15 | | THE COURT:  All right. |
| 16 | | Mr. Stoddard, any questions for the witness? |
| 17 | | And if you could talk right into the microphone, |
| 18 | | please. |
| 19 | | CROSS-EXAMINATION |
| 20 | | BY MR. STODDARD: |
| 21 | Q | Mr. Trainer, you state that I wrote this and asked you to |
| 22 | | copy this down, correct? |
| 23 | A | Yes, you did. |
| 24 | Q | Now, you stated that my spelling is not that great? |
| 25 | A | That's right. |

1   Q    And if anyone were paying attention, I haven't picked up a

2        pen to write anything --

3            MR. STODDARD:  And I have a test here, your Honor --

4   well, let me ask questions.

5   BY MR STODDARD:

6   Q    Where is the copy that I sent you?  Where's that copy?

7   A    You got it back.  You said you wanted it back.

8   Q    So you're telling me -- I don't know -- I'm definitely

9        illiterate.   I spelled my name S-T-O-D-D-E-R?

10  A    No, you told me to write your name down, and after I wrote

11       it down you told me, "Hey, Rick, you misspell my name."  You

12       said that.

13  Q    Let me ask you the question.  If I did tell you -- when you

14       sent this to me, I did tell you you spelled my name wrong?

15  A    Yeah.

16  Q    So if I sent you something -- if I sent you something to

17       copy down, don't you think I would have been able to spell

18       my name correctly?

19  A    But you didn't have your name on that.

20  Q    You just stated to the Court --

21  A    I just stated to the Court --

22           THE COURT:  Hold on.  One at a time.

23  A    I'm answering your question -- I'm answering your question.

24       I just stated to the Courts that you sent me this to

25       write -- to rewrite, which is what I did.  I did not state

1        that your name was on it.  I put it in that term because I

2        was helping you with this here, that when I sent it back to

3        you and told you -- I mean, you told me that I spell your

4        name wrong, I say, "I'm sorry I spelled your name wrong.

5        What difference does it make?"

6   Q    Are you finished answering the question?

7            THE COURT:  All right -- so Mr. Stoddard, ask another

8   question.

9            MR. STODDARD:  Okay.

10  BY MR. STODDARD:

11  Q    Isn't it true, Mr. Trainer, that you approached me outside

12       at rec and told me that Officer Medina had came to you and

13       offered you 100 books of stamps, and Officer Hozey had came

14       to you and offered you five cans of chewing tobacco to do

15       harm to me at rec?

16  A    No.  If you remember correctly, you just told us, me and

17       Cash and Regan, to come in here and say that this man

18       offered you that -- offered us that, which he did not offer

19       us anything.  You told us to say that.

20  Q    So you -- you telling me that you didn't come to me outside?

21  A    I'm telling you what you told us.  I'm answering your

22       question.

23  Q    That's a yes or no question.

24  A    No, I'm answering your question.  You told me to come in

25       here and state Officer Hozey offered me five cans of

1       tobacco, 100 books of stamps, and you also told Regan and

2       Cash the same thing.  So if they come in here and say the

3       same thing, I mean -- I answered your question.

4  Q   Didn't you write my -- aside from this letter, you're saying

5       I had you write and send to my letter -- I mean, send to my

6       lawyer -- didn't you ask me for my lawyer's address?

7  A   Yes.

8  Q   Do you recall the reason why you asked for it?

9  A   Yeah, I recall.

10  Q   What was the reason?

11  A   So I can send a letter to him stating that my life has been

12       threatened and all of this, and -- I mean, it was a lot said

13       in those letters.

14  Q   Isn't it true that when you asked me for my lawyer's

15       letter -- excuse me, when you asked me for my lawyer's

16       address, I asked you what for, and you told me a lawsuit

17       pending in Texas, and you wanted to know if he can recommend

18       or get somebody to be your mouthpiece in court in the

19       lawsuit you have against the Federal Bureau of Prisons?

20  A   No, I already have a lawyer for that.

21         MR. STODDARD:  I'd like to -- I'd like to hand this

22  into the Courts.

23         THE COURT:  All right, let's see, Mr. Leonardo will you

24  take a look at that?

25         (Mr. Stoddard and Mr. Leonardo conferred off the

1  record.)

2          MS. DEMARAIS:  Your Honor, this appears -- it's

3  lengthy.  This appears to be --

4          THE WITNESS:  A copy of my case, probably.

5          THE COURT:  Hold on.

6          MS. DEMARAIS:  Yeah, that helps.  It appears to be a

7  copy of his case.

8          THE COURT:  Mr. Trainer's case?

9          MS. DEMARAIS:  Yes.  And I'm going to object to

10  relevance on this, your Honor.  I don't have time to read the

11  whole thing, but it appears -- well, it's a complaint for

12  violation of constitutional rights under the Eighth Amendment.

13          THE COURT:  All right.  Mr. Stoddard, I don't want that

14  complaint in evidence in this case.  Do you have any

15  documentation indicating that Mr. Trainer mailed that to

16  Mr. Leonardo?

17          MR. STODDARD:  What this is, your Honor, this is --

18  when I asked him why did he need my lawyer's address, he sent me

19  this paper down as the reason as to what he was going to send to

20  my lawyer.  However, he never sent this to my lawyer.  He sent

21  this here to my lawyer.

22          If I could show this to counsel and have Mr. Trainer

23  read this out loud to the Courts.

24          THE COURT:  Let's just let Ms. DeMarais read that

25  first.

1          THE WITNESS:  Can I say something?

2          THE COURT:  Hold on, just a minute.

3          So Mr. Stoddard, you're saying that these yellow pieces

4     of paper that you just handed to Ms. DeMarais, those were pieces

5     of paper written by Mr. Trainer and sent to Mr. Leonardo?

6          MR. STODDARD:  Yes, ma'am.  When he sent them to me, I

7     asked him why he needed my lawyer's address.  He send me this

8     piece of paper.  This is paper I'm assuming he filed pertaining

9     to his lawsuit that he had.  So when I sent the information to my

10    lawyer -- I mean, the information to Mr. Trainer about my lawyer,

11    I was under the impression that he was going to send my lawyer a

12    copy of this.  However, he sent my lawyer that.

