1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3    --------------------------------)
                                     )
4                                    )
     UNITED STATES OF AMERICA,       )
5                   Plaintiff,       ) No. 10-10124 9th Circuit
                                     )
6           vs.                      ) No. CR 09-0918 TUC-CKJ
                                     )
7    ROBERT LEROY STODDARD, JR.,     )      Tucson, Arizona
                    Defendant.       )      March 19, 2010
8                                    )
                                     )
9    --------------------------------)

10

11                    TRANSCRIPT OF SENTENCING

12

13            BEFORE THE HONORABLE CINDY K. JORGENSON
                   UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16

17   For the Plaintiff:   By:   Ann DeMarais
                                U.S. Attorney's Office
18                              405 W. Congress St., Suite 4800
                                Tucson, AZ   85701
19
     For the Defendant:   By:   Robert L. Stoddard, Jr., pro so
20                              Nathan Leonardo (Advisory Counsel)
                                2 E. Congress, Suite 900
21                              Tucson, AZ   85701

22
     Mary A. Riley, RMR, FCRR
23   United States Court Reporter
     U.S. District Court
24   405 W. Congress St.
     Tucson, AZ   85750
25
            Proceedings produced by computer-aided transcription

1    TRANSCRIPT OF PROCEEDINGS

2    (11:05 a.m.)

3         MS. DEMARAIS:  Good morning.  Ann DeMarais for the

4    government.

5         THE COURT:  Good morning.

6         MR. LEONARDO:  Good morning, your Honor.  Nathan

7    Leonardo on behalf of Mr. Stoddard.  He's present in custody.

8         THE COURT:  Good morning.  And this is the time set for

9    sentencing.  I have received -- I have a letter from

10   Mr. Stoddard.  I have a letter from Mr. Hozey.  I have the most

11   recent presentence report which responded, Mr. Leonardo, to some

12   of your second set of objections which were more -- not guideline

13   relevant objections, but just other objections related to some of

14   the facts listed in the report.  So I have that most recent

15   report, which is March 16th.  I have, Mr. Leonardo, your

16   objections -- your supplemental objections, and the government's

17   response to the original objections.  So those are the materials

18   I've reviewed.

19         So Mr. Leonardo, before I have you -- have Mr. Stoddard

20   come up to the podium for sentencing, why don't you go ahead and

21   come up to the podium and let me just hear you as to whether you

22   have any guideline relevant objections.

23         MR. LEONARDO:  The only guideline relevant objections I

24   had were made in my first objections to the presentence report,

25   and that was just that this -- that the conduct in this case did

1   not -- it was not the equivalent of physical contact, or did not

2   qualify as physical contact under the statute or under the

3   guidelines, and for the same reasons I argued in my motion to

4   dismiss the indictment originally, and which was renewed, I

5   think, at the close of the State's (sic) case.

6               THE COURT:  So you want to incorporate those same

7   arguments into your guideline relevant objections?

8               MR. LEONARDO:  Yes, your Honor.  And also, the other

9   guideline relevant objection was the obstruction of justice, the

10  levels that were added for the alleged obstruction of justice

11  regarding an inmate that claimed on the stand during trial that

12  Mr. Stoddard had written out a letter -- a fabricated letter, and

13  had him sign it as his own, or rewrite it as his own.  I think

14  that --

15              THE COURT:  This was Mr. Trainer?

16              MR. LEONARDO:  Mr. Trainer was his name.

17              That was kind of a confusing situation to the Court,

18  because there were a bunch of letters, I recall, and I think some

19  of them were admitted into evidence.  But I know Mr. Trainer

20  wrote me a letter, and I think that was one of the letters that

21  was admitted into evidence, and he was asking me to do certain

22  things on his behalf.  And I had interviewed him over the phone.

23  In his interview with me he was consistent with the letter, but

24  then when he came to testify here after talking to the F.B.I., he

25  changed his story.

1       One of the things he wanted me to do was to get him --
2  to file some kind of motion to get him out of custody, but I
3  didn't do anything because I didn't represent him.  And I think
4  during trial it was brought out in cross-examination that
5  Mr. Trainer wanted to get out of U.S.P. Tucson, and that may be
6  his underlying motive for saying that Mr. Stoddard fabricated
7  this letter.  He -- from my understanding, he is not -- no longer
8  at U.S.P. Tucson.  I don't know that for sure, but that's my
9  understanding.
10       THE COURT:  Now, the letter, I think it was Exhibit 7,
11  was a September 6, 2009 letter.  Was that a letter that you were
12  aware of before trial?  So that was -- actually had been sent to
13  you?
14       MR. LEONARDO:  Yes.
15       THE COURT:  The letter that was at issue?
16       MR. LEONARDO:  I believe so.
17       THE COURT:  Okay.  And that was in that big pile.  I
18  know there was a large stack --
19       MR. LEONARDO:  Right.  So that's why I informally
20  interviewed him, or --
21       THE COURT:  And I forget, how did government counsel
22  get a hold of that letter?
23       MR. LEONARDO:  I think I disclosed it.
24       THE COURT:  Okay, and then they went and talked with
25  Mr. Trainer?