13         MS. DEMARAIS:  Well, Judge, this appears to be an

14    attorney/client privilege situation, first of all.  He's sending

15    --

16         THE COURT:  Well, let me just -- Mr. Trainer, did you

17    ever send anything to Mr. Leonardo?

18         THE WITNESS:  I sent him a letter -- I think it was two

19    letters stating factual what Stoddard and I talked about as the

20    same individual, which is Darius Reny, had threatened our lives,

21    and this and that, and that and this.  But that has nothing to do

22    with what he got that -- my court document from.  He got that

23    court document from inmate Brian Cash, because that's who I left

24    it with.

25         THE COURT:  Okay, so you did -- and you wrote it on a

```
 1   yellow piece of paper?
 2              THE WITNESS:  Yes.
 3              THE COURT:  You mailed that to Mr. Leonardo?
 4              THE WITNESS:  Yes.
 5              THE COURT:  All right, so I don't need those actually
 6   admitted into evidence, Mr. Stoddard.
 7              So why don't you ask another question.
 8   BY MR. STODDARD:
 9   Q    You say that Mr -- you say that Mr. Darius Reny was
10        threatening us?  That's what you just said?
11   A    I mean, you got him down as a separation, so --
12   Q    This -- again, the question is you say that Mr. Trainer -- I
13        mean, Mr. Reny was threatening us?
14   A    That's what --
15              MS. DEMARAIS:  Objection on relevance, your Honor.
16   This is getting --
17              THE COURT:  This is getting a little removed,
18   Mr. Stoddard, from your particular case.
19              MR. STODDARD:  Your Honor -- what is going on here,
20   your Honor, Mr. Trainer came to me basically about my case --
21              THE COURT:  And I'll give you a chance to testify after
22   we're done with Mr. Trainer, but do you have any more questions
23   for Mr. Trainer?
24              MR. STODDARD:  Your Honor, what it is, these letters
25   basically saying that he has been threatening -- he has been
```

1    threatened and he was afraid to testify in a case as if he was

2    being threatened by this inmate, and if he was to testify for me,

3    this particular inmate was going to do some bodily harm to him.

4    I know nothing of that, if it's true or false, but that's the

5    reason why he may have changed his story.

6              THE COURT:  All right, then you can ask him about --

7              MS. DEMARAIS:  Judge, I quickly skimmed that, but I do

8    not believe that's the content of the letter.  I believe it has

9    nothing, absolutely, to do with him testifying today.  I skimmed

10   very quickly, but -- I mean, he's free to ask did you change your

11   mind because you were threatened by somebody, but I don't --

12             THE COURT:  Yes, go ahead and ask him that.

13   BY MR. STODDARD:

14   Q    Was you ever threatened in this case about testifying for

15        me?

16   A    Man, I mean, we go to rec --

17   Q    It's a yes or no question.

18   A    It's not a yes or no question.  It's for me to answer your

19        question.  We go to rec every day, you and I, every day.

20        And you know nobody threatening me.  What you doing is

21        telling a lie, and I'm exposing your lie.

22   Q    So why is it that you have papers asking to be separated

23        from --

24   A    Read them.  Read them.  Read it.

25             (Mr. Stoddard and Mr. Leonardo conferred off the

```
 1          record.)
 2               MR. STODDARD:  Can I read -- can I read the letters,
 3     your Honor?
 4               THE COURT:  You want to read it out loud?
 5               MR. STODDARD:  Yes.
 6               THE COURT:  Mr. Leonardo, why don't you review those
 7     papers and see if they appear to be what Mr. Stoddard is
 8     alleging.
 9     BY MR. STODDARD:
10     Q    Mr. Trainer, you -- you wrote a letter to Mr. McFadden.
11          Could you tell us who Mr. McFadden is?
12     A    Mr. McFadden is the regional director.
13     Q    And in the contents of the letter that you wrote
14          Mr. McFadden, you specifically state that you would like to
15          be kept away from Darius Reny?
16     A    Yeah.  I mean, what has that got to do with Mr. Stoddard?
17     Q    For the simple fact that you wrote my lawyer and asked him
18          if -- let me put it this way.  Did you ever write my lawyer
19          and ask him --
20     A    Listen, you got that right in front of you.  You wasting the
21          Court's time.  Man, you got it right in front of you.
22               THE COURT:  Mr. Trainer, let him ask the question.
23     BY MR. STODDARD:
24     Q    Did you ever speak to my lawyer or write my lawyer and ask
25          him to file a motion to get a court order to have you
```

1              separated from different individuals?

2                   MS. DEMARAIS:  Objection on relevance.

3                   THE COURT:  You can answer that yes or no.

4                   Did you ever do that?

5    A     No, I never asked him to file a motion for me to do nothing,

6          but I did write the letter to him, and he has them right

7          there.  I mean, that -- it has nothing to do with this case.

8    Q     Mr. Trainer, did you send -- did you -- you know who

9          Mr. Regan is, Nicholas Regan?

10   A     Yeah, the same one you told to come in here and lie.

11                  MR. STODDARD:  I'd like to give this to the prosecutor.

12                  I'd like to have Mr. Trainer read it out loud in court,

13   please.

14                  THE WITNESS:  You read it.  It's yours.

15                  THE COURT:  Mr. Stoddard, is that an exhibit you want

16   admitted?

17                  MR. STODDARD:  Yes, ma'am.

18                  THE COURT:  What is the exhibit?

19                  MR. STODDARD:  It's basically an exhibit saying -- he

20   wrote -- it's several letters that he wrote to -- we call them

21   kites in prison.  So it's several letters that he wrote to

22   Mr. Nicholas Regan telling him about how bad he wants to go home.

23   He say he just got off the phone speaking with an attorney, which

24   was my attorney who he spoke with.  My attorney called up to

25   speak with him, and say that my attorney was going to get a court

1   order to have him separated from certain individuals, and was

2   going to send the big boys in.  When internal feds get involved,

3   that -- you know, it's serious.  And that's --

4            THE COURT:  So what does that have to do with this

5   case?