1    MR. LEONARDO:  I disclosed Mr. Trainer as a witness, I
2 believe.

3    THE COURT:  Okay.

4    MR. LEONARDO:  And then --

5    THE COURT:  So Mr. Trainer -- you listed him as a
6 potential witness based on -- well, his involvement?

7    MR. LEONARDO:  And so the bottom line on this whole
8 thing is that I think it's -- the evidence is very confusing.  I
9 don't think the evidence is clear enough for the Court to
10 determine by even a preponderance of the evidence that this was
11 obstruction of justice on Mr. Stoddard's behalf that should
12 enhance his sentence any more than it already is.

13    THE COURT:  So you're thinking it might have been
14 Mr. Trainer's idea to create this letter?

15    MR. LEONARDO:  It may be.

16    THE COURT:  Of course, he couldn't have done it without
17 Mr. Stoddard.  I mean, it had all that information in there about
18 Mr. Stoddard's situation.

19    MR. LEONARDO:  He clearly talked to Mr. Stoddard at
20 some point, yeah, and I think he admitted -- well, obviously he
21 admitted that on the stand.  But yeah, I think that there's --
22 certainly could have been an underlying motive and a goal, which
23 is to -- he wanted to leave U.S.P. Tucson, which once he
24 testified against Mr. Stoddard was accomplished, I think.  I
25 don't know if he'll get more from the government on this also.

```
 1            So those were the only guideline relevant
 2  calculations -- or objections that I had.
 3            THE COURT:  All right, thank you.
 4            MR. LEONARDO:  And the original thing doesn't --
 5  original objection goes to the guidelines and the statute, but
 6  it -- I don't think it would bring the guidelines down -- and
 7  this is the physical contact issue.  I don't think it would
 8  necessarily bring the guidelines down below 12 months, but under
 9  the statute if it was treated as a misdemeanor, it would.
10            THE COURT:  Maximum of 12 months?
11            MR. LEONARDO:  Right.
12            THE COURT:  All right.
13            So Mr. Stoddard, why don't you come up and join
14  Mr. Leonardo at the podium.
15            And on December 4th of 2009, the defendant was found
16  guilty by the Court at a bench trial.  Based on that finding by
17  the Court, it is the judgment of the Court that you are guilty of
18  the charge of assault on a federal officer in violation of Title
19  18, United States Code, Section 111(a)(1), a Class D felony.
20            It is ordered the presentence report is made a part of
21  the record.  The Court finds that the report accurately describes
22  the offense conduct, and the Court adopts those facts.  I note
23  the probation officer has amended the report after receiving
24  Mr. Leonardo's second set of objections.
25            Further, I'm adopting, obviously, the facts that came
```

1   out during the trial.

2        Further, the Court finds just as a preliminary

3   guideline calculation, I'll hear more from the parties and --

4   including the government before I finalize my guideline

5   calculations, but just preliminarily as outlined in the

6   presentence report we have a base offense level of ten, a three

7   level enhancement because this incident involved physical contact

8   under 2A2.4(b)(1)(A).  There's a proposed two level adjustment

9   for obstruction of justice, for an adjusted offense level of 15,

10   and then the defendant has a criminal history category of six,

11   and that is based on a total of 14 criminal history points as

12   outlined in paragraphs 30 through -- well, summarized in

13   paragraphs 30 through 32.

14        So the initial guideline calculations as proposed by

15   the probation department is a range of 41 to 51 months in

16   custody.

17        And obviously, the guidelines is one of the statutory

18   factors of sentencing the Court needs to compute.  So I will

19   compute the guidelines after I hear from both sides, but those

20   are just the initial calculations proposed by the probation

21   department.

22        I -- I have read, Mr. Stoddard, the letter that you

23   wrote to the Court.  Is there any statement that you would like

24   to make on your own behalf at this time?

25        MR. STODDARD:  Yes, I would say -- yes, ma'am.  I don't

1    know if I'm allowed to or not -- to go back and elaborate on some

2    of the things that you and Mr. Leonardo just went over?

3              THE COURT:  Sure.  This is your chance.

4              And why don't you pull that microphone -- or

5    Mr. Leonardo, could you pull that over so that he can speak right

6    into the microphone?