6            MR. STODDARD:  That he's lying.  And Mr. Regan, I hope

7   I be able to recall him for rebuttal, can dispute the things that

8   Mr. Trainer is saying now.

9            THE WITNESS:  Bogus.

10           THE COURT:  Ms. DeMarais?

11           MS. DEMARAIS:  Your Honor, I -- we've gone way far

12  afield on this, and that's why -- I mean, even hearsay.  We're

13  never going to finish this trial if we keep going back and forth.

14           This has absolutely nothing to do -- what I can see,

15  and like I said, Judge, I'm skimming very quickly.  It has

16  nothing to do with the spitting.  It has nothing to do with

17  lying, him writing Exhibit 7 to lie for him.  It has nothing to

18  do with him recanting anything.  It's an unrelated -- what I

19  gather is he feels like he's threatened by somebody.  I mean,

20  it's an unrelated case.  I don't think we're here to decide

21  whether he indeed is being threatened by someone or not, your

22  Honor.

23           THE COURT:  Let me see the materials and see if it's

24  related or unrelated to this case.

25           THE WITNESS:  Your Honor, can I -- your Honor?

1              THE COURT:  Hold on, just a minute.

2              Let me just ask, Mr. Leonardo, do you feel that some of

3    this material might be attorney/client privilege material that's

4    not relevant to this case, or do you have any thoughts on that

5    before I --

6              MR. LEONARDO:  Judge, I did -- I had a telephonic

7    interview with Mr. Trainer.  This is before he basically came out

8    and said that that was false testimony.  But I believe I made

9    clear that I was Mr. Stoddard's attorney at the time, and that I

10   was just asking him questions as a witness.  I -- that was the

11   only conversation I had with him on the phone.

12             Other than the letters I got, that was the only

13   communication we had.  So I don't know if he -- I didn't see any

14   reason why he would think of me as his attorney, although he --

15   obviously, he did request that I do something in those letters,

16   which I didn't.

17             THE COURT:  All right.  I will go ahead and just admit

18   these for purposes of impeachment.

19             So Mr --

20             MS. DEMARAIS:  Well, your Honor, I would like to read

21   them, then, because I don't even know -- I mean, I'm going very

22   quickly.  What I see is they're not relevant.  But if they're

23   going to be admitted, I feel like I should at least know what

24   they say.

25             THE COURT:  All right.

1           Are there any other documents, Mr. Stoddard, that you

2   are planning to admit or talk about during this trial that none

3   of us have seen yet?

4           MR. STODDARD:  I guess you -- I wouldn't say you call

5   them documents, but when Mr. Trainer came to me and he called

6   himself assisted me in this case, he gave me paperwork from his

7   incident as far as protocols and procedures in which they were

8   supposed to follow.  That's what these are, him basically saying

9   this is what they're supposed to do with the camera, notify

10  certain individuals --

11          THE COURT:  So Mr. Trainer gave you these documents to

12  help you in your case?  Is that what you're saying?

13          MR. STODDARD:  Some of the documents that you have in

14  your hand, your Honor, was sent to my attorney.  Some of the

15  documents you have in your hand was sent to Nicholas Regan, and

16  some of the documents -- none of the documents you have in your

17  hand he sent to me directly.

18          THE COURT:  All right.  And you're saying these are

19  all -- well, I'm sure this is all an attempt by Mr. Stoddard to

20  impeach Mr. Trainer.

21          So why don't we take a ten minute afternoon recess to

22  give Ms. DeMarais and the Court an opportunity to read these

23  documents, as well as the -- the two additional documents, and

24  then -- we need to take a break in any event, so let's take a ten

25  minute recess.

1               And Ms. DeMarais, if you want to approach sidebar.

2               (The Court recessed at 3:39 p.m., and reconvened at

3     3:55 p.m.)

4               THE COURT:  The record can reflect the presence of the

5     defendant, counsel, and the witness.

6               And let's see, we had a group of documents that

7     Mr. Stoddard had indicated he thought were relevant for this case

8     for impeachment purposes as to Mr. Trainer.  I've reviewed the

9     documents.

10               Ms. DeMarais, did you have a chance to look at them?

11               MS. DEMARAIS:  Yes, I did, your Honor.

12               THE COURT:  All right.  And what are your thoughts as

13    to the admissibility or relevancy of the documents?

14               MS. DEMARAIS:  Your Honor, I think -- and I did draft a

15    couple of proposed questions.  I mean, I'll just -- this is my --

16    if he's trying to have him say something like you were lying

17    about being threatened, because I think that's what the

18    letters -- in order to move somewhere, I mean, I think he can ask

19    him did you lie in these letters, rather than going through each

20    letter, because obviously, I will agree that, you know, his

21    truthfulness does become at issue once he testifies.  So if it's

22    related to him lying about something, or not telling the truth

23    about something, I do feel it's relevant, but I would just -- and

24    I talked to Mr. Leonardo about asking a question regarding these

25    documents.

1              THE COURT:  All right.  I will have the documents -- do

2    you have them, Ms. DeMarais -- or where are they -- oh, they're

3    all up here.  Okay.

4              I'm going to -- what I'm going to do is make them one

5    exhibit, and just admit them for impeachment purposes only and

6    not for the truth of the matter.  I've read through them.

7              Mr. Stoddard -- so you don't have to repeat what's in

8    them, but if you have any questions for Mr. Trainer -- any

9    further questions, I mean.  You've already asked him some

10   questions, the government's asked him some questions.

11             So let's see, that's Exhibit Number what, Jill?

12             THE CLERK:  12.

13             THE COURT:  12 will be admitted for purposes of

14   impeachment.

15   BY MR. STODDARD:

16   Q    Mr. Trainer, isn't it true that you wrote in re Nick --

17        Nicholas Regan about how you -- to get moved, how you needed

18        five names to get moved to a different facility?

19   A    Yes.

20   Q    And you wrote that you need five separatees and one spec,

21        right -- I mean, five enemies and one spec, correct?

22   A    Yup.

23   Q    You wrote my lawyer and asked him to do a motion to have a

24        judge order you be separated and moved from certain

25        individuals, correct?