7              Go ahead.

8              MR. STODDARD:  I heard a lot of inconsistencies in the

9    original PSR report, and brought it to Mr. Leonardo's attention.

10   When -- when the original report was given to me, it had my

11   points calculated at 14, and my sentencing range, if I'm correct,

12   ranged from 37 months to 49 months.

13             Then there were some things that was put into the

14   report that I never even said to the -- the gentleman who wrote

15   the PSR report, and then some of the things that I did say to

16   him, my words was turned around and misconstrued.

17             For one, I don't know how he got on this topic, but

18   suicide came up, and I had told him that I -- when I was with my

19   ex-wife, that I took two -- because my jaw was broken at the

20   time, that I took -- and they had gave me some Codeine Tylenol,

21   which was liquid Codeine in a bottle, and I had took the two

22   bottles.  And then I informed him after I learned that I was

23   indicted, which was around the 4th or the 5th of June that I

24   learned that I was indicted, I just really was out of it, and I

25   had took and swallowed 100 pills of -- Tylenol pills, which they

1  wrote the incident report, which I had the incident report

2  stating that the person seen me take the pills, and -- but when

3  he write his presentence report, he say that I took 100 pills

4  after I learned of my wife's infidelity when I was previously

5  incarcerated.  I never stated that to him in that manner.  I

6  said, you know, that the reason for me taking it was because I

7  felt by her telling me, she had cheated on me.

8          And also in the report he states that Mr. Trainer

9  testified that I offered to pay him some tobacco, and some

10  cigarettes, and some stamps.  Mr. Trainer never said none of

11  that.  What Mr. Trainer wrote was when -- the letter which he

12  wrote my attorney, Mr. Leonardo, he wrote saying that the police,

13  which was Officer Hozey and an officer named Medina.  Officer

14  Medina had nothing to do with the case.  And he was saying that

15  the officers offered him that, but in the PSI report it had that

16  it's been written as if I offered Trainer these things.

17          And I brought a copy of the letter that Trainer sent to

18  Mr. Leonardo.  Now, Mr. Trainer came to me and said to me that

19  this is what happened, that I asked him could he put that in

20  writing so I could send it to my attorney?  Okay?  And then out

21  of nowhere he just asked me for my attorney's address one time

22  and I said, "What you need that for?"  He said he had a lawsuit

23  in -- in Texas, and that he didn't have a lawyer, but the case

24  was all ready and maybe your attorney can recommend someone for

25  me in Texas to represent me on a case.  So I gave him that.

1          Then Mr. Trainer, I guess, sent him all of these

2    papers, unknown to me.  I didn't know that he send him these

3    papers.

4          And then as far as -- there was one more thing I need

5    to elaborate on that came up, how -- how it came about as far as

6    Mr. Trainer saying that I had him do this.  One day Officer

7    Hozey, the officer who alleged that I spitted on him, he wasn't

8    assigned to work in the special housing unit, but he was working

9    overtime when he came -- and there was memos wroten (sic) up on

10   that.  I don't know if you ever received copies of the memo.  The

11   memo's wroten up saying that he kept asking another officer to

12   pull him to the law library, because we sleep on the same range,

13   you know, we -- so he asked him can -- he need to talk to Hozey.

14   So he kept begging the officer.  He took -- the officer took him

15   out, and put him in the law library.

16         Then Trainer had a conversation with Officer Hozey, who

17   in return wrote a memo, and I guess faxed it to SIA Mendez, who

18   in return faxed to the F.B.I. agent, or e-mailed the F.B.I. agent

19   what Trainer had said.  The F.B.I. agent is sitting behind me.

20   And he came to interview Trainer as relations to the memos that

21   was sent to him.

22         And then that's how all this came up.  And then to my

23   understanding -- I don't know if this is factual, but what I

24   heard was this is -- it wasn't nothing that wasn't unreasonable.

25   It was things that could be handled to a degree in-house.  He was

1    supposed to go to special management, which is -- we call it the

2    SMOOK program in Lewisburg, Pennsylvania.  However, a lot of new

3    letters you got was saying he didn't want to go there.  He wanted

4    separatees away from certain individuals.  One of them

5    individuals was scheduled to go to the same institution that he

6    was going to.  So to my understanding what they did was they

7    redesignated him to a different special management unit, which

8    was in Louisiana, which is one state over from Alabama, which is

9    right next to Alabama.  That's where Mr. Trainer is from.  So

10   they sent him closer to home.  He had no phone privileges.  He

11   had no visitation, and he had no commissary.  And to my knowledge

12   they -- they gave him back that for his testimony.