1    A    Yup.

2    Q    When you -- when you wrote that to my lawyer, was that a

3         lie, or was that the truth?

4    A    It was the truth.

5    Q    So if we are to believe that you wrote -- so basically what

6         you're telling us is we should believe that what you wrote

7         to my lawyer is the truth, but we should believe this right

8         here what you wrote is a lie?

9    A    I'm going to answer that as what I wrote is the truth.  What

10        you gave me to write is a lie.

11   Q    My lawyer didn't file that motion for you, did he?

12   A    No, he didn't.

13   Q    I didn't hear you, sir.

14   A    I said no, he did not.

15   Q    Then the F.B.I. came to see you.  Do you recall what date

16        that was the F.B.I. came to see you?

17   A    No.

18   Q    But the F.B.I. did come to see you, correct?

19   A    I mean you -- you --

20   Q    I'm asking the question, sir.  I don't know.

21   A    Yeah, he came to see me.  Yeah.

22   Q    Now, before you was leaving off the range, and they told

23        you -- where did they tell you you was going when they came

24        to tell you you had a visit?  Where did they tell you you

25        was going?

1    A    Nobody told me I had a visit.  Where were you?

2    Q    Excuse me, when the F.B.I. came to see you, when they came

3         to your door did they come to your door saying the F.B.I.

4         wanted to see you, or somebody wanted to see you in R&D?

5    A    The F.B.I. never came to my door.

6    Q    I didn't ask you that.  When a SHU officer came to your

7         door, officer that's working in the SHU, and told you you

8         had a visitor in R&D, did he say to you who the visitor was?

9    A    No.

10   Q    Did you ever go up to R&D to see anyone?

11   A    I mean, you just asked me --

12   Q    I'm asking the question, because I don't know, sir.

13   A    Yeah, I went to see somebody.  Yeah.

14   Q    Okay.  Now, before you left when -- when they say -- they

15        say it to you, didn't I say to you, I say, "Rick," I say,

16        "Man, when the F.B.I. came to see me, they told me someone

17        wanted to see me at R&D," correct?

18   A    I don't remember you saying that.

19   Q    You don't remember me saying anything to you?

20   A    No.

21   Q    Okay.  Now, when you came from seeing the F.B.I., and I

22        asked you who was up there, what did you tell me?

23   A    I don't even remember you asking me nothing about no F.B.I.

24   Q    So you don't remember me asking you who came to see you?

25   A    No.

1    Q    So did you ever write an officer by the name of Stangel up

2         for allegedly going through your mail when he had no

3         business going through your mail and then discussing the

4         contents of the letter to other individuals -- other

5         inmates?

6              MS. DEMARAIS:  Objection, your Honor, relevance.

7              THE COURT:  Mr. Stoddard --

8    Q    Didn't you --

9              THE COURT:  Hold on a second, sir.  How is that

10   relevant to anything in this case?

11             MR. STODDARD:  Because, your Honor, when Mr. Trainer

12   left off the range, when they came and told him someone wanted to

13   see him in R&D, when the F.B.I. officer that's sitting there came

14   to see me, that's the same thing they told me.  So when I heard

15   that, I said, "Rick, man, I think the F.B.I. is coming to see

16   you."  Because he was in the SHU for hitting a dude all over the

17   head with a lock and all that.  So that's why I'm thinking they

18   coming to see him.  So when he come back, I asked him, "Who was

19   it?"  He said it was internal affairs with Mendez coming to see

20   him about him writing Stangel up for some letters.  And he even

21   informed me that they would be coming to pull me because Stangel

22   did mention something to me about some contents that was in a

23   letter he was supposed to send out.  He told me that someone from

24   internal affairs would be coming to see me to get an affidavit

25   pertaining to that.  So I took what he said at face value.  Never

1    in my wildest dreams did I ever thought that he went up there to

2    talk to the F.B.I.

3            THE COURT:  All right.  Well, I think your statement

4    right now covers it.

5            MR. STODDARD:  Okay.

6            THE COURT:  So go ahead and ask Mr. Trainer another

7    question.

8    BY MR. STODDARD:

9    Q    And when the F.B.I. came to see you, you saw that as an

10        opportunity, didn't you?

11   A    Who -- I mean, you asking me something that you basically --

12        you guessing.  Ask me a question that's -- I mean, a direct

13        question, and I answer it for you.

14           MR. STODDARD:  Your Honor, can you ask Mr. Trainer on

15   the stand --

16           THE COURT:  Go ahead and answer that -- ask that

17   question again, Mr. Stoddard.

18   BY MR. STODDARD:

19   Q    When you went to see -- when the F.B.I. agent came to see

20        you, you saw that as an opportunity to possibly get moved to

21        another institution, correct?

22   A    No, I saw that as an opportunity to tell the truth.

23   Q    Let me ask you a question about -- you say telling the

24        truth.  You know, in prison is it fair to say that us as

25        inmates, we have rules and regulations that we live by as

1        inmates?

2   A    We have rules and regulations --

3   Q    That we live with as inmates?

4   A    -- that we not follow, and I'm not going to follow nothing

5        that you tell me, dude.

6   Q    Okay, so let me ask you a question.  In prison by -- as they

7        like to use the word in prison snitch, snitching's --

8        snitchings get labeled and possibly can get killed in

9        prison, correct?

10  A    So your threatening my life now, right?

11           THE COURT:  Hold on, Mr. Trainer.

12  BY MR. STODDARD:

13  Q    I'm not threatening your life, Mr. Trainer.  Your life is

14       not worth my time.

15           THE COURT:  Wait, now, this is starting to deteriorate,

16  Mr. Stoddard.

17           MR. STODDARD:  Well, he's not answering my question.

18           THE COURT:  Okay, now -- wait, so Mr. Trainer, answer

19  his question that he asked you.  Can you answer that?

20  A    Yes, snitching will get you killed.

21           THE COURT:  All right.

22           Mr. Stoddard, ask another question.

23  BY MR. STODDARD:

24  Q    Now, did you have an agreement with the F.B.I. agent who's

25       in the courtroom or the prosecution to be moved for your

1        testimony?