13           As far as the case is concerned, I still maintain my

14   innocence.  I have never been to trial -- like I stated in the

15   letter I wrote, I have never been to trial for anything in my

16   entire lifetime.  If I was guilty, I took responsibility of

17   what I was guilty for and pled guilty, and accepted my punishment

18   that came behind it.

19           I know it's kind of hard to believe, well, why would

20   they two officers say you did this?  I know that's kind of hard

21   to believe.  But I was acting up so much in the institution

22   that -- it wasn't me acting up to a physical standpoint, to me

23   acting up physical, doing things to staffers.  It was more so me

24   being a nuisance.  When I do certain things, they must address

25   the issue.  They knew through disciplinary process, meaning they

1    write an incident report for me doing something.

2              Even if they sanction me on the incident report, it

3    didn't stop -- it didn't change my release date from going home.

4    My release date is May 10th, 2010.  I had a six year sentence.

5    Come May 10th, 2010 is the full -- you know, the full term.  I

6    did exactly six years of my sentence.  I wasn't going home on

7    good time.  So when I was acting up and I catch these shots and

8    they take my phone for a year, they take my commissary for a

9    year, whatever they do, they take my visits, take good time, it

10   didn't change the outcome that I was going.

11             And to just show you how I feel that they was just

12   trying to prosecute me for anything -- the F.B.I. agent is

13   sitting behind me.  When he originally come to interview me, he

14   don't come to interview me about Mr. Hozey.  He come interview me

15   about three incident reports that staff wrote during the use of

16   force saying that I said that I put this on my mother, I'm going

17   to get you.  So what I said to the officer is, I say, "Dang, man,

18   if -- if -- if during the use of force a video camera is supposed

19   to be present," I say, "why don't you go review the videotape

20   from the use of force, and if you see me on a videotape

21   threatening anyone, you got your man.  I didn't threaten anyone."

22   I said it again.  I said, Dang, I could see if he was coming to

23   see me on the lie that Officer Hozey said me spitting on you.

24   That's when he wrote the officer's name down.  And then maybe

25   two, three months later I get indicted for spitting on Officer

1   Hozey.

2           But you know, when -- I don't know what type of

3   paperwork the institution then sent to you probably through

4   someone else, but it just amaze me how they don't describe the

5   treatment that I'm going through.  For example, when I act up,

6   they put you in ambulatory restraints.  Ambulatory restraints is

7   like the equivalence of how I'm speaking to you right now.  But

8   they may leave me in ambulatory restraints for three to four

9   days.  I mean, I have to try to eat -- they don't undo you.  I

10  have to try to eat.  I must try to use the bathroom, you know,

11  doing number one as well as number two.  Then if I'm acting up,

12  they four-point me like I'm on a cross to a degree.  I'm not able

13  to reach my mouth, anything like this.  I been four-pointed for

14  two to three days to the degree that when they come to bring me

15  up, my shoulders are so -- hurt so bad that medical staff got to

16  give me some type of shot for pain; where during the course of

17  them two or three days I been four-pointed, I'm not able to eat

18  because they're not letting me up to eat.  I'm not able to use

19  the bathroom.  So any bowel movements, anything that I have to do

20  I'm doing it on myself.

21          I'll be the first to admit, your Honor, I have been

22  acting up since I have been in the institution, but it just

23  amazes me if you look at my overall record, any shots that I have

24  ever caught in special housing unit compared to general

25  population, all my shots have been accumulated in the special

| | |
|---|---|
| 1 | housing unit.  I have only caught maybe three or four shots in |
| 2 | general population. |
| 3 | Since I have been incarcerated, staff have thrown my -- |
| 4 | like, letters away, address books, phone books, things of that |
| 5 | matter where I done lost complete contact with my family.  When |
| 6 | the presentence dude asked me did I have a number for my father, |
| 7 | I couldn't even provide him with it.  I had to provide him with |
| 8 | the only number I knew, which is my cousin's information.  But |
| 9 | since I been in, I lost contact with family.  They granted me a |
| 10 | phone call the other day.  I just found out I have a sister who |
| 11 | joined the Marines and got married, like, three years ago.  I'm |
| 12 | like -- and I'm just hearing about this three years later. |
| 13 | THE COURT:  What -- what level of -- are you at right |
| 14 | now at the institution? |
| 15 | MR. STODDARD:  I'm in special housing unit.  Is that |
| 16 | what you mean? |
| 17 | THE COURT:  Have you been behaving since our trial? |
| 18 | MR. STODDARD:  I'm going to be honest with you, your |
| 19 | Honor, you know, I haven't because staff have been taunting me. |
| 20 | I got into the institution October the 8th of 2008.  I been in |
| 21 | the special housing unit since October the 16th, 2008 -- 2008, |
| 22 | which basically is I've been -- for roughly a year and a half I |
| 23 | been confined to a cell.  I get to go out for rec inside of a |
| 24 | cage outdoors for one hour, five times a week.  I must eat in |
| 25 | that cell.  I must use the bathroom in that cell, and I must |

1    shower in that cell.  You know, I mean -- I'm going to say I feel

2    as though I've suffered -- I've suffered enough.  You know, I

3    have a 21 year old son who had two sons since I been incarcerated

4    who -- I have seen pictures of them, but I don't even know what

5    they sound like.