2    A   I never seen this lady a day in my life.

3    Q   I also spoke about the F.B.I. agent that's present right

4        there.

5    A   Was he the one that seen me?

6    Q   Yes.

7    A   Ask him.

8    Q   I'm asking you if he's the one that seen you.

9    A   That's not what you asked me.

10   Q   I'm asking you is this F.B.I. agent is the F.B.I. agent that

11       came to interview you?

12   A   Yes, I spoke with him.

13   Q   Now, when you -- when you spoke with him, what did he --

14       what did he say to you -- what did he say to you?

15           What was that discussion about?  Can you tell me what

16       that discussion was about?

17   A   This piece of paper right here.

18           (Mr. Stoddard and Mr. Leonardo conferred off the

19       record.)

20   BY MR. STODDARD:

21   Q   Okay, let me rephrase the question again.  Has anybody ever

22       promised you anything for your testimony, to be moved out of

23       the jail, or anything for your testimony?

24   A   You --

25   Q   Have any --

```
1    A     -- asked me --
2    Q     Have any government offered -- anybody that work for the
3          federal government, F.B.I., or prosecution, or correction
4          officer offered you anything for your testimony far as you
5          to be moved out of prison?
6    A     No.
7    Q     But you are moved, correct?
8    A     Yes, I am moved.
9    Q     Why?
10   A     I guess for my safety reasons.  Like you just said, I'm
11         snitching.  We get killed, right?
12   Q     Because of me?
13             And you knew that a snitch would be moved, correct?
14   A     They don't -- I mean, you ain't been moved.
15   Q     I'm not a snitch, though.
16             THE COURT:  All right, so Mr. Stoddard, ask another
17   question.
18             MR. STODDARD:  He's -- your Honor, he never answered my
19   question as far as --
20             THE COURT:  Where are you presently housed?
21             THE WITNESS:  I'm housed in a -- another Tucson
22   facility.
23             THE COURT:  All right, another Tucson facility.
24             Okay.  Go ahead, Mr. Stoddard.
25   BY MR. STODDARD:
```

```
 1    Q    So you housed at FCI Tucson?

 2              THE COURT:  It doesn't matter where he's housed.  He's

 3    housed at another facility.

 4              So go ahead, Mr. Stoddard.  Ask another question.

 5    BY MR. STODDARD:

 6    Q    So you say that no one offered you anything for your

 7         testimony?

 8              THE COURT:  That's already been asked and answered.

 9    He's --

10    BY MR. STODDARD:

11    Q    Mr. Trainer, didn't -- on October the 25th -- let me

12         rephrase it.

13              Didn't me and you used to bet -- every weekend didn't

14         we used to bet on college football and NFL football?

15    A    Yeah.

16    Q    Have we ever had any disagreements over those football

17         games?

18    A    Nope.

19    Q    So you don't recall us getting into an argument --

20              THE COURT:  Now, Mr. Stoddard, how could that be

21    relevant?

22              MR. STODDARD:  What's relevant, your Honor, is on

23    October 25th the New Orleans Saints was playing the Miami

24    Dolphins, and Mr. Trainer and I had a disagreement over the game,

25    and Mr. Trainer got on the door and we cussing each other out,
```

1   and he said F me -- but he used the actual words, said F me, I'm

2   not going to testify for you.  Now, this was on November -- I

3   mean, correction, this was on the 25th of last month.  Now --

4              THE WITNESS:  Your Honor --

5              THE COURT:  Hold on a second.

6              MR. STODDARD:  -- I mean, month before last, and

7   since -- since that time, you know, I'm trying to figure out --

8   like, I don't know the exact date.  I wish I had the exact date

9   that Mr. Trainer actually spoke with the F.B.I., because to me

10  all this just lines up in a row, your Honor, as far as him

11  telling me he's not going to testify for me because of the

12  disagreement we had over the game.  And I have other witnesses

13  who can attest to -- to this, and I hope to be able to call him

14  as a rebuttal witness pertaining to Mr. Trainer.

15             THE COURT:  All right, did -- Mr. Trainer, was there a

16  disagreement about this football game?

17             THE WITNESS:  No, ma'am.  The last time we made a bet,

18  Ms -- I mean, your Honor, was on a college game, and that was

19  before I left, and I won and didn't get paid.

20             And I never did see you again because you went to rec

21  and I didn't, so --

22             THE COURT:  All right.

23             So Mr. Stoddard, ask another question.

24             MR. STODDARD:  I have no further questions, your Honor.

25             THE COURT:  Any redirect?

REDIRECT EXAMINATION

BY MS. DEMARAIS:

Q    Were you offered anything by the government to retract the statement that's now Exhibit 7?

A    Ma'am, I was never offered anything by you or nobody else.

Q    And in fact, in that stack of letters up there did you write -- which is Exhibit 12, I think, did you write sometime -- did you write his attorney and said that you were going to retract the statement?

A    No.  I just told him point blank that what his client had me to say was bogus, and if the letter should be up there -- if -- if he submitted all the letters --

Q    Yeah, there's a letter in there that was written by you that says --

A    Everything --

Q    -- that he's not -- his client isn't telling the truth about this supposed bribe of Officer Hozey.  If that letter is in there, you wrote that letter.  You remember that letter, okay.

A    Yes.  Yes.

Q    And as far as when you retracted this letter -- initially, you wrote the letter for Stoddard, correct?

A    Yes.

Q    And isn't it true that you talked to somebody -- the first person you talked to about retracting the letter was

1    somebody who was on the range, and you requested to speak to

2    somebody.  How did that come about?

3  A  It was because when Officer Hozey -- you know, when Officer

4    Hozey came through on a day -- I think it was, like -- I

5    don't remember the day he came through, and the man walked

6    straight through doing his checks, signed the book, and left

7    back out, and that's when inmate Stoddard got on the door

8    and say, "Listen, this is what we gonna do.  Everybody say

9    that Officer Hozey just said whoever beat up Stoddard can

10    have five cans of tobacco."  And I was, like, "Man, this is

11    bogus.  I'm not going with none of this."

12  Q  And so Cash was present when he -- the defendant requested

13    that you testify?