6           You know, I mean, any -- anything I do, your Honor, I'm

7    willing to accept the consequences and move on, but this here,

8    your Honor, is a -- is a lie.  It's a complete lie.  It's a lie.

9    I mean, I -- I know -- I don't know -- that institution probably

10   been open for three years, having no one before my latest

11   incident ever been prosecuted for allegedly spitting on staff,

12   but I'm pretty sure staff members have been spitten on.  I'm

13   pretty sure after my indictment as well as my conviction staff

14   have been spitted on, but have no one else to my knowledge came

15   through this courthouse for assaulting staff by spitting on them.

16          THE COURT:  All right.  Mr. Stoddard, I'm going to have

17   you step back with Mr. Leonardo, and then I'm going to hear now

18   from government counsel.

19          MR. STODDARD:  All right.  Thank you.

20          THE COURT:  Just have a seat.  Thank you.

21          And Ms. DeMarais, if you'd like to approach the podium.

22          MS. DEMARAIS:  Yes, your Honor.

23          First, I'd like to say that Officer Hozey was aware of

24   this hearing and chose not to come.

25          I know you've read his letter, and I think it shows the

1    double-edged sword is that you want to deter this defendant from

2    doing this kind of behavior, you want to deter all the prisoners

3    from this type of behavior, like you're going to be prosecuted.

4    However, it's a double-edged sword because then the

5    prosecution actually of this brings more light to it.  People

6    know who Officer Hozey is.  And I think you can read in your

7    letter that he was very affected by this.  And -- I mean, I don't

8    think it's that much to ask.  People who have been committed to

9    these institutions, they've been convicted or pled guilty, and to

10   be respectful, and -- you know, not spit, and not throw things at

11   people.  And unfortunately, Mr. Stoddard -- he was in the general

12   population, your Honor.  He was in for a drug charge.  I mean, he

13   put himself in the situation.

14            And I talked to the F.B.I. agent, and he said this

15   behavior continues.  Now, he has not been violent.  He has not

16   spit on anybody.  What he's doing is the same obstructive --

17   setting fires, breaking sprinklers.  And that's not only a pain

18   for the people who work there, it's all the other inmates.  They

19   can't get fed, they can't get out.  I mean, it's hugely

20   destructive, and disruptive to the other inmates that he's --

21   that he's with.

22            And so -- but he will be -- and it is a bad situation

23   in that facility.  He's going to be moved, your Honor, as soon as

24   this is over.  He'll probably go to a maximum security that's for

25   very violent people, but that is a better place for him, and

1   they'll be more equipped to deal with him, your Honor.  So he

2   will -- as soon as this is over, he will be shipped somewhere

3   that should be more appropriate for him, because he continues to

4   do these things.

5           Regarding the guideline calculations, I do concur with

6   the calculations of the presentence report writer.  I would like

7   to note that if -- if spitting on the officer would be considered

8   a violent felony, he would have been a career offender and his

9   guidelines would have been higher.  But the probation officer

10  explained to me that he didn't think that the spitting was

11  violent.  You'll see next week if they consider biting is

12  violent, but -- so he got a break in that sense in that he wasn't

13  a career offender or he would have been bumped up to a level 17.

14          He's been acting -- like I said, he's still active

15  doing all these things since our trial and before that the

16  presentence report writer in paragraph four talks about, the

17  numerous things that he has done, including throwing feces, and

18  urine, and other things.  Your Honor, he has been very disruptive

19  in that case.

20          The plus three -- the government has responded

21  regarding contact, and the change in the statute on assault on

22  officers, and the plus three is appropriate.  And I don't have

23  anything to add to my prior responses on that.

24          As for the obstruction of justice, that did get very

25  confusing, but I was -- defense counsel did let me know that -- I

1   think he did send me the letter that Trainer had written, and so

2   I say, you know, who is this guy?  I said I would even bring him

3   to trial because it's easier for me to coordinate this, we'll

4   just get him here, that sort of thing.