14  A  Yeah, even Regan.  He was -- he was -- see, with Stoddard

15    and Regan it's like this here -- and I'm going to say this,

16    and this is factual.  They dealing with the same homosexual.

17    It's -- a homosexual just left the prison named Diamond.

18    All of them are so head over heels for this homosexual --

19  Q  Let's -- let's not go there because it's getting late, but

20    basically, I just want to know that -- I mean, I just want

21    you to answer, basically, the question that at some point

22    you wrote the letter, and at some point you decide you're

23    not going to testify for him, correct?

24  A  Yes.

25  Q  And why did you do that?

1   A   Because it's a lie.

2   Q   I mean, but it was a lie before.  Why did you change your

3       mind?

4   A   Because I know if I would have went back and sign the

5       affidavit and they would have checked everything that I

6       said, they would have seen that I was not nowhere in the

7       vicinity of this incident.

8   Q   And so were you -- you were afraid of perjury charges?

9   A   That's it.  I told -- I told the F.B.I. agent, I say, "I'm

10      not going to do this, because I'm not -- you know, I'm six

11      years to the door."

12  Q   Did you request to see an F.B.I. agent?  Did you request --

13  A   No.

14  Q   -- somebody to retract the letter?

15  A   What I did was I wrote -- I wrote a letter to his attorney

16      and basically told him if I come to court for inmate

17      Stoddard, I said, I will only tell the truth.  I say what he

18      had me to say is bogus, and I got -- all of that is over

19      there.

20  Q   And that's in a letter.  Okay.  And then at some point after

21      you decide to retract your story, do you talk to the F.B.I.

22      agent and sign an affidavit and stuff?

23  A   Yes.

24  Q   But that was after you had already made your decision?

25  A   That was after I had already sent the letter to him.

1    Q    And -- and so basically, everything in the letter is not

2         true.  You never overheard Hozey offering anything to beat

3         up --

4    A    No, this was just a thing whereas -- okay, say you did

5         something to me and you got the upper hand on me, so I got

6         to come up with something to try to fight off what you --

7         what you doing to me.

8    Q    Yeah, and I -- you know, I get all that.  And we're just

9         here today, actually, about what we initially were, about

10        the spitting incident.

11   A    Yes.  But he did tell me he spit in the man face.

12   Q    And then were you on the range on October 21st, '09, when

13        Hozey came down the range?

14   A    October the 21st?  Yes, I think so.

15   Q    Is that the day you were telling the judge about --

16   A    When he came to do his rounds.  He made his rounds.

17   Q    And again, how did he make his rounds?

18   A    He came straight through the gate, went from cell to cell

19        looking in each cell to make sure all the inmates were

20        alive, signed the books, and turn around and walk right back

21        out.

22   Q    About how long was he there?

23   A    Not a good two, three minutes.

24             MS. DEMARAIS:  That's all I have, Judge.

25             THE COURT:  All right.

1          This witness may step down and be excused.

2          MS. DEMARAIS:  Yes, Judge.

3          THE COURT:  And any additional rebuttal evidence on

4     behalf of the government?

5          MS. DEMARAIS:  No, your Honor.

6          THE COURT:  All right.

7          What I'm going to do -- I have a note from the jury in

8     the other matter.  I'm going to take a 15 to -- or 20 minute

9     break on this case.  When we reconvene, I'll hear closing

10    arguments from both sides.

11         And I think we have all the exhibits introduced in

12    evidence that -- Ms. DeMarais, from your perspective?

13         MS. DEMARAIS:  Yes.

14         THE COURT:  All right.

15         So we'll take about a 20 minute break so I can deal

16    with my other issues with my other case, and I'll hear closing

17    arguments from both sides.

18         MR. STODDARD:  And, your Honor, could I give a rebuttal

19    to Mr. Trainer testimony, your Honor?

20         THE COURT:  What would that rebuttal be?

21         MR. STODDARD:  Far as what actually took place.  He was

22    allowed to tell his side of the story, and I can only ask

23    questions, but I would like to be able to tell my side of the

24    story.

25         THE COURT:  All right.  Why don't I let you do that

1        when you present your closing arguments to the Court.

2                  MR. STODDARD:  Okay.

3                  THE COURT:  You can summarize for me your testimony as

4        to what you would testify to, and I'll treat it is as testimony.

5                  MR. STODDARD:  Okay.

6                  THE COURT:  All right?

7                  MR. STODDARD:  Yes, ma'am.

8                  THE COURT:  All right.

9                  So we will stand at recess, then, for about 15 or 20

10       minutes.

11                  (The Court recessed at 4:13 p.m., and reconvened at

12       4:46 p.m.)

13                  THE COURT:  The record can reflect the presence of

14       counsel, the defendant, advisory counsel.

15                  And Ms. DeMarais, you may make your closing remarks to

16       the Court.

17                  MS. DEMARAIS:  Yes, your Honor.

18                  I'd ask that you find the defendant guilty.  On

19       January 9th, 2009, he did spit in Officer Hozey's face.  Officer

20       Hozey's testified to that, Officer Smith testified to that, as

21       well as inmate Trainer who among other things said that Stoddard

22       had told him that he spit in the B-I-T-C-H's face.

23                  This is a clear case.  He spit -- he's angry that he

24       got charged with it, but he did spit in the face.  We have proved

25       all our elements of this crime, and in fact, not only did he

1   spit, the spit did make contact with Hozey.

2           As far as the evidence, Trainer regarding the

3   October 20 -- oh, I don't remember, October 29th or whatever day

4   it was, when -- 21st, whenever he was on the range, even if it

5   were true that he did offer inmates cigarettes to beat up

6   Stoddard, does that negate the fact that the incident happened?

7   But -- I mean, I called Trainer, and I probably shouldn't have

8   fallen into that trap, but it's just annoying that people would

9   come here and lie about that for -- Mr. Stoddard lied on his

10  behalf, but his witness lied about it.  That never happened.

11  There were never any offers to beat up Stoddard by Hozey.

12          We have proved our case, and ask that you find him

13  guilty.

14          THE COURT:  All right.  Thank you, Ms. DeMarais.

15          And Mr. Stoddard, any closing remarks, and also if you

16  want to present any additional statements in the way of testimony

17  regarding the last witness, go ahead, sir.