5          He did approach the guard and say he wanted to talk to

6   them.  And so it was Mr. Trainer's initiative regarding this that

7   he would write the letter -- and he testified, and I think he was

8   very honest.  He -- Stoddard handed him the letter, he copied it,

9   and yes, from the other letters maybe he was trying to get

10  something out of that from the defense attorney to help him, but

11  when push came to shove, he got on the stand, he even knew what

12  the penalty for perjury was, which I don't remember offhand, but

13  he said I'm not going to do extra time for him.  I'm not going to

14  permit perjury.  And there is a difference.  I mean, lying is

15  bad, but it's one thing to lie, and it's another thing to lie

16  on the stand.

17         So I do believe that obstruction of justice, and what

18  he said happened -- Stoddard, the other two -- was it just one

19  inmate who testified?  He told them everybody tell him that Hozey

20  offered you cigarettes, and whatever -- or whatever.  I don't

21  smoke, but whatever they were offered, stamps or whatever, to say

22  that, you know, Hozey offered you these things to beat me up.

23  And Trainer talks about they were all there.  They're all in the

24  special housing unit.  And so when he yelled it out there, the

25  rest of them said okay, and we'll do that.

1              And then Hozey talked about the one time -- it was the

2      one day he got assigned to the special, you know, housing unit,

3      and he told them, "I don't want to be there.  I don't want to go

4      there.  It's going to cause problems."  And they sent him in

5      anyway.  And he was there.  He made his rounds and left.  And he

6      never talked to anybody or anything.

7              So I think that the government has shown by a

8      preponderance that Mr. Stoddard did try to get these people to

9      commit perjury.  He had one inmate on the stand to do this, and

10     obstruction of justice -- I mean, the sad thing is that it

11     wouldn't even matter.  He still could have spit on him and plead

12     guilty if the officer later offered something in exchange for

13     someone beating him up.

14             But I think it's clear, your Honor, that that

15     adjustment is appropriate.

16             The presentence reporter talks about all the

17     aggravating circumstances, his criminal history, his continued

18     behavior, and gets a guideline range of 41 to 51 months.  And

19     despite all these aggravating factors, your Honor, he is

20     recommending the low end of the guidelines at 41 months.

21             The government agrees that's probably enough time for

22     this sort of activity, your Honor, and we're asking for the 41

23     months followed by three years supervised release.

24             THE COURT:  All right.  Thank you, Ms. DeMarais.

25             And Mr. Leonardo, if you want to come back up to the

1    podium with your client.  And I'll give you an opportunity,

2    Mr. Leonardo, if you have any additional comments -- you talked

3    about the guideline applications, but any additional comments

4    that you'd like to make regarding sentence?

5         MR. LEONARDO:  The only additional -- I think there are

6    some mitigating factors set forth in the presentence report, his

7    drug use, and his introduction to alcohol and drugs at a young

8    age.  But mainly, I wanted to mention that the sentencing -- the

9    guideline range in this case, it seems to me at least to be

10   disproportionate to the crime.  And it's even worse because it's

11   added on to his release date that he had for so long, and now

12   this is on top of that.  And it sounds like even though it may be

13   better for him to leave this facility given his history there, it

14   doesn't sound like a great place that he's going to, I guess a

15   maximum security facility for violent people.

16        But -- so it's a very high guideline range.  And I

17   think the statute that he was convicted under does not

18   differentiate -- if -- if spitting is physical contact, it does

19   not differentiate between something like spitting by -- done by

20   somebody whose is disease free - he doesn't have any kind of

21   contagious disease - and attacking an officer with kicking, or

22   punching, anything like that, which to me in my mind seems a lot

23   more serious than spitting.  So I think there needs to be some

24   recognition of the difference, some -- there needs to be

25   distinguishment between something like this and an actual attack

1  on an officer, and that I think should be reflected in the

2  sentence.

3  　　　　　THE COURT:  And I don't think that analysis could be

4  done within the guideline framework, do you?  I mean, there's no

5  departures within the guidelines.

6  　　　　　MR. LEONARDO:  No, there is no departure in the

7  guidelines.  So I think under the factors set forth in Section

8  3553 and the goals of sentencing as outlined there, I think a

9  much lower sentence would certain achieve all of those goals, and

10  I think would be more appropriate given the conduct involved

11  specifically in this offense.

12  　　　　　THE COURT:  All right.  Thank you, Mr. Leonardo.

13  　　　　　All right, now the Court -- I've heard from the

14  parties, reviewed the paperwork that I told you I reviewed,

15  including the presentence report, and I'm going to now calculate

16  the guidelines.

17  　　　　　The Court finds that as outlined on page four of the

18  presentence report, we have a base offense level of ten.  The

19  Court finds -- I'm going to affirm the Court's prior ruling that

20  this is -- that this offense did involve physical contact,

21  spitting on a person where there's actually contact with the

22  spit, and the person is in fact -- does involve physical contact,

23  and the guideline enhancement of three levels is appropriate.