18          And if you can just talk right into the microphone.

19          MR. STODDARD:  Yes, ma'am.

20          I'd like make a comment on the last witness.

21          THE COURT:  Sure.  Why don't you do that first, and

22  then you can make any closing remarks.

23          MR. STODDARD:  What happened, your Honor, Mr. Trainer

24  approached me outside and told me that Officer Hozey and Officer

25  by the name of Medina -- Medina had offered him some stamps.  And

1   in prison, stamps is money.  One stamp is the equivalence of 30

2   cents.  So a book of stamps, which is 20 stamps is $6.  So he

3   tells me that Officer Medina offered him 100 books of stamps,

4   which would be the equivalence of $600 in prison money.

5           He also stated that Officer Hozey had offered him while

6   he was in the law library -- all this took place at certain

7   points he was in the law library, had offered him some tobacco to

8   do something to me at rec.  At this point I wasn't on

9   the lieutenant hold.  I was able to go in the cage with any and

10  everyone that was on my range, as well as the range that comes

11  out beside us.  So I asked Mr. Trainer could he give me something

12  in writing so I could send to my attorney?

13          He testified that -- which is true, my spelling is not

14  all that great, but the same as though from -- if you read the

15  paper, the only word that was wrong in there was my name.  I

16  mean, I could see if another word came up then his thinking

17  have a little validity to it.  And he wasn't ever able to produce

18  any type of written kite, which we call a kite which is a letter,

19  to show that I wrote him at any point of time we was back there

20  and asked him to do anything.  However, I'm able to provide

21  numerous kites that he then -- letters that he then wrote to my

22  lawyer as well as to inmate Regan, which is Nick, as well as

23  kites that he wrote to the regional director, Mr. McFadden,

24  questioning about his safety.  And it's on one of the things he

25  say something about ammunition.  Use all the ammunition you can

 1    when it come to your safety.  The way I take that is I'm

 2    ammunition.  I believe Mr. Trainer when he came to me -- if what

 3    he said was true or false, your Honor, I don't know because I

 4    wasn't there.  All I can do is relay this information on to my

 5    attorney.

 6              But what I believe happened was I believe Mr. Trainer

 7    was going to testify on my behalf, but when the F.B.I -- but he

 8    was going to testify on my behalf, and I believe he was hoping

 9    that he could use my attorney to get a motion put in to get him

10    separated from these different individuals, these different

11    gangs.  But I think when the F.B.I. came to see him -- which

12    because my lawyer never did that for him, never wrote him to my

13    knowledge saying he would or he wouldn't, just never responded

14    back.  Now, when the F.B.I. came to see him, and what -- I'm just

15    speculating.  I don't know this to be a fact, but I believe what

16    happened is when I gave Mr. Trainer's name to my attorney, he

17    passed it on to the prosecution, the prosecution passed the name

18    on to the F.B.I. agent, who at that turn pulled Mr. Trainer to

19    see Mr. Trainer and question Mr. Trainer as to what he was going

20    to testify to.  And I believe at that moment Mr. Trainer saw an

21    opportunity to use the government to get probably some separatees

22    put on him, or get keep-aways put on him from these separate

23    individuals.  Because if you mainly read all them kites, all them

24    kites are mainly talking about, the letters, is his safety.  Put

25    this person away from me, keep this person away from me, keep

1  that person away from me.  And he was hoping by getting on my

2  case that my attorney would be able to do that, but my attorney

3  was not -- didn't even respond to his letter to my knowledge.

4          I know that all this is real -- real crazy, you know,

5  as far as I'm now going from A to Z, I'm jumping all over the

6  place, and I really just hope that you can just understand where

7  I'm coming from.  I have never been to trial a day in my life

8  because if I'm guilty of something, I went on and plead guilty to

9  it.  But I know all this is fabrication.  It's more so being done

10  as you notice everybody that got on the stand, my behavior in the

11  SHU.  I'm -- I was the worse person in the SHU.  I was always

12  acting up.  But they provide video -- even in my video that we

13  seen -- yeah, I'm smart mouth.  I say smart comments, but not one

14  time on that video did I threaten anyone.  And as the government

15  attest to, that I had been videotaped so many times, but at the

16  same token I'm pretty sure they reviewed them videos to see if I

17  threatened anyone, or anything like -- or spat on anyone,

18  anything.  And if so, they would have presented that evidence,

19  which they didn't.

20          All we have here, your Honor, is a bunch of officers

21  saying I did something.  Not one officers that got on the stand

22  spoke highly of me whatsoever.  Not one.  Then you have Mr. Hozey

23  who basically say -- if you want -- I don't look at it as being a

24  threat, but if you want to interpret it that way, you can.  I

25  know where your sister work at.  Why would you say that to me?

1   That mean if you want to get to my sister, you can.

2           Then let's look at the evidence.  There's no physical

3   evidence whatsoever.  No DNA evidence, no photograph, pictures

4   showing spit on them, no -- no video evidence showing me spitting

5   on them.  It's just officers saying they seen me do it.  You saw

6   the video.  Every officer that was on the video he was saying

7   they heard me threaten him, or seen me spit on him.  But only two

8   people come to testify.  Why wasn't other people who -- I guess

9   the government thought they could get a conviction off of just

10  two, but I just feel as though DNA evidence could have exonerated

11  me.  It could have found me guilty if I did spit on him, which I

12  didn't, or it could find me not guilty.

13          I have never spoken to them officers.  They have never

14  seen a case like this, especially when an individual has no type

15  of disease that can cause a person their life down the line, or

16  cause them some serious type of -- medical type of, you know,

17  health problems, or anything of that nature, your Honor.

18          I ask that you find me not guilty, your Honor.  I don't

19  feel as though the evidence substantiate me as being guilty, to

20  find me guilty when there was no -- no evidence whatsoever other

21  than people testimony that show that I did these allegations,

22  your Honor.

23          Thank you.

24          THE COURT:  All right.  Thank you, Mr. Stoddard, for

25  your closing remarks.