24  　　　　　Further, I know that, Mr. Leonardo, you renewed your

25  motion to have this offense treated as a misdemeanor as opposed

1  to a felony, and I'm going to reaffirm my prior ruling.  I think

2  the plain reading of the statute -- I'm not saying the statute's

3  still not somewhat confusing, but my reading of it is that this

4  is clearly physical contact, and therefore, it is a felony under

5  the statute.  So I'm going to not go through all of the case law

6  analysis that we -- both sides did previously, but I think the

7  government has the better argument, and that this is in fact a

8  felony under that statute as opposed to a misdemeanor with the

9  idea that the statute has been recently amended, which I think

10  makes it a little clearer than it was previously, and I think the

11  plain reading of the statute to this Court says that this is

12  felony type behavior.

13        Further, the Court is going to find that the

14  obstruction of justice under 3C1.1 has been proved, was proved at

15  the trial by a preponderance of the evidence.  The Court finds

16  that the defendant had another inmate, specifically Mr. Trainer,

17  fabricate a letter hoping that that letter would be used at his

18  trial in order to basically commit perjury to the Court.  So I

19  think that that is obstruction of justice.  It has been proved by

20  a preponderance of the evidence.

21        And of course, the Court was able to evaluate the

22  credibility of Mr. Trainer, and has evaluated the credibility of

23  Mr. Stoddard, and the Court finds that Mr. Trainer was credible

24  in his testimony.

25        So the Court based on all the evidence and the

1   testimony at trial finds that the obstruction of justice

2   enhancement has been shown, for an adjusted offense level of 15.

3           And as I already said, Mr. Stoddard has a criminal

4   history category of six.

5           So the range under the advisory guidelines is 41 to 51

6   months in custody.

7           The guidelines is one of the statutory factors of

8   sentencing.  You know, in looking at this, Mr. Stoddard, that is

9   a lot of prison time, and the way we get there primarily is your

10  failure to accept responsibility, and your criminal history

11  category six, and the enhancement.  So that really bumps up these

12  ranges, appropriately.

13          But the Court is also wrestling with the idea that this

14  is -- obviously, this was serious.  Obviously, in this Court's

15  mind Agent Hozey was very credible.  He's obviously been impacted

16  by this.  It impacts him in his personal and his professional

17  life.  So the Court finds that that's an aggravating factor in

18  this case.  And the additional threats that you made to the

19  victim.  That's an aggravating factor that's not counted into the

20  guideline computations.  So the Court finds that those are

21  aggravating factors.

22          In mitigation, there are some mitigating personal

23  factors that you have here that are outlined in the presentence

24  report.

25          And further, the Court looks to the nature of the

1    conduct involved in this case.  Although this is serious conduct,

2    although you have a history of being very disruptive at the

3    institution, the Court is concerned that a guideline sentence is

4    really not an appropriate range of sentence for this kind of

5    conduct, although I think the guidelines have been correctly

6    computed by the Court.

7            So the Court finds that the guidelines is one of the

8    statutory factors of sentencing.  I need to look to the other

9    factors, your history and characteristics, and the need for the

10   sentence to deter you, hopefully, from further assaults on

11   guards, or disrupting the institution.  The sentence needs to

12   promote respect for the law, and primarily it needs to be

13   reasonable and no greater than necessary to achieve those various

14   factors.  So the Court is mindful of that.

15           And with those ideas in mind, the Court is going to

16   sentence you outside of the advisory guideline range, because I

17   think that the 41 to 51 month range is really excessive for the

18   conduct involved in this case, even though there are, as I've

19   outlined, the aggravating factors that I've mentioned.

20           And I really hope, Mr. Stoddard, for your sake and for

21   the sake of the people that work at these institutions that you

22   have a change in attitude, and that -- so that you can do the

23   rest of this time without being so disruptive.  As you told me

24   just a minute ago, it so greatly impacts you and your most basic

25   ability to do the most fundamental things that you would like to

1    do because of your conduct.  And I would just like you to see

2    that connection, and make a decision that you're going to behave

3    so that you can do this time and get out, and get on with your

4    life.  That's what you want to do.  You want to get on with your

5    life.

6           And you can see how the institution's going to respond.

7    They're just not going to sit back and let you do what you want.

8    They're going to respond either within the institutional rules,

9    and they're also going to respond if they feel you're committing

10   crimes.  I mean, you've really -- I mean, like this.  You've

11   really come to their attention now.  You're front and center with

12   the institution, and that now makes a difference.  You've set

13   yourself up, really, to be fairly aggressively prosecuted, or

14   held accountable for your conduct because of your past history.