1          The Court -- this is a bench trial, so the Court has

2    evaluated the testimony of the witnesses, the exhibits that have

3    been admitted into evidence.

4          Further, I'd like to comment briefly on the legal issue

5    that was raised before the magistrate judge, which is something I

6    think this Court needs to -- needs to rule on in this case.

7          The Court finds that the government has met its burden

8    of proof to prove beyond a reasonable doubt that Mr. Stoddard did

9    violate the statute, 18 USC Section 111(a)(1), as alleged in the

10   indictment for the incident on January 9th of 2009.

11         The Court finds that the victim in this case, Federal

12   Corrections Officer Christopher Hozey, was credible, as well as

13   the -- the officer who testified for the government

14   corroborated -- Officer Smith, corroborated Officer Hozey.

15         Further, the Court finds that Mr. Trainer's testimony

16   was probative to the Court as far as the letter, which I believe

17   was Exhibit 7, his explanation of the -- the letter as well as

18   the letter that he subsequently wrote to Mr. Leonardo indicating

19   that he was not going to testify.

20         So based on all the evidence that was presented in this

21   case, the Court finds the defendant guilty of assault on a

22   federal officer.  That's the title of the -- of the statute,

23   assaulting, resisting, or impeding certain officers or employees.

24         Now, the government hasn't argued whether it's -- the

25   indictment reads did intentionally and forcibly assault, resist,

1    oppose, impede, intimidate and interfere.  So looking at the

2    statute and the facts of this particular case the Court finds

3    that the defendant did assault, impede, and interfere with

4    Officer Christopher Hozey as he was acting as a Federal

5    Corrections Officer on January 9th of 2009.

6            And the Court has considered all of the evidence in the

7    case, including Mr. Stoddard's statements to the Court, as well

8    as Mr -- the witness that Mr. Stoddard presented, as well as all

9    the documentary evidence.

10           Now, relating to the issue raised earlier in the motion

11   to dismiss indictment, the Court finds first that the facts

12   clearly show in this case that when Mr. Stoddard spit on the

13   corrections officer, that the -- there was actual physical

14   contact.  So therefore, under the Llewellyn case, which is at 481

15   F.3d 695, that case involved an intentional spitting case,

16   intentionally spitting in the face of a victim is an offensive

17   touching that rose to the level of simple criminal assault.

18   Under the theory of assault is an attempted or completed battery,

19   and I'm just summarizing this case as outlined in one of the

20   headnotes.  So -- so intentionally spitting is -- is contact, an

21   offensive touching.

22           The Court further finds that intentionally -- or

23   spitting and not missing but actually having contact where the

24   spit actually has contact with the victim is physical contact as

25   outlined in ARS Section -- 18 -- not ARS, United States Code,

1   Section 111(a)(1) where it says:  And where such acts involve
2   physical contact with the victim of that assault, then it's
3   treated as a felony, where the fine is as outlined under the
4   statute, or imprisonment for not more than eight years.

5          So the Court has read the briefs, the motion to dismiss
6   filed by Mr. Leonardo, the government's response, and
7   Mr. Leonardo's reply, and the Court agrees with the government's
8   analysis that now that the statute has been amended, that the
9   particular facts of this case -- I'm not saying that all
10  scenarios are going to be clearly outlined in the statute, but in
11  this particular case it's clear that Mr. Stoddard committed an
12  assault by spitting, also impeded and interfered with Officer
13  Hozey's duties by spitting.  And it's clear that this is not a
14  misdemeanor because the statute now reads where the acts involve
15  physical contact with the victim, and the Court finds that this
16  is an act that involved physical contact.  We'd have a different
17  situation if there had not been this actual physical contact.
18  Then it might be a simple assault, if there was spitting and
19  there hadn't been actual contact with Officer Hozey.

20         So the Court finds that that -- this is a felony.  And
21  it's not the Court's decision as to the drafting of the statute,
22  the decision to make this kind of an incident a felony.  That's
23  up to Congress, as they've outlined in the statute.  And it's
24  further not the Court's prerogative to decide who gets charged
25  for a particular conduct.  That's up to the government, the

1    United States Attorney's Office.  It's this Court's job as the

2    trier of fact to look at the facts and see if the government has

3    met its burden of proof regarding the allegations in the

4    indictment, and given the statute cited in the indictment.  And

5    the Court, as I've said, finds that the government has met its

6    burden of proof.

7              So the Court finds Mr. Stoddard guilty of assaulting,

8    resisting, or impeding Officer Hozey.

9              And I will set sentencing for --

10             (The Court and clerk conferred off the record.)

11             Approximately 70 days away.  And a presentence report

12   will be prepared, which I will read prior to sentencing.

13             I'll set the sentencing for February 12th at 10:15.

14             And is there anything further from the government,

15   Ms. DeMarais?

16             MS. DEMARAIS:  No, your Honor.

17             THE COURT:  All right.

18             Mr. Stoddard, anything further from your perspective?

19             MR. STODDARD:  Yes, ma'am.  I would like to remove

20   myself from being my own counsel, and ask can you appoint

21   Mr. Leonardo back for sentencing purposes, please?

22             THE COURT:  All right.  I think that would be well

23   advised since Mr. Leonardo is very experienced, and can help you

24   to prepare for sentencing.

25             So Mr. Leonardo, any problems with you being

1    reappointed to represent Mr. Stoddard for purposes of sentencing?

2              MR. LEONARDO:  No, your Honor.

3              THE COURT:  All right.  So I'll order that that happen.

4              And so Mr. Leonardo, is there anything further from

5    your perspective at this time?

6              MR. LEONARDO:  No, your Honor.

7              THE COURT:  All right.

8              So we will stand at recess on this matter.

9    (5:02 p.m.)

1                  **C E R T I F I C A T E**

2              I, Mary A. Riley, do hereby certify that I reported the

3    foregoing proceedings to the best of my skill and ability, and

4    that the same was transcribed by me via computer–aided

5    transcription, and that the foregoing pages of typewritten matter

6    are a true, correct and complete transcript of all the

7    proceedings had, as set forth in the title page hereto.

8              Dated this 25th day of May, 2010.

9

10                                        s/ Mary A. Riley

11                                   United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25