15   This isn't the first time that you've disrupted the institution,

16   and these institutions -- they have to run smoothly for the sake

17   of everybody, the inmates, the people working there.  And when

18   that doesn't happen, it doesn't just impact you and the guards

19   around you, but the whole institution.  So they have, I think,

20   reasonably and realistically responded to your very negative

21   behavior.

22           So in my discretion in considering the statutory

23   factors of sentencing and the idea that the Court is to impose a

24   sentence that's no greater than necessary to achieve those

25   factors, it is the judgment of the Court -- I'm going to sentence

1   you outside of the advisory guidelines, and it is the judgment of

2   the Court that you be committed to the Bureau of Prisons for a

3   period of 24 months.

4          Further, the Court is going to order that this sentence

5   run consecutively to the sentence that you are currently serving

6   in case number F 1172-04.  I think it's important that there be a

7   separate sanction for this behavior relating to this incident.

8          It is further ordered that you pay a special assessment

9   of $100, which will be due immediately or at a rate of not less

10  than $25 per quarter through the Bureau of Prisons Inmate

11  Financial Responsibility Program.

12         The Court finds that you do not have the ability to pay

13  a fine.  It is ordered that the fine is waived.

14         Upon release from imprisonment, you will be placed on

15  supervised release to this Court for a period of three years.

16  While on supervised release you shall comply with the standard

17  conditions of supervision adopted by this Court, and you'll

18  receive a written copy of those conditions when you're released.

19  Within 72 hours of release from the custody of the Bureau of

20  Prisons you shall report in person to the probation office in the

21  district to which you are released, and you shall comply with the

22  following additional conditions:

23         You shall participate as instructed by your probation

24  officer in a program of substance abuse treatment, which may

25  include testing for substance abuse.

1    You shall contribute to the cost of treatment in amount
2  to be determined by your probation officer.
3    You shall submit your person, property, including any
4  computer you have access to, residence, office, or vehicle to
5  searches to be conducted by your probation officer at a
6  reasonable time and a reasonable manner.
7    You shall participate in a mental health program as
8  directed by your probation officer, which may include taking
9  prescribed medication.
10    You shall contribute to the cost of treatment in an
11  amount to be determined by your probation officer.
12    And based on your criminal history, which is outlined
13  in the presentence report, you shall participate in a sex offense
14  specific evaluation to be determined by your probation officer to
15  see if there are any additional conditions that need to be set
16  while you're under the supervision of this Court.
17    Further, Mr. Stoddard, you have the right to appeal
18  from the judgment and sentence of the Court.  If you want to file
19  an appeal, you must do so in writing within 14 days of today's
20  date, or you would lose the right to file an appeal.
21    If you could not afford a lawyer to represent you for
22  that proceeding, Mr. Leonardo would continue to represent you for
23  that matter.
24    So do you understand your appellate rights?
25    MR. STODDARD:  Yes, ma'am.

1          THE COURT:  And did you want me to recommend -- well, I

2    don't think I'll recommend a particular facility.  Do you want me

3    to recommend a facility?

4          MR. STODDARD:  You mean as far as --

5          THE COURT:  Do you want to be housed -- the Bureau of

6    Prisons, they're going to do what they're going to do, but they

7    will consider a Court's recommendation.

8          MR. STODDARD:  I would say Terry Haute, Indiana.

9          THE COURT:  Where?

10         MR. STODDARD:  Terry Haute --

11         MR. LEONARDO:  Terry Haute.

12         MR. STODDARD:  -- Indiana.

13         THE COURT:  All right.  I will make a judicial

14   recommendation that you be housed at a facility in Terry Haute,

15   Indiana.  You should understand that although the Bureau of

16   Prisons considers the Court's recommendation, the final decision

17   based on many different factors as to where you serve your

18   sentence will be made by Bureau of Prisons officials.

19         And Mr. Leonardo, is there anything further at this

20   time?

21         MR. LEONARDO:  No, your Honor.  Thank you.

22         THE COURT:  Anything further from the government?

23         MS. DEMARAIS:  No, your Honor.

24         THE COURT:  All right, then we'll stand at recess on

25   this matter.

1            MR. STODDARD:   Thank you, your Honor.

2    (11:45 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2              I, Mary A. Riley, do hereby certify that I reported the

3      foregoing proceedings to the best of my skill and ability, and

4      that the same was transcribed by me via computer-aided

5      transcription, and that the foregoing pages of typewritten matter

6      are a true, correct and complete transcript of all the

7      proceedings had, as set forth in the title page hereto.

8              Dated this 25th day of May, 2010.

9

10                                              s/ Mary A. Riley

11                                    United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